UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                       )
UNITED STATES OF AMERICA,              )
            PLAINTIFF,                 )    CASE NO. 12CR4868-DMS
                                       )
                                       )    SAN DIEGO, CALIFORNIA
                                       )    MONDAY APRIL 14, 2014
                                       )     9:00 A.M. CALENDAR
CRAIG LASALLE WRIGHT,                  )
            DEFENDANT.                 )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY MOTION HEARING

COUNSEL APPEARING:

FOR PLAINTIFF:              LAURA E. DUFFY,
                            UNITED STATES ATTORNEY
                            BY:  HAROLD W. CHUN
                                 TODD W. ROBINSON
                            ASSISTANT U.S. ATTORNEYS
                            880 FRONT STREET
                            SAN DIEGO, CALIFORNIA 92101


FOR DEFENDANT:              FEDERAL DEFENDERS OF SAN DIEGO, INC.
                            BY:  JOHN C. ELLIS
                                 REUBEN CAMPER CAHN
                            225 BROADWAY, SUITE 900
                            SAN DIEGO, CALIFORNIA 92101



REPORTED BY:                LEE ANN PENCE,
                            OFFICIAL COURT REPORTER
                            UNITED STATES COURTHOUSE
                            333 WEST BROADWAY ROOM 1393
                            SAN DIEGO, CALIFORNIA 92101
                            TELEPHONE: (619) 977-7653

```
 1     SAN DIEGO, CALIFORNIA - MONDAY, APRIL 14, 2014 - 9:00 A.M.

 2                             *   *   *

 3          THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 12CR4868,

 4    UNITED STATES OF AMERICA VERSUS CRAIG LASALLE WRIGHT; ON FOR

 5    EVIDENTIARY MOTION HEARING.

 6          MR. ELLIS:  GOOD MORNING, YOUR HONOR.  JOHN ELLIS

 7    AND REUBEN CAHN, FEDERAL DEFENDERS, ON BEHALF OF MR. WRIGHT.

 8          THE COURT:  THANK YOU.  GOOD MORNING.

 9          MR. CHUN:  GOOD MORNING, YOUR HONOR.  HAROLD CHUN

10    AND TODD ROBINSON FOR THE UNITED STATES, JOINED BY NICHOLAS

11    CHEVIRON OF THE FBI.

12          THE COURT:  THANK YOU.  GOOD MORNING.

13          WE ARE SET FOR EVIDENTIARY HEARING TODAY.  IT IS MY

14    UNDERSTANDING THERE ARE FOUR WITNESSES.

15          MR. CHUN:  THAT'S CORRECT, YOUR HONOR.

16          THE COURT:  AND THEN CAN YOU GIVE ME A QUICK

17    OVERVIEW OF THE ISSUES WE ARE GOING TO BE COVERING?

18          MR. ROBINSON:  YES, YOUR HONOR.  PURSUANT TO THE

19    MOTION FILED BY THE DEFENDANTS THERE ARE TWO ISSUES THAT I

20    BELIEVE THE COURT IS SET FOR AN EVIDENTIARY HEARING TODAY.

21    FIRST IS TO DISMISS THE INDICTMENT FOR OUTRAGEOUS GOVERNMENT

22    CONDUCT OR ALLEGED OUTRAGEOUS GOVERNMENT CONDUCT.  THE SECOND

23    IS THE STOP RELATED SUPPRESSION MOTION ON THE STATEMENTS MADE

24    BY THE DEFENDANT.

25          SO THOSE ARE THE TWO ISSUES, I BELIEVE, THAT THE
```

APRIL 14, 2014

1    COURT SET FOR AN EVIDENTIARY HEARING TODAY.  AND WE CAN

2    ADDRESS THOSE IN ANY ORDER IN WHICH THE COURT WOULD LIKE US

3    TO.

4         **THE COURT:**  SO ON THE SECOND ISSUE, WITH RESPECT TO

5    THE STOP, THAT WAS THE JULY 12 STOP, THAT ENCOMPASSES NOT ONLY

6    THE STOP BUT THE STATEMENTS THAT ARE ATTRIBUTED TO MR. WRIGHT

7    THEREAFTER?

8         **MR. CHUN:**  THAT IS CORRECT.  WE HAVE THE AGENT WHO

9    INTERVIEWED MR. WRIGHT FOLLOWING THE STOP, AND WE INTEND TO

10   PRESENT EVIDENCE REGARDING THE VOLUNTARINESS OF THAT STATEMENT

11   AS WELL.

12        **THE COURT:**  THERE WERE STATEMENTS ATTRIBUTED TO HIM

13   BOTH AT THE VEHICLE AND THEN SUBSEQUENTLY AT THE STATION?

14        **MR. ROBINSON:**  THAT IS CORRECT.

15        **THE COURT:**  AND BOTH OF THOSE STATEMENTS ARE AT

16   ISSUE?

17        **MR. ROBINSON:**  YES.

18        **THE COURT:**  HOW ABOUT THE DECEMBER 6 STATEMENTS, ARE

19   THOSE AT ISSUE?

20        **MR. ROBINSON:**  I DON'T BELIEVE SO.  THERE WAS A

21   MOTION FILED REGARDING THOSE STATEMENTS.  THE GOVERNMENT

22   SUBMITTED TO THE COURT THE DVD CONTAINING THE INTERVIEW OF THE

23   DEFENDANT.  I THINK AT ISSUE WAS WHETHER OR NOT HE WAS ADVISED

24   OF HIS MIRANDA RIGHTS AND WHETHER OR NOT IT WAS VOLUNTARY.  IT

25   IS THE GOVERNMENT'S POSITION THAT THE VIDEO SPEAKS FOR ITSELF.

APRIL 14, 2014

```
 1            THE COURT:  ALL RIGHT.  SO THE FIRST ISSUE RELATES
 2   TO ALLEGATIONS OF GOVERNMENTAL MISCONDUCT, THE SECOND ISSUE
 3   ENCOMPASSES THE JULY 12 STOP AND THE STATEMENTS, BOTH ON-SCENE
 4   AND AT THE STATION FOLLOWING THE STOP.
 5            MR. ROBINSON:  YES, YOUR HONOR.
 6            THE COURT:  OKAY.  ANY OTHER ISSUES?
 7            MR. ELLIS:  NO, YOUR HONOR.  I BELIEVE THAT IS
 8   CORRECT.  WE SUBMITTED ON THE DECEMBER STATEMENT.
 9            THE COURT:  OKAY.  I HAVE RE-REVIEWED ALL OF MY
10   NOTES IN THAT REGARD.  I AM PREPARED.
11            ARE THERE ANY OTHER PRELIMINARY MATTERS WE NEED TO
12   ADDRESS?
13            MR. ELLIS:  NO, YOUR HONOR.  THANK YOU.
14            THE COURT:  I AM PREPARED, IN ANY ORDER YOU DESIRE.
15            MR. ROBINSON:  YOUR HONOR, IF IT SUITS THE COURT, I
16   THINK THE ORDER THAT YOUR HONOR JUST ADDRESSED, FIRST THE
17   ALLEGED OUTRAGEOUS GOVERNMENT CONDUCT MOTION, WE WILL PUT ON
18   EVIDENCE IN THAT REGARD.  AND THEN MOVE ON TO THE STOP, IF
19   THAT IS OKAY.
20            THE COURT:  YES.
21            GOVERNMENT'S FIRST WITNESS.
22            MR. ROBINSON:  YES, YOUR HONOR.  THE UNITED STATES
23   CALLS NICK CHEVIRON TO THE STAND.
24            THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
25            DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
```

APRIL 14, 2014

1    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE

2    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH.

3              **THE WITNESS:**  YES.

4              **THE COURT:**  PLEASE TAKE THE STAND.

5              SIR, PLEASE STATE AND SPELL YOUR FIRST AND LAST

6    NAMES.

7              **THE WITNESS:**  MY NAME IS SPECIAL AGENT NICHOLAS

8    CHEVIRON.  FIRST NAME N-I-C-H-O-L-A-S.  LAST NAME

9    C-H-E-V-I-R-O-N.

10             **THE COURT:**  THANK YOU.  GOOD MORNING.

11             **THE WITNESS:**  GOOD MORNING, YOUR HONOR.

12             **THE COURT:**  I AM NOT SURE WHETHER WE MENTIONED OR

13   NOT, BUT MR. WRIGHT IS PRESENT.

14             THANK YOU.  GOOD MORNING.

15             MR. ROBINSON.

16             **MR. ROBINSON:**  THANK YOU, YOUR HONOR.

17             BEFORE I BEGIN MY QUESTIONING THERE WERE A COUPLE OF

18   ISSUES RAISED IN THE DEFENSE MOTION, AND I AM SPEAKING TO THE

19   MOTION FILED AS DOCKET NO. 75 AT PAGES 12 THROUGH 17.

20             I JUST WANT TO FRAME THE ISSUES THAT WE INTEND TO

21   ADDRESS.  THERE WERE A NUMBER OF MISSTATEMENTS THAT I DON'T

22   BELIEVE WE NEED TO ELICIT ANY TESTIMONY TO REBUT OR TO

23   ADDRESS.

24             THE FIRST IS THAT THE CONFIDENTIAL INFORMANT -- I

25   THINK WE ALL KNOW WHO THAT IS, I WILL BE REFERRING TO HIM AS

APRIL 14, 2014

THE CONFIDENTIAL INFORMANT THROUGHOUT TODAY'S HEARING -- WAS

CHARGED WITH CONSPIRACY INVOLVING 4 KILOGRAMS OF COCAINE.

I THINK THE DEFENSE REPRESENTED THAT THAT WAS A

10-YEAR MANDATORY MINIMUM OFFENSE.  JUST FOR THE RECORD IT IS

THE GOVERNMENT'S POSITION, I THINK IT IS WELL-ESTABLISHED THAT

THAT IS A FIVE-YEAR MINIMUM MANDATORY OFFENSE.

THERE WERE ALSO ALLEGATIONS -- AND I THINK IT GOES

TO THE HEART OF THE DEFENSE MOTION -- THAT AT THE ORDER TO

SHOW CAUSE HEARING IN FRONT OF JUDGE GONZALEZ, WHICH WAS HELD

ON APRIL THE 9TH OF 2012, THE GOVERNMENT DID A NUMBER OF

THINGS, AND THIS WAS REPRESENTED IN THEIR MOTION.

THE FIRST IS THAT THE GOVERNMENT SOUGHT TO KEEP THE

CONFIDENTIAL INFORMANT OUT OF CUSTODY AND MADE THAT

RECOMMENDATION TO JUDGE GONZALEZ.  THAT ARGUMENT APPEARS

BETWEEN PAGES 12 AND 17 OF THE DEFENSE MOTION.

THAT IS JUST FLAT OUT A MISSTATEMENT OF WHAT

HAPPENED AT THE HEARING.  SO I WOULD LIKE THE RECORD TO BE

CORRECTED IN THAT REGARD.

AND UNLESS DEFENSE TAKES ISSUE WITH THAT, I DO HAVE

A COPY OF THAT TRANSCRIPT AND I CAN DIRECT THE COURT'S

ATTENTION TO THE PAGES OF THE TRANSCRIPT WHERE THE GOVERNMENT

SEEKS TO HAVE THE CONFIDENTIAL INFORMANT PUT INTO CUSTODY FOR

A 30-MONTH PERIOD.

**THE COURT:**  MR. ELLIS.

**MR. ELLIS:**  THANK YOU, YOUR HONOR.

APRIL 14, 2014

```
 1          WE DIDN'T HAVE ACCESS TO THE TRANSCRIPT AT THE
 2   FILING OF THE MOTIONS.  THIS COURT MIGHT NOT BE AWARE, WHEN WE
 3   SOUGHT TO UNSEAL THESE TRANSCRIPTS THAT WERE SEALED THE
 4   GOVERNMENT OPPOSED IT, AND IT TOOK US SOME TIME TO GET THE
 5   TRANSCRIPTS.
 6          SO ALTHOUGH IT IS ACCURATE THE GOVERNMENT DID
 7   REQUEST THAT, THE MINUTE ORDER SEEMED TO REFLECT THAT IT WAS
 8   THE GOVERNMENT'S MOTION TO DISMISS AND THAT THE GOVERNMENT WAS
 9   SEEKING TO KEEP HIM OUT.  WE WEREN'T TRYING TO MISLEAD THE
10   COURT.  IT WAS THE BEST AVAILABLE INFORMATION THAT WE HAD.
11          THE COURT:  ALL RIGHT.
12          SO AS TO THE TWO REPRESENTATIONS THAT MR. ROBINSON
13   JUST MADE, YOU AGREE THAT WHAT HE SAID IS CORRECT.
14          MR. ELLIS:  AS TO THE FIRST ONE, YOUR HONOR, IT IS
15   NOT ENTIRELY ACCURATE.  THIS IS A FIVE-YEAR MANDATORY MINIMUM;
16   HOWEVER, MR. ATAYEE IS ENHANCEABLE UNDER 851, WHICH WOULD MAKE
17   IT A 10-YEAR MINIMUM MANDATORY.
18          THE COURT:  AS TO THE SECOND REPRESENTATION, YOU
19   AGREE THAT THE RECORD WOULD SPEAK FOR ITSELF AND IT IS
20   CONSISTENT WITH WHAT MR. ROBINSON JUST SAID.
21          MR. ELLIS:  THAT IS CORRECT, YOUR HONOR.
22          THE COURT:  ALL RIGHT.
23          MR. ROBINSON:  TO BE CLEAR, THE FIRST INACCURACY I
24   NOTED WAS THE DEFENSE ARGUED IT WAS A 10-YEAR ENHANCEABLE TO
25   20 YEARS.  OF COURSE A FIVE-YEAR IS ENHANCEABLE WITH THE 851
```

APRIL 14, 2014

```
 1    TO 10 YEARS, AND WE DO AGREE WITH THAT.
 2              THE COURT:  ALL RIGHT.
 3              MR. ROBINSON:  WITH RESPECT TO THE OTHER ISSUE
 4    SURROUNDING THE APRIL 9TH, 2012 HEARING INVOLVING THE
 5    CONFIDENTIAL INFORMANT, THE DEFENSE MAKES THE ARGUMENT THAT
 6    THE GOVERNMENT SOUGHT TO DISMISS THE CONDUCT UNDERLYING
 7    ALLEGATION NO. 5.
 8              IT IS A LITTLE MORE SOFT-PEDALED THAN THAT IN THAT
 9    THE GOVERNMENT'S CONVERSATION WITH JUDGE GONZALEZ WAS HE HAS
10    PLED TO ALLEGATION NO. 4, THAT IS THE GRADE A VIOLATION, AND
11    WE DON'T INTEND TO GO FORWARD ON THE GRADE C VIOLATION.
12              SO WHILE AS A TECHNICAL MATTER I BELIEVE THAT IS
13    CORRECT, I DON'T BELIEVE THAT THE WAY IN WHICH THE HEARING
14    TRANSPIRED IS CONSISTENT WITH THE SOMEWHAT NEFARIOUS SPIN THAT
15    THE DEFENSE ATTRIBUTED TO THAT HEARING IN THEIR MOTION TO
16    DISMISS THE INDICTMENT.
17              MR. ELLIS:  YOUR HONOR, IT WASN'T INTENDED TO BE
18    NEFARIOUS; IT IS SIMPLY TRUE.  THE GOVERNMENT MOVED TO DISMISS
19    ALLEGATION 5 AT THAT HEARING.
20              THE COURT:  ALL RIGHT.  I THINK THE RECORD IS CLEAR
21    ON THAT ISSUE, AND I ACCEPTED EACH PARTY'S POSITION SIMPLY AS
22    ARGUMENT.  SO I THINK THE RECORD IS CLEAR AS TO WHAT HAPPENED
23    AND THE BASIS FOR THE GOVERNMENT'S MOTION TO DISMISS THAT
24    ALLEGATION.
25              MR. ROBINSON:  OKAY.  THANK YOU, YOUR HONOR.
```

APRIL 14, 2014

1          THOSE ISSUES HAVING BEEN ADDRESSED.

2                    DIRECT EXAMINATION

3    **Q.**     **(MR. ROBINSON)** MR. CHEVIRON, CAN YOU TELL THE COURT HOW

4    YOU ARE CURRENTLY EMPLOYED.

5    **A.**    I AM EMPLOYED AS A SPECIAL AGENT WITH THE FEDERAL BUREAU

6    OF INVESTIGATION.

7    **Q.**    HOW LONG HAVE YOU BEEN EMPLOYED IN THAT MANNER?

8    **A.**    APPROXIMATELY SEVEN YEARS.

9    **Q.**    PRIOR TO BECOMING A SPECIAL AGENT, DID YOU HOLD ANOTHER

10   LAW ENFORCEMENT POSITION?

11   **A.**    I DID.  I WAS A POLICE OFFICER IN BLOOMINGTON, ILLINOIS

12   POLICE DEPARTMENT.

13   **Q.**    HOW LONG WERE YOU A POLICE OFFICER IN ILLINOIS?

14   **A.**    APPROXIMATELY FOUR YEARS.

15   **Q.**    NOW, WITH RESPECT TO THE INVESTIGATION OF DEFENDANT

16   WRIGHT, WHAT WAS YOUR ROLE IN THAT INVESTIGATION?

17   **A.**    I WAS THE CASE AGENT FOR THAT INVESTIGATION.

18   **Q.**    AND DID YOUR INVOLVEMENT IN THE WRIGHT INVESTIGATION

19   STEM FROM YOUR HANDLING OF A CONFIDENTIAL INFORMANT?

20   **A.**    IT DID.

21   **Q.**    AND YOU KNOW THE INDIVIDUAL TO WHOM I AM REFERRING,

22   DON'T YOU?

23   **A.**    YES.

24   **Q.**    AND WHAT WAS YOUR ROLE WITH RESPECT TO THE CONFIDENTIAL

25   INFORMANT?

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

```
 1   A.    I HAD BEEN HIS HANDLING AGENT SINCE HIS ARREST IN 2009.
 2   Q.    WHAT DOES A HANDLING AGENT DO WITH RESPECT TO A
 3   CONFIDENTIAL INFORMANT?  WHAT ARE YOUR ROLES AND
 4   RESPONSIBILITIES?
 5   A.    WE ARE TASKED WITH DIRECTING AND GIVING –– GIVING
 6   DIRECTION TO THE C.I. AS WELL AS PERFORMING ADMINISTRATIVE
 7   DUTIES THAT ARE REQUIRED BY THE FBI.  BUT ALSO CERTAIN THINGS
 8   LIKE CRIMINAL HISTORY CHECKS AND THINGS LIKE THAT.
 9   Q.    SO IF THE CONFIDENTIAL INFORMANT IS BEING TASKED WITH
10   SOMETHING, YOU WERE THE INDIVIDUAL DOING THE TASKING?
11   A.    THAT IS CORRECT.
12   Q.    WHEN DID THE CONFIDENTIAL INFORMANT AT ISSUE IN THIS
13   CASE BEGIN WORKING WITH YOU, APPROXIMATELY?
14   A.    AROUND JUNE OF 2009.
15   Q.    AND WERE YOU THE SUPERVISING AGENT WITH RESPECT TO THE
16   CONFIDENTIAL INFORMANT FOR THE DURATION OF THAT INDIVIDUAL'S
17   COOPERATION WITH THE FBI?
18   A.    YES.
19   Q.    DID THERE COME A POINT IN TIME WHEN YOU WERE SUPERVISING
20   THE CONFIDENTIAL INFORMANT THAT YOU BECAME AWARE OF AN
21   INCIDENT WHICH OCCURRED ON DECEMBER THE 4TH OF 2010?
22   A.    YES.
23   Q.    HOW DID YOU BECOME AWARE OF THAT INCIDENT?
24   A.    THE C.I., OR THE C.H.S., INFORMED ME OF THE ACTIVITY.
25   Q.    HOW SOON AFTER DECEMBER THE 4TH OF 2010 DID THE
```

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

1   CONFIDENTIAL INFORMANT GIVE YOU THAT INFORMATION?

2   **A.**   I CAN'T SAY A FOR SURE DATE, BUT CERTAINLY WITHIN A DAY

3   OR TWO.

4   **Q.**   WITHIN A DAY OR TWO OF DECEMBER THE 4TH OF 2010?

5   **A.**   YES.

6   **Q.**   DID THE CONFIDENTIAL INFORMANT DESCRIBE TO YOU THE

7   SURROUNDING CIRCUMSTANCES OF THAT EVENT?

8   **A.**   HE DID.

9   **Q.**   WHAT DID THE CONFIDENTIAL INFORMANT TELL YOU IN THAT

10  REGARD, IN GENERAL TERMS?

11  **A.**   HE EXPLAINED TO ME THAT HE WAS OUT AT A SOCIAL GATHERING

12  AT A BAR, AND THERE WAS AN ARGUMENT THAT TOOK PLACE IN OR

13  AROUND THE BAR.  THE ARGUMENT BEGAN TO ESCALATE.  AND HE SAID

14  HE WOULD SEEK TO REMOVE HIMSELF BY GOING TO THE PARKING GARAGE

15  OF THAT ASSOCIATED BAR.  HE WAS FOLLOWED BY THE OTHER GROUP.

16  AND HE SAID THAT AFTER SEVERAL WORDS WERE EXCHANGED HE

17  DISPLAYED A POCKET KNIFE BECAUSE HE FELT FEAR FOR HIS LIFE.

18  AND HIM AND HIS SOCIAL COMPANIONS LEFT THE AREA.

19  **Q.**   DID THE INCIDENT ON DECEMBER THE 4TH OF 2010 ALSO

20  INVOLVE THE CONFIDENTIAL INFORMANT'S USE OF CERTAIN RACIAL

21  SLURS?

22  **A.**   IT DID.

23  **Q.**   ARE THOSE RACIAL SLURS ACCURATELY REFLECTED IN THE

24  PETITION FOR THE ORDER TO SHOW CAUSE ULTIMATELY ISSUED BY KIM

25  PELOT?

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

1    **A.**    YES, I CAN ASSUME SO.

2    **Q.**    MORE OR LESS.

3    **A.**    YES.

4    **Q.**    WE KNOW THE WORD WE ARE TALKING ABOUT, RIGHT?

5    **A.**    YES.

6    **Q.**    IT IS AN N WORD?

7    **A.**    YES, THAT'S CORRECT.

8    **Q.**    COMMONLY USED IN A DEROGATORY FASHION WITH RESPECT TO

9    AFRICAN-AMERICAN INDIVIDUALS?

10   **A.**    YES, THAT'S CORRECT.

11   **Q.**    UPON RECEIVING THAT INFORMATION FROM THE CONFIDENTIAL

12   INFORMANT, TO WHOM, IF ANYONE, DID YOU COMMUNICATE THAT

13   INCIDENT?

14   **A.**    PRIMARILY I COMMUNICATED IT WITH HIS PROBATION

15   SUPERVISING OFFICER, WHICH WAS KIM PELOT AT THE TIME.

16   **Q.**    HAD YOU HAD INTERACTIONS WITH OFFICER PELOT PRIOR TO

17   DECEMBER OF 2010 WHEN YOU COMMUNICATED THAT INFORMATION?

18   **A.**    YES.  I HAD BEEN WORKING WITH MS. PELOT SINCE,

19   ESSENTIALLY, SIGNING UP THE C.H.S.

20   **Q.**    WAS MS. PELOT THE SUPERVISING OFFICER FOR THE C.H.S., OR

21   CONFIDENTIAL INFORMANT, THROUGHOUT THE ENTIRE PERIOD OF THAT

22   INDIVIDUAL'S COOPERATION?

23   **A.**    FROM JUNE OF '09 WHEN HE BEGAN, CERTAINLY WITH -- MOST

24   OF THE TIME PROBABLY WITHIN THE LAST SIX MONTHS SHE TOOK A

25   SUPERVISORY ROLE, AND U.S. PROBATION, LARRY HUERTA HAD TAKEN

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

1    OVER.  CERTAINLY FOR SEVERAL YEARS.

2    **Q.**    AND TO BE CLEAR, WITH RESPECT TO THE DECEMBER 4TH, 2010

3    INCIDENT, HOW SOON AFTER LEARNING ABOUT THAT INCIDENT DID YOU

4    COMMUNICATE THAT INFORMATION TO OFFICER PELOT?

5    **A.**    AGAIN, I CAN'T BE FOR SURE ON AN EXACT DATE, BUT

6    CERTAINLY AFTER THE C.H.S. HAD TOLD ME, A DELAY OF NO LONGER

7    THAN ONE OR TWO DAYS.

8    **Q.**    WAS THE ONE OR TWO-DAY DELAY ATTRIBUTABLE TO THE FACT

9    THAT YOU WANTED TO HIDE THAT INFORMATION FROM THE PROBATION

10   OFFICE?

11   **A.**    NO.

12   **Q.**    DID YOU TAKE ANY STEPS TO HIDE THAT INFORMATION FROM THE

13   PROBATION OFFICE?

14   **A.**    NO.

15   **Q.**    ONCE YOU COMMUNICATED THAT INFORMATION TO OFFICER PELOT,

16   DID YOU ASK HER TO REFRAIN FROM TAKING ANY ACTION TO VIOLATE

17   THE CONFIDENTIAL INFORMANT'S SUPERVISED RELEASE?

18   **A.**    I DID NOT.

19   **Q.**    HAVE YOU EVER ASKED OFFICER PELOT, DURING THE ENTIRE

20   PERIOD OF THE CONFIDENTIAL INFORMANT'S COOPERATION, TO REFRAIN

21   FROM ASKING THE COURT TO VIOLATE THE CONFIDENTIAL INFORMANT ON

22   HIS TERMS OF SUPERVISION?

23   **A.**    NO, I HAVE NOT.

24   **Q.**    HAVE YOU EVER ASKED MS. PELOT, DURING THE COURSE OF THE

25   CONFIDENTIAL INFORMANT'S COOPERATION, TO REFRAIN FROM

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

```
 1   INFORMING THE COURT OF ANY OF THE CONFIDENTIAL INFORMANT'S
 2   ACTIVITIES TO INCLUDE THE DECEMBER 4TH, 2010 INCIDENT?
 3   A.    NO.
 4   Q.    WITH RESPECT TO THE DECEMBER 4TH, 2010 INCIDENT, DID YOU
 5   CONTINUE TO USE THE CONFIDENTIAL INFORMANT AFTER THAT?
 6   A.    I DID.
 7   Q.    AND DID THE CONFIDENTIAL INFORMANT CONTINUE TO WORK
 8   CASES ON BEHALF OF THE FBI AFTER THAT POINT?
 9   A.    YES.
10   Q.    DID THERE COME A POINT IN TIME WHEN YOU HAD A
11   CONVERSATION WITH THE CONFIDENTIAL INFORMANT ABOUT AN
12   INDIVIDUAL KNOWN TO YOU AS CRAIG LASALLE WRIGHT?
13   A.    YES.
14   Q.    IN OR ABOUT WHEN DID THAT CONVERSATION OCCUR?
15   A.    APPROXIMATELY SOMETIME IN APRIL/MAY TIME FRAME OF 2012.
16   Q.    AND WAS THAT CONVERSATION THAT YOU HAD WITH THE
17   CONFIDENTIAL INFORMANT PURSUANT TO HIS ONGOING EFFORTS TO TRY
18   AND ASSIST THE FBI IN INVESTIGATING AND APPREHENDING
19   INDIVIDUALS INVOLVED IN CRIMINAL ACTIVITY?
20   A.    YES, IT WAS.
21   Q.    ONCE MR. WRIGHT'S NAME WAS BROUGHT TO YOUR ATTENTION,
22   WHAT DUE DILIGENCE DID YOU DO WITH RESPECT TO MR. WRIGHT IN
23   ASCERTAINING WHETHER OR NOT HE HAD ANY PRIOR CRIMINAL HISTORY?
24   A.    FIRST, AFTER OBTAINING SOME INFORMATION, SOME BASIC
25   INFORMATION ABOUT MR. WRIGHT FROM THE C.H.S., I GATHERED
```

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

1   ADDITIONAL INFORMATION THROUGH DATABASE QUERIES.  I CONFIRMED

2   WITH THE C.H.S. THAT THE INDIVIDUAL THAT I WAS QUERYING WAS

3   THE SAME MR. WRIGHT THAT HE WAS DISCUSSING BY SHOWING HIM A

4   CALIFORNIA DMV PHOTO.

5   **Q.**    IF I CAN INTERRUPT YOU THERE.  WHAT, IN GENERAL TERMS,

6   DID THE CONFIDENTIAL INFORMANT TELL YOU ABOUT MR. WRIGHT AND

7   HIS ONGOING ILLEGAL ACTIVITIES?

8   **A.**    HE HAD TOLD ME THAT HE -- THE C.H.S. HAD TOLD ME HE HAD

9   PRIOR DEALINGS, COCAINE TRANSACTIONS WITH MR. WRIGHT FROM WHEN

10  HE WAS -- WHEN THE C.H.S. WAS PREVIOUSLY INVOLVED IN ILLEGALLY

11  DISTRIBUTING NARCOTICS.

12  **Q.**    WHEN YOU SAY PREVIOUS COCAINE DEALS, DID THE

13  CONFIDENTIAL INFORMANT GIVE YOU A QUANTITY OF COCAINE THAT HE

14  WAS DEALING WITH MR. WRIGHT?

15  **A.**    HE SAID APPROXIMATELY HALF A KILO TO KILO QUANTITIES OF

16  COCAINE.

17  **Q.**    IS THAT, BASED ON YOUR TRAINING AND EXPERIENCE, A

18  SIGNIFICANT AMOUNT OF COCAINE?

19  **A.**    IT IS.

20  **Q.**    IN THAT ANYTHING OVER A HALF A KILOGRAM OF COCAINE

21  INVOLVES MANDATORY MINIMUM PENALTIES UNDER TITLE 21?

22  **A.**    THAT'S CORRECT.

23  **Q.**    HAVING RECEIVED THE INFORMATION THAT THERE WAS THIS

24  EXISTING DRUG DEALING RELATIONSHIP BETWEEN THE CONFIDENTIAL

25  INFORMANT AND DEFENDANT WRIGHT, YOU SAID YOU RAN HIS CRIMINAL

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

1    HISTORY?

2    **A.**    THAT'S CORRECT.

3    **Q.**    AND WHAT TYPE OF INFORMATION DID YOU LEARN FROM RUNNING

4    HIS CRIMINAL HISTORY?

5    **A.**    MR. WRIGHT'S CRIMINAL HISTORY REFLECTED HE HAD AN

6    EXTENSIVE HISTORY OF NARCOTICS CONVICTIONS, DISTRIBUTABLE

7    AMOUNTS OF NARCOTICS CONVICTIONS.

8    **Q.**    DID ANY OF THOSE NARCOTICS CONVICTIONS INVOLVE FELONY

9    OFFENSES?

10   **A.**    YES.

11   **Q.**    DID ANY OF THOSE NARCOTICS CONVICTIONS INVOLVE THE

12   SIMULTANEOUS POSSESSION AND/OR USE OF A FIREARM?

13   **A.**    YES.

14   **Q.**    IS THAT SOMETHING THAT WAS OF CONCERN TO YOU?

15   **A.**    IT WAS.

16   **Q.**    WHY?

17   **A.**    BECAUSE IT SPOKE TO MR. WRIGHT'S –– NOT ONLY HIS DRUG

18   DEALING CRIMINAL HISTORY BUT ALSO HIS PROPENSITY FOR VIOLENCE,

19   THE CARRYING OF A FIREARM.

20   **Q.**    WAS THERE ANYTHING ELSE IN THE CRIMINAL HISTORY THAT YOU

21   WERE ABLE TO REVIEW THAT DEMONSTRATED MR. WRIGHT HAD A

22   PROPENSITY FOR VIOLENCE, IF YOU WILL?

23           **MR. ELLIS:**  OBJECTION.  RELEVANCE, YOUR HONOR.

24           **MR. ROBINSON:**  YOUR HONOR, THE GOVERNMENT IS ALLEGED

25   TO HAVE TARGETED THIS INDIVIDUAL SOLELY BECAUSE OF HIS RACE.

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

```
 1   I THINK THIS IS HIGHLY RELEVANT TO THAT ACCUSATION.
 2           THE COURT:  OVERRULED.
 3           YOU MAY ANSWER.
 4   Q.    (MR. ROBINSON) WHAT WAS IT IN THE DEFENDANT'S CRIMINAL
 5   HISTORY THAT CORROBORATED THE FIREARM DRUG OFFENSES YOU
 6   PREVIOUSLY TESTIFIED TO?
 7   A.    HE HAD A LATE '90'S, I THINK 1998 CONVICTION FROM A PLEA
 8   AGREEMENT FOR VOLUNTARY MANSLAUGHTER.
 9   Q.    WHAT WAS THE ORIGINAL CHARGE THAT THE VOLUNTARY
10   MANSLAUGHTER PLEA WAS BASED UPON?
11   A.    MURDER.
12   Q.    AND WITH RESPECT TO THAT CHARGE AND THE OTHER CHARGES,
13   HOW WOULD YOU CHARACTERIZE THE DEFENDANT'S STATUS AS AN
14   INCARCERATED ADULT VERSUS HIS STATUS AS AN OUTSIDE MEMBER OF
15   THE COMMUNITY?
16           MR. ELLIS:  OBJECTION, YOUR HONOR.  AGAIN, RELEVANCE
17   AND VAGUE.
18           THE COURT:  OVERRULED.
19           THE WITNESS:  I AM SORRY?
20   Q.    (MR. ROBINSON) WAS THE DEFENDANT, FOR MOST OF HIS ADULT
21   LIFE, INCARCERATED DUE TO HIS CRIMINAL CONVICTIONS, OR WAS HE
22   OUT BEING A PRODUCTIVE MEMBER OF THE COMMUNITY, BASED UPON
23   YOUR REVIEW OF HIS CRIMINAL HISTORY?
24   A.    IT APPEARED HE HAD SPENT AN EXTENSIVE AMOUNT OF TIME IN
25   PRISON.
```

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

1    **Q.**    THEREFORE, BASED UPON WHAT THE CONFIDENTIAL INFORMANT

2    TOLD YOU, WHEN COUPLED WITH YOUR REVIEW OF THE DEFENDANT'S

3    CRIMINAL HISTORY, DID YOU MAKE AN INVESTIGATORY DECISION AS TO

4    WHETHER OR NOT TO PURSUE AN INVESTIGATION OF MR. WRIGHT AT

5    THAT TIME?

6    **A.**    I DID.  AND THE DECISION WAS TO PURSUE AN INVESTIGATION.

7    **Q.**    HOW MUCH OF YOUR DECISION TO PURSUE AN INVESTIGATION OF

8    MR. WRIGHT WAS BASED UPON HIS RACE?

9    **A.**    ZERO.

10   **Q.**    ARE YOU ABSOLUTELY CERTAIN OF THAT FACT?

11   **A.**    YES.

12   **Q.**    WERE THERE OTHER INDIVIDUALS AGAINST WHOM THE

13   CONFIDENTIAL INFORMANT COOPERATED THAT WERE NOT

14   AFRICAN-AMERICAN IN RACE?

15   **A.**    YES, MANY.

16   **Q.**    DURING THE PERIOD OF HIS COOPERATION?

17   **A.**    YES.

18   **Q.**    WOULD YOU SAY IT WAS A SUBSTANTIAL NUMBER OF PEOPLE WHEN

19   COMPARED TO THE INDIVIDUALS HE WAS WORKING AGAINST THAT WERE

20   AFRICAN-AMERICAN?

21   **A.**    YES.  CERTAINLY THE PRIMARY TARGETS OF MOST OF HIS

22   INVESTIGATIONS WERE NOT AFRICAN-AMERICANS.

23   **Q.**    SO TO BE CLEAR, RACE HAD NO BASIS IN YOUR DECISION

24   MAKING WHATSOEVER?

25   **A.**    ZERO.

APRIL 14, 2014

CHEVIRON – DIRECT EXAMINATION

```
 1            MR. ROBINSON:  YOUR HONOR, AT THIS TIME I WOULD
 2   SUBMIT THE WITNESS.
 3            THE COURT:  ALL RIGHT.  THANK YOU.
 4            CROSS-EXAMINATION.
 5       MR. ELLIS:  YES.
 6            MR. ROBINSON:  ACTUALLY, MAY I ENTER INTO EVIDENCE
 7   ONE THING?
 8            THE COURT:  YES.
 9   Q.    (MR. ROBINSON) I THINK IT IS EASIER -- AGENT CHEVIRON,
10   I AM SHOWING YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS
11   GOVERNMENT'S EXHIBIT NO. 2.
12        YOU TESTIFIED EARLIER THAT YOU RAN A CRIMINAL HISTORY
13   FOR THE DEFENDANT, MR. WRIGHT.  WOULD YOU TAKE A LOOK AT
14   GOVERNMENT'S EXHIBIT NO. 2 AND TELL ME WHETHER THAT ACCURATELY
15   DEPICTS THE CRIMINAL HISTORY YOU WERE ABLE TO ASCERTAIN FROM
16   MR. WRIGHT BEFORE MAKING THE DECISION TO PURSUE AN
17   INVESTIGATION OF HIS ALLEGED MISCONDUCT?
18            (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19   A.    IT DOES.
20   Q.    AND THAT INFORMATION WAS AVAILABLE TO YOU BEFORE YOU
21   MADE THAT TARGETING DECISION?
22   A.    THAT'S CORRECT.
23            MR. ROBINSON:  YOUR HONOR, AT THIS TIME I WOULD LIKE
24   TO MOVE INTO EVIDENCE GOVERNMENT EXHIBIT NO. 2.
25            THE COURT:  ANY OBJECTION?
```

APRIL 14, 2014

```
1              MR. ELLIS:  NO, YOUR HONOR.

2              THE COURT:  RECEIVED.

3          (EXHIBIT 2 RECEIVED INTO EVIDENCE)

4  Q.    (MR. ROBINSON) TO BE CLEAR, GOVERNMENT'S EXHIBIT NO. 2

5  IS A DIFFERENT FORMAT THAN YOU WERE ABLE TO USE USING LAW

6  ENFORCEMENT INDICES; IS THAT CORRECT?

7  A.    THAT'S CORRECT.

8  Q.    BUT THE INFORMATION CONTAINED IN GOVERNMENT'S EXHIBIT

9  NO. 2 IS CORRECT AND ACCURATE AND WAS IN YOUR POSSESSION WHEN

10 YOU MADE THE TARGETING DECISION?

11 A.    THAT'S CORRECT.

12             MR. ROBINSON:  THANK YOU, YOUR HONOR.  I DON'T HAVE

13 ANY FURTHER QUESTIONS AT THIS TIME.

14             THE COURT:  CROSS-EXAMINATION.

15                      CROSS-EXAMINATION

16 Q.    (MR. ELLIS) GOOD MORNING, AGENT CHEVIRON.  HOW ARE YOU?

17 A.    GOOD MORNING.

18             MR. ELLIS:  YOUR HONOR, MAY I APPROACH?

19             THE COURT:  YES.

20             MR. ELLIS:  YOUR HONOR, I HAVE A BINDER FOR THE

21 COURT AS WELL.

22             THE COURT:  ALL RIGHT.  THANK YOU.

23 Q.    (MR. ELLIS) AGENT CHEVIRON, I WANT TO TALK TO YOU FIRST

24 ABOUT THE FORMS OF COMMUNICATION BETWEEN YOU AND A

25 CONFIDENTIAL INFORMANT BY THE NAME OF ATAYEE.
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1    **A.**    OKAY.

2    **Q.**    NOW, ONE TYPE OF COMMUNICATION THAT YOU HAD WITH MR.

3    ATAYEE WAS IN PERSON; IS THAT CORRECT?

4    **A.**    YES.

5    **Q.**    MEANING THAT YOU WOULD MEET EITHER AT YOUR OFFICE?

6    **A.**    WE NEVER MET AT MY OFFICE.

7    **Q.**    YOU WOULD MEET AT COFFEE SHOPS?

8    **A.**    WE WOULD MEET AT VARIOUS PUBLIC LOCATIONS.

9    **Q.**    INCLUDING COFFEE SHOPS?

10   **A.**    YES.

11   **Q.**    PARKING LOTS?

12   **A.**    YES.

13   **Q.**    YOU WOULD ALSO HAVE TELEPHONE CONVERSATIONS WITH HIM?

14   **A.**    THAT'S CORRECT.

15   **Q.**    THAT WOULD INCLUDE TEXT MESSAGES?

16   **A.**    YES.

17   **Q.**    THERE WOULD BE TIMES WHERE YOU WOULD LEAVE HIM VOICE

18   MAILS?

19           **MR. ROBINSON:**  OBJECTION, YOUR HONOR, AS TO

20   RELEVANCE.  WE ARE GETTING INTO THE DEPOSITION OF THE AGENT

21   NON-PERTINENT TO THE ISSUES BEFORE THE COURT.

22           **MR. ELLIS:**  YOUR HONOR, IT IS JUST FOUNDATION FOR

23   THE FIRST EXHIBIT.

24           **THE COURT:**  OVERRULED.

25           YOU MAY ANSWER.

APRIL 14, 2014

1          **THE WITNESS:**  YES.

2  **Q.**    **(MR. ELLIS)** HE WOULD LEAVE YOU VOICE MAILS?

3  **A.**    YES.

4  **Q.**    AND THERE WAS TEXT MESSAGES?

5  **A.**    YES.

6  **Q.**    INCLUDING PHOTOGRAPHS?

7  **A.**    NO.

8  **Q.**    EMAILS?

9  **A.**    YES.

10  **Q.**    AND YOU WOULD LEAVE HIM NOTES.

11  **A.**    NO -- BY NOTES WHAT -- WHAT DO YOU MEAN?

12  **Q.**    IN THE COMMON SENSE.  HAVE YOU EVER WRITTEN A

13  HANDWRITTEN NOTE TO HIM?

14  **A.**    NO.

15  **Q.**    HAVE YOU EVER TYPED OUT A NOTE TO HIM?

16  **A.**    OTHER THAN A TEXT MESSAGE, NO.

17  **Q.**    SIR, IF YOU WERE TO OPEN THE BINDER AND LOOK AT EXHIBIT

18  A -- EXCUSE ME -- TAB 1, EXHIBIT A, AS WELL AS TAB 2, WHICH IS

19  EXHIBIT B.

20          (EXHIBIT A, B MARKED FOR IDENTIFICATION)

21  **A.**    OKAY.

22  **Q.**    SIR, THESE APPEAR TO BE THE TEXT MESSAGES BETWEEN YOU

23  AND MR. ATAYEE THAT WERE TAKEN FROM YOUR BLACKBERRY; IS THAT

24  CORRECT?

25  **A.**    I HAVE REVIEWED AND I HAVE SUPPLIED THE COURT, THE AUSA

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1  WITH TEXT MESSAGING REPORTS FROM MY BLACKBERRY WITH THE C.H.S.

2  I CAN ASSUME THAT THAT IS WHAT THIS REPORT IS.

3  **Q.**    OKAY.  FAIR ENOUGH.

4       NOW, JUST FOR PURPOSES OF LOOKING AT IT, THE FORMATTING,

5  THE WAY IT IS PRINTED, IT DIDN'T ALL PRINT ON ONE PAGE; IS

6  THAT FAIR TO SAY?

7  **A.**    YES.

8  **Q.**    SO IF YOU WERE TO LOOK AT EXHIBIT A, FOR INSTANCE, THERE

9  ARE FIVE FIELDS?

10       **MR. ROBINSON:**  YOUR HONOR, I DON'T KNOW IF IT IS

11  LOGISTICALLY POSSIBLE, BUT COULD I LOOK OVER THE SHOULDER OF

12  THE WITNESS?  I DON'T HAVE A COPY.

13       **THE COURT:**  YES.

14       **MR. ELLIS:**  I AM GOING TO PUT IT ON THE SCREEN IN

15  JUST A MINUTE, MR. ROBINSON.

16       **THE WITNESS:**  I WOULD AGREE THAT THERE ARE FIVE

17  FIELDS ON THE EXHIBIT A PAGE.

18  **Q.**    **(MR. ELLIS)** SO IF WE WERE TO LOOK AT THIS -- FOR

19  INSTANCE IF WE LOOK AT THE LINE THAT SAYS NO. 2, THAT TELLS US

20  THAT IS A TEXT MESSAGE; IS THAT CORRECT?

21  **A.**    THAT IS MY UNDERSTANDING, YES.

22  **Q.**    THE SECOND ONE WOULD BE THE DATE IT WAS SENT?

23  **A.**    YES.

24  **Q.**    THE THIRD ONE IS BLACKBERRY OWNER?

25  **A.**    YES.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1    **Q.**    THE FOURTH ONE IS WHETHER IT IS AN INCOMING OR OUTGOING

2    TEXT?

3    **A.**    THAT'S CORRECT.

4    **Q.**    AND THE NEXT COLUMN IS JUST YOUR PHONE NUMBER.

5    **A.**    NO, THAT IS THE C.H.S.'S PHONE NUMBER.

6    **Q.**    SO THE WAY IT WAS DONE WAS JUST BY HIS PHONE NUMBER.

7          IF WE WERE TO LOOK AT TAB 2, WHICH IS EXHIBIT B, THOSE

8    WOULD BE THE ACTUAL BODY OF THE TEXT MESSAGE ITSELF; IS THAT

9    CORRECT?

10   **A.**    YES.

11   **Q.**    SO THE WAY THIS IS GOING TO WORK IS, IF WE LOOK AT A

12   PARTICULAR TEXT MESSAGE IN ORDER TO DETERMINE WHEN IT WAS SENT

13   WE WOULD HAVE TO LOOK AT EXHIBIT A; IS THAT CORRECT?

14   **A.**    AND REFERENCE THE LINE?

15   **Q.**    YES.

16   **A.**    YES, THAT'S MY UNDERSTANDING.

17   **Q.**    NOW, IF YOU WERE TURN TO -- IN EXHIBIT B TO TEXT MESSAGE

18   81, IF YOU CROSS REFERENCE EXHIBIT A AND LOOK, 81 IS A TEXT

19   MESSAGE FROM ATAYEE; IS THAT CORRECT?

20   **A.**    LINE 81, YES.

21   **Q.**    AND THIS SAYS -- THIS IS A TEXT MESSAGE TO YOU?

22   **A.**    LINE 81?

23   **Q.**    YES.

24   **A.**    LINE 81 IS AN INCOMING MESSAGE, YES.

25   **Q.**    IT SAYS:  OKAY, I GOT YOUR NOTES.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1          IS THAT CORRECT?
 2  A.      YES.
 3  Q.      BUT YOU ASSUME HE MUST BE REFERRING TO A TEXT MESSAGE?
 4  A.      YES.
 5  Q.      NOW, STEPPING AWAY FROM THIS FOR A MOMENT, SIR, I WANT
 6  TO TALK TO YOU ABOUT FORMS OF COMMUNICATIONS THAT ATAYEE WOULD
 7  HAVE WITH TARGETS OF INVESTIGATION.
 8  A.      OKAY.
 9  Q.      NOW, WHEN I SAY TARGETS OF INVESTIGATION, YOU KNOW I AM
10  TALKING ABOUT SOMEONE THAT YOU MIGHT BE LOOKING INTO
11  DETERMINING IF THERE SHOULD BE CHARGES FILED AGAINST; IS THAT
12  CORRECT?
13  A.      YES.
14  Q.      NOW, WHEN A C.I., OR A C.H.S., MEETS WITH A PERSON IN
15  PERSON -- MEETS WITH THEM IN PERSON, OFTENTIMES THEY HAVE A
16  BODY RECORDER ON; IS THAT CORRECT?
17          MR. ROBINSON:  OBJECTION, YOUR HONOR.  BEYOND THE
18  SCOPE OF THIS PARTICULAR HEARING.
19          THE COURT:  SUSTAINED.
20          MR. ELLIS:  YOUR HONOR, THE POINT IS THAT THERE IS
21  GOING TO BE CERTAIN COMMUNICATIONS THAT WERE CAPTURED AND
22  CERTAIN COMMUNICATIONS THAT WEREN'T CAPTURED AND I WANT TO
23  ESTABLISH WHY CERTAIN COMMUNICATIONS WOULD NOT BE CAPTURED.
24          MR. ROBINSON:  PERHAPS WE COULD GO TO THE INCIDENTS
25  IN QUESTION, YOUR HONOR, INSTEAD OF GOING TO GENERAL PRACTICES
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1    OF THE FBI.

2         **MR. ELLIS:**  YOUR HONOR, THIS IS BROADER.

3         **THE COURT:**  I WOULD SUSTAIN THE OBJECTION, ASK YOU

4    TO FOCUS ON THIS SPECIFIC CASE.

5    **Q.    (MR. ELLIS)** IN THIS SPECIFIC CASE, WHEN ATAYEE WOULD

6    MEET WITH PEOPLE, TARGETS, HE WAS OFTEN WEARING A BODY

7    RECORDER; IS THAT CORRECT?

8         **MR. ROBINSON:**  OBJECTION.  VAGUE AS TO CASE, YOUR

9    HONOR.  I BELIEVE WE ARE TALKING --

10        **THE COURT:**  SUSTAINED.

11   **Q.    (MR. ELLIS)** IN GENERAL, IF ATAYEE WAS GOING TO MEET

12   WITH A TARGET OF INVESTIGATION, THERE WAS TIMES WHERE HE WOULD

13   BE WEARING A BODY RECORDER.

14        **MR. ROBINSON:**  OBJECTION.  BEYOND THE SCOPE.

15        **THE COURT:**  OVERRULED.

16        YOU MAY ANSWER.

17        **THE WITNESS:**  YES.  THE C.H.S. WOULD SOMETIMES WEAR

18   A BODY RECORDER AND SOMETIMES NOT.

19   **Q.    (MR. ELLIS)** EXACTLY.  SOMETIMES HE WOULDN'T WEAR A BODY

20   RECORDER, RIGHT?

21        **MR. ROBINSON:**  OBJECTION.  I HAVE NO IDEA WHAT WE

22   ARE TALKING ABOUT, WHETHER IT IS THIS CASE OR ALL OF THE OTHER

23   ONES HE COOPERATED ON.

24        **THE COURT:**  SUSTAINED.

25        **MR. ELLIS:**  YOUR HONOR, THIS WILL GO A LOT QUICKER

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1   WITHOUT THE OBJECTIONS.  THESE ARE JUST FOUNDATIONS TO GET

2   INTO THE NEXT FEW QUESTIONS, BUT I AM HAPPY TO BREAK IT DOWN

3   FURTHER.

4   Q.    **(MR. ELLIS)** YOU JUST TESTIFIED THAT ATAYEE DID NOT

5   ALWAYS WEAR A BODY RECORDER.  WHEN HE DID NOT YOU HAD TO RELY

6   ON HIM FOR WHAT WAS SAID DURING COMMUNICATIONS, CORRECT?

7           **MR. ROBINSON:** OBJECTION. RELEVANCY.

8           **THE COURT:** OVERRULED.

9           YOU MAY ANSWER.

10          **THE WITNESS:** IN THIS INVESTIGATION WHEN THE C.H.S.

11  MET WITH MR. WRIGHT HE ALWAYS WORE A BODY RECORDER.

12  Q.    **(MR. ELLIS)** BUT THERE ARE TIMES THROUGHOUT OTHER

13  INVESTIGATIONS HE DID NOT; IS THAT CORRECT?

14          **MR. ROBINSON:** OBJECTION. RELEVANCE.

15          **THE COURT:** SUSTAINED.

16  Q.    **(MR. ELLIS)** NOW, THE TELEPHONE AS WELL, MR. ATAYEE HAD

17  THE ABILITY TO RECORD PHONE CALLS; IS THAT CORRECT?

18  **A.**    THE FBI HAS THE ABILITY TO RECORD PHONE CALLS, THE

19  C.H.S. DOES NOT.

20  **Q.**    SO THE RECORDED PHONE CALLS WITH ATAYEE WOULD HAVE

21  OCCURRED IN YOUR PRESENCE, OR THE PRESENCE OF ANOTHER AGENT.

22  **A.**    SOMETIMES PHONE CALLS WOULD TAKE PLACE AFTER AN FBI

23  BODY -- AUDIO RECORDER HAD BEEN GIVEN TO THE C.H.S.  THOSE

24  WOULD BE RECORDED AND AN FBI AGENT WOULD NOT TECHNICALLY BE

25  RIGHT BY HIS SIDE, BUT MOST OF THE CALLS THAT WERE RECORDED I

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1  WOULD HAVE BEEN VERY CLOSE BY.

2  **Q.**   AND YOU ARE AWARE THAT NOT ALL OF THE PHONE CALLS

3  BETWEEN ATAYEE AND MR. WRIGHT WERE RECORDED; ISN'T THAT

4  CORRECT?

5  **A.**   THERE WERE CALLS WHERE MR. WRIGHT WOULD CALL MR. ATAYEE,

6  AND VICE VERSA, WHERE THEY WOULDN'T HAVE CONVERSATION, WHERE I

7  WASN'T WITH THE C.H.S., AND THOSE WERE NOT RECORDED.

8  **Q.**   SIR, THAT WASN'T MY QUESTION.  MY QUESTION IS ARE YOU

9  AWARE THAT THERE WERE SUBSTANTIVE CONVERSATIONS BETWEEN MR.

10  WRIGHT AND MR. ATAYEE THAT WERE NOT RECORDED?

11       **MR. ROBINSON:**  OBJECTION.  "SUBSTANTIVE" ASSUMES

12  FACTS NOT IN EVIDENCE.

13       **THE COURT:**  SUSTAINED.

14  **Q.**   **(MR. ELLIS)** YOU JUST TESTIFIED, SIR, THAT THERE WERE

15  CERTAIN PHONE CALLS THAT WEREN'T RECORDED BECAUSE NOTHING WAS

16  SAID; IS THAT CORRECT?

17  **A.**   CALLS WHERE NEITHER PARTY PICKED UP WERE NOT RECORDED.

18  **Q.**   BUT THERE WERE PHONE CALLS WHERE THERE WAS CONVERSATION

19  BETWEEN WRIGHT AND ATAYEE THAT WERE NOT RECORDED; ISN'T THAT

20  CORRECT?

21  **A.**   CONVERSATIONS SUCH AS:  LET ME CALL YOU BACK.

22       THINGS LIKE THAT.

23       I AM BUSY.

24       AND THEN IF IT WAS A CALL INTO THE C.H.S. HE WOULD

25  CONTACT ME, I WOULD MEET WITH HIM.  WE WOULD MAKE A CALL BACK

APRIL 14, 2014

1    TO MR. WRIGHT AND RE-DISCUSS OR DISCUSS WHATEVER WAS --

2    **Q.**    SIR, LET ME PUT IT THIS WAY.  YOU WEREN'T WITH MR.

3    ATAYEE 24 HOURS A DAY, CORRECT?

4    **A.**    THAT IS CORRECT.

5    **Q.**    THERE WAS NOT A CONTINUALLY RECORDING DEVICE ON HIS

6    PHONE, CORRECT?

7    **A.**    THAT'S CORRECT.

8    **Q.**    THERE WAS NO TITLE III ON HIS PHONE, CORRECT?

9    **A.**    THAT'S CORRECT.

10   **Q.**    SO YOU ARE NOT AWARE OF WHETHER OR NOT THERE WOULD HAVE

11   BEEN PHONE CALLS THAT TOOK PLACE THAT WEREN'T RECORDED BETWEEN

12   WRIGHT AND ATAYEE.

13   **A.**    I LISTENED TO ALL OF THE PHONE CONVERSATIONS BETWEEN --

14   THAT WERE RECORDED BETWEEN MR. ATAYEE AND MR. WRIGHT, AND AT

15   NO TIME WAS THERE A REFERENCE TO ANOTHER CALL OR ANOTHER

16   DISCUSSION THAT I WAS NOT AWARE OF.

17   **Q.**    I UNDERSTAND THAT.  BUT YOU ARE NOT -- YOU DON'T HAVE

18   PERSONAL KNOWLEDGE AS TO WHETHER OR NOT ATAYEE AND WRIGHT HAD

19   PHONE CALLS THAT WEREN'T RECORDED, CORRECT?

20   **A.**    I GUESS RESTATE IT, PLEASE.

21   **Q.**    SIMPLE TERMS.  YOU WEREN'T WITH HIM ALL THE TIME.  YOU

22   ARE SAYING YOU ARE RELYING ON ATAYEE'S ACCOUNTING OF WHAT

23   PHONE CALLS HE HAD WITH WRIGHT; IS THAT CORRECT?

24   **A.**    ATAYEE'S RECOUNTING AND REVIEWING ALL OF THE RECORDED

25   CONVERSATIONS.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1   Q.    NOW, AS WELL AS THAT, YOU ARE AWARE IN THIS CASE AND
 2   OTHER CASES ATAYEE WAS ALSO SENDING TEXT MESSAGES TO TARGETS;
 3   IS THAT CORRECT?
 4           MR. ROBINSON:  OBJECTION AS TO OTHER CASES.
 5           THE COURT:  SUSTAINED.
 6   Q.    (MR. ELLIS) IN THIS CASE YOU ARE AWARE THAT WRIGHT --
 7   OR MR. ATAYEE WAS SENDING TEXT MESSAGES AS WELL; IS THAT
 8   CORRECT?
 9   A.    YES.
10   Q.    AND WHEN HE WOULD SEND YOU TEXT MESSAGES OR RECEIVE TEXT
11   MESSAGES, HE WOULD FORWARD THOSE TEXT MESSAGES TO YOU,
12   CORRECT?
13   A.    OFTENTIMES.  OR I WOULD REVIEW THEM IN PERSON WITH HIM.
14   Q.    AND WERE THOSE TEXT MESSAGES, THAT HE SENT OR HE
15   RECEIVED ON HIS PHONE, WERE THOSE PRESERVED IN ANY WAY?
16   A.    OTHER THAN MY REVIEWING OF THEM OR IF HE FORWARDED THEM,
17   YES, THAT WOULD BE THE ONLY WAY.
18   Q.    IF YOU WOULD HAVE VIEWED THEM ON HIS PHONE WOULD THEY
19   HAVE BEEN CAPTURED BY CELLEBRITE OR PHOTOGRAPHED, OR YOU WOULD
20   HAVE JUST MADE NOTE OF THEM?
21   A.    I WOULD HAVE MADE NOTE OF THEM.
22   Q.    NOW TURNING YOUR ATTENTION TO WHEN ATAYEE WAS FIRST
23   SIGNED UP AS A CONFIDENTIAL INFORMANT.  HE WAS SIGNED UP ON
24   JUNE 22ND, 2009 BY THE DEA; IS THAT CORRECT?
25   A.    I AM NOT AWARE OF WHEN THE DEA SIGNED HIM UP.
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1   Q.    WELL, WHEN WAS HE SIGNED UP BY THE FBI?

 2   A.    IN MAY OF 2010, I BELIEVE.

 3   Q.    SO THERE WAS A TIME WHERE HE WAS A DEA C.I. AND NOT AN

 4   FBI C.I.

 5         MR. ROBINSON:  OBJECTION.  RELEVANCE, YOUR HONOR, AS

 6   TO THIS CASE AND THIS MOTION.

 7         THE COURT:  SUSTAINED.

 8   Q.    (MR. ELLIS) LET ME ASK IT THIS WAY.  CAN YOU TAKE A

 9   LOOK AT TAB 3?

10   A.    OKAY.

11   Q.    TAB 3 APPEARS TO BE A CONFIDENTIAL SOURCE AGREEMENT?

12         MR. ROBINSON:  OBJECTION.  RELEVANCE, YOUR HONOR.

13   IT IS A DEA.

14         THE COURT:  OVERRULED.

15         (EXHIBIT C MARKED FOR IDENTIFICATION)

16   Q.    (MR. ELLIS) THIS APPEARS TO BE A CONFIDENTIAL SOURCE

17   AGREEMENT?

18         MR. ROBINSON:  OBJECTION.  LACK OF FOUNDATION.

19         THE COURT:  SUSTAINED.

20   Q.    (MR. ELLIS) HAVE YOU EVER SEEN A DEA CONFIDENTIAL

21   SOURCE AGREEMENT BEFORE, SIR?

22   A.    I HAVE NOT SEEN THIS EXACT FORM, NO.

23   Q.    BUT THE FBI HAS ONE ALSO, CORRECT?

24   A.    THE FBI HAS A –– THE FBI HAS SEVERAL C.H.S. FORMS.

25   Q.    IN FACT, ATAYEE SIGNED AN FBI C.I. FORM, CORRECT?  OR HE
```

APRIL 14, 2014

1   SIGNED A CONFIDENTIAL SOURCE AGREEMENT, CORRECT?

2   **A.**    YES.

3           **MR. ROBINSON:**  OBJECTION AS TO VAGUE, YOUR HONOR.

4   IF IT IS THE FBI, I HAVE NO OBJECTION.

5           **THE COURT:**  SUSTAINED.

6   **Q.**   **(MR. ELLIS)** HE SIGNED ONE OF THESE WITH THE FBI,

7   CORRECT?

8   **A.**    HE SIGNED SEVERAL FORMS INDICATING HIS COOPERATION

9   STATUS, YES.

10  **Q.**   AND YOU PROVIDED THOSE TO THE GOVERNMENT?

11  **A.**    YES.

12  **Q.**   ANY REASON WHY THE GOVERNMENT HASN'T TURNED THOSE OVER

13  TO US?

14          **MR. ELLIS:**  BECAUSE ALL WE HAVE, YOUR HONOR, IS THE

15  DEA ONES, WHICH IS WHY THAT IS WHAT I AM PROCEEDING WITH,

16  BECAUSE THE GOVERNMENT HASN'T PROVIDED THE FBI ONES YET.

17          **THE COURT:**  ALL RIGHT.

18  **Q.**   **(MR. ELLIS)** DO YOU HAVE THEM WITH YOU?

19          **THE COURT:**  WHY DON'T WE JUST PROCEED WITH

20  QUESTIONING OF THIS WITNESS.  WE CAN COME BACK TO THAT LATER.

21          **MR. ELLIS:**  YES, YOUR HONOR.

22  **Q.**   **(MR. ELLIS)** NOW, IF I UNDERSTAND THIS, SIR, YOU ARE

23  SAYING THAT YOUR TESTIMONY TODAY IS THAT ATAYEE SIGNS UP AS A

24  CONFIDENTIAL SOURCE FOR THE FBI IN MAY OF 2010; IS THAT YOUR

25  TESTIMONY?

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1   **A.**   YES.

2   **Q.**   BUT YOU MET MR. ATAYEE PRIOR TO 2010; ISN'T THAT

3   CORRECT?

4   **A.**   YES.  HE WAS WORKING AS A COOPERATING DEFENDANT AT THAT

5   TIME.

6   **Q.**   FOR THE DEA.

7   **A.**   NO, FOR THE FBI.

8   **Q.**   PRIOR TO 2010?

9   **A.**   CORRECT.

10  **Q.**   BECAUSE, IN FACT, YOU ORIGINALLY MET HIM IN 2007,

11  CORRECT?

12  **A.**   NO, THAT'S NOT CORRECT.

13  **Q.**   CAN YOU PLEASE TAKE A LOOK AT TAB 2, THE LAST PAGE.

14  **A.**   SO THE PAGE PRECEDING TAB 3?

15  **Q.**   YES.  LOOK AT LINE 991.

16  **A.**   CAN I ASSUME WHAT IS ON THE SCREEN IS THAT?

17  **Q.**   YES.

18  **A.**   OKAY.

19  **Q.**   CAN YOU NOW TAKE A LOOK AT EXHIBIT A AND CONFIRM THAT

20  TEXT 991 IS FROM ATAYEE TO YOU?

21  **A.**    LINE 991 SAYS IT WAS SENT NOVEMBER 26, 2013.  AN

22  INCOMING MESSAGE FROM THE C.H.S., CORRECT.

23  **Q.**    IF YOU LOOK AT THE MESSAGE HE SAYS:  ME AND YOU

24  UNOFFICIALLY MET WHEN I WAS 28 YEARS OLD.

25  **A.**    OKAY.  I SEE THAT IT SAYS THAT.

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1   **Q.**   IS THAT CORRECT?

2          **MR. ROBINSON:**  OBJECTION AS TO RELEVANCE TO THIS

3   HEARING, YOUR HONOR.

4          **THE COURT:**  OVERRULED.

5          YOU MAY ANSWER.

6          **THE WITNESS:**  WELL, HE WAS BORN IN 1980.  I ARRESTED

7   HIM IN JUNE OF 2009.  SO THAT WOULD PUT HIM AT 29 YEARS OLD.

8   **Q.**   **(MR. ELLIS)** WELL, IT WOULD HAVE BEEN THE YEAR BEFORE,

9   RIGHT?  THAT WOULD HAVE BEEN PRIOR TO THE 2009 ARREST,

10  CORRECT?

11  **A.**   HIS BIRTHDAY IS JULY 15TH, 1980.  SO I ARRESTED HIM IN

12  JUNE OF 2009, HE WOULD HAVE BEEN 28, NEARLY 29.

13  **Q.**   NOW, BEYOND THAT, SIR, MOVING BACK TO JUST WHEN HE WAS

14  SIGNED UP, YOU SAID THAT HE WAS -- YOU DID AGREE, THOUGH, THAT

15  THERE WAS A TIME WHERE HE WAS UNOFFICIALLY WORKING AS A C.H.S.

16  FOR THE F.B.I.; IS THAT CORRECT?

17          **MR. ROBINSON:**  OBJECTION.  MISCHARACTERIZES THE

18  TESTIMONY.

19          **THE COURT:**  SUSTAINED.

20  **Q.**   **(MR. ELLIS)** WAS HE UNOFFICIALLY WORKING AS A C.H.S. FOR

21  THE FBI PRIOR TO 2010?

22          **MR. ROBINSON:**  OBJECTION.  RELEVANCE TO THIS

23  HEARING, YOUR HONOR.  WE ARE DEPOSING THIS WITNESS AS TO

24  EVENTS WHICH HAVE NOTHING TO DO WITH THE MOTION TO DISMISS THE

25  INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1              MR. ELLIS:  NOT TRUE, YOUR HONOR.  I AM ESTABLISHING
 2    A TIMELINE FOR WHAT HE WOULD HAVE KNOWN AND WHEN.
 3              YOU MAY ANSWER THE QUESTION.
 4              THE WITNESS:  COULD YOU RESTATE THE QUESTION PLEASE,
 5    OR REPEAT?
 6    Q.    (MR. ELLIS)  TO BE CLEAR, YOUR TESTIMONY IS THAT ATAYEE
 7    DIDN'T SIGN UP WITH THE FBI UNTIL MAY OF 2010; IS THAT
 8    CORRECT?
 9    A.    HE WAS NOT SIGNED UP AS A C.H.S. UNTIL MAY OF 2010,
10    THAT'S CORRECT.
11    Q.    BUT HE WAS PROVIDING COOPERATION TO THE FBI PRIOR TO
12    THAT; IS THAT CORRECT?
13    A.    YES.
14    Q.    WHEN DID THAT BEGIN?
15    A.    JUNE OF 2009, IMMEDIATELY AFTER HIS ARREST.
16    Q.    SO AROUND THE JUNE -- BETWEEN -- WELL, HE WAS ARRESTED
17    ON JUNE 4TH; IS THAT CORRECT?
18    A.    YES.
19    Q.    AND WHEN HE WAS ARRESTED ON JUNE 4TH IT WAS AFTER A
20    SEARCH WARRANT WAS EXECUTED; IS THAT CORRECT?
21    A.    YES.
22    Q.    WHERE THREE AND ONE QUARTER KEYS OF COCAINE WERE FOUND?
23    A.    APPROXIMATELY, YES.
24    Q.    $5,000 IN CASH?
25              MR. ROBINSON:  OBJECTION, YOUR HONOR.  BEYOND THE
```

APRIL 14, 2014

```
 1   SCOPE OF THE MOTION HEARING.
 2         MR. ELLIS:  IT IS NOT, YOUR HONOR.  THIS GOES TO THE
 3   ONGOING CRIMINAL ACTIVITY OF THE C.I.
 4         THE COURT:  DOES IT RELATES TO THE ALLEGATION OF
 5   GOVERNMENTAL MISCONDUCT?
 6         MR. ELLIS:  IT DOES, YOUR HONOR.
 7         MR. ROBINSON:  THE ALLEGATION OF GOVERNMENTAL
 8   MISCONDUCT STEMS FROM RACIALLY MOTIVATED INVESTIGATION OF THE
 9   DEFENDANT AND THE USE OF THE C.I. IN THAT REGARD.  THE FACT
10   THAT HE WAS ARRESTED WITH $5,000, I JUST DON'T SEE HOW THAT
11   IMPACTS, ONE WAY OR THE OTHER, THE PENDING MOTION BEFORE THE
12   COURT.
13         MR. ELLIS:  YOUR HONOR, THE GOVERNMENT IS TRYING TO
14   UNFAIRLY LIMIT THE SCOPE OF OUR MOTION.  IT IS BROADER THAN
15   THAT.  AND IT GOES ALSO TO THE RECKLESS USE OF THE C.I.
16   CONSIDERING THE ONGOING CRIMINAL ACTIVITY.
17         THE COURT:  I WOULD OVERRULE THE OBJECTION.
18   Q.   (MR. ELLIS) HE ALSO HAD CASH ON HIM?
19   A.   AT THE TIME OF HIS ARREST?
20   Q.   YES.
21   A.   YES.
22   Q.   AND IT WAS IN A SAFE.
23   A.   THAT'S CORRECT.
24   Q.   BY THE WAY, HE GOT TO KEEP THE SAFE, RIGHT?
25         MR. ROBINSON:  OBJECTION, YOUR HONOR.  RELEVANCE.
```

CHEVIRON – CROSS-EXAMINATION

```
 1              THE COURT:  OVERRULED.

 2              THE WITNESS:  THE FBI DID NOT SEIZE THE SAFE.

 3   Q.    (MR. ELLIS) NOW, MR. CHEVIRON, I WANT TO TURN YOUR

 4   ATTENTION TO WHAT YOU KNEW ABOUT ATAYEE BEFORE HE STARTED

 5   WORKING WITH YOU IN 2009.  OKAY?

 6   A.    OKAY.

 7   Q.    SO, SIR, YOU ARE AWARE THAT MR. ATAYEE WAS RELEASED FROM

 8   PRISON IN MAY OF 2006?

 9              MR. ROBINSON:  OBJECTION.  RELEVANCE, YOUR HONOR.

10              THE COURT:  OVERRULED.

11              YOU CAN ANSWER THAT.

12              THE WITNESS:  THAT SOUNDS RIGHT.  I AM NOT SURE OF

13   THE EXACT MONTH.

14   Q.    (MR. ELLIS) I AM JUST TRYING TO SET THE TIMELINE SO WE

15   ARE CLEAR ON WHAT I AM TALKING ABOUT.

16        THEN HE WAS -- PLED GUILTY TO THE NEW COCAINE OFFENSE ON

17   MARCH 13TH, 2011.

18   A.    YES.

19   Q.    IS THAT CORRECT?

20   A.    YES.

21   Q.    SO AGAIN, TALKING ABOUT THE TIME FRAME BETWEEN HIS

22   RELEASE AND HIS NEW GUILTY PLEA.

23   A.    OKAY.

24   Q.    SO WHAT YOU -- I WANT TO TALK ABOUT THE DOCUMENTS YOU

25   REVIEWED BEFORE HE STARTED WORKING WITH YOU.
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1        YOU HAD A CHANCE TO LOOK AT HIS CRIMINAL HISTORY AS

 2   WELL, CORRECT?

 3   A.    I DID.

 4        MR. ROBINSON:  OBJECTION, YOUR HONOR.  RELEVANCE TO

 5   THE PENDING MOTION.

 6        THE COURT:  OVERRULED.

 7        MR. ELLIS:  YOUR HONOR, THIS GOES TO THE VERY HEART

 8   OF OUR MOTION ABOUT THE VIOLENT, RACIST, UNTRUSTWORTHY PERSON

 9   THE GOVERNMENT CHOSE TO USE.

10        THE COURT:  OVERRULED.  THE ANSWER WILL STAND.

11   Q.    (MR. ELLIS) SO YOU REVIEWED HIS CRIMINAL HISTORY?

12   A.    I DID.

13   Q.    YOU REVIEWED HIS PROBATION REPORT?

14   A.    PROBATION REPORT FOR?

15   Q.    FOR THE PRIOR ARREST, THE 2009 ARREST.  THE ORIGINAL --

16   A.    THE 1999 CASE?

17   Q.    THE 1999 CASE, THAT'S CORRECT.

18   A.    I DIDN'T REVIEW THAT, NO.

19   Q.    DID YOU REVIEW ANY OF THE SENTENCING PAPERS THAT WERE

20   FILED IN THAT CASE?

21   A.    I REVIEWED SOME OF THEM, SURE.

22   Q.    WERE YOU AWARE AT THE TIME -- OR WERE YOU AWARE PRIOR TO

23   THE TIME YOU BEGAN WORKING WITH HIM THAT HE HAD BEEN DIAGNOSED

24   WITH HAVING OPPOSITIONAL DEFIANCE DISORDER?

25   A.    NO.
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1              MR. ROBINSON:  OBJECTION.  ASSUMES FACTS NOT IN

 2   EVIDENCE.

 3              THE COURT:  OVERRULED.

 4   Q.    (MR. ELLIS) WERE YOU AWARE THAT HE HAD BEEN DIAGNOSED

 5   WITH ATTENTION DEFICIT DISORDER?

 6              MR. ROBINSON:  OBJECTION.  RELEVANCE.

 7              THE COURT:  OVERRULED.

 8              THE WITNESS:  NO.

 9   Q.    (MR. ELLIS) WERE YOU AWARE THAT HE WAS ACCUSED OF

10   HAVING IMPULSIVITY AND POOR JUDGMENT?

11   A.    NO.

12   Q.    BUT YOU WERE AWARE OF HIS CRIMINAL HISTORY.

13   A.    YES.

14   Q.    AND YOU WERE AWARE THAT HE HAD, AT LEAST AT THAT POINT,

15   PARTICIPATED IN TWO LARGE-SCALE COCAINE TRAFFICKING OFFENSES.

16              MR. ROBINSON:  OBJECTION AS TO THE CHARACTERIZATION.

17   ARGUMENTATIVE.

18              THE COURT:  SUSTAINED.  ARGUMENTATIVE.

19   Q.    (MR. ELLIS) WERE YOU AWARE THAT HE HAD ONE CONVICTION

20   FOR MULTI KILOS OF METHAMPHETAMINE?

21   A.    YES.

22   Q.    AND THAT HE HAD BEEN INVOLVED IN A CONSPIRACY TO

23   DISTRIBUTE A LARGE AMOUNT OF COCAINE?

24              MR. ROBINSON:  OBJECTION AS TO ARGUMENTATIVE, LARGE

25   AMOUNT.
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1            THE COURT:  SUSTAINED.
 2    Q.    (MR. ELLIS) LET ME ASK YOU THIS WAY, SIR.  YOU WERE
 3    ASKED ON DIRECT EXAMINATION ABOUT MR. WRIGHT'S PRIOR CRIMINAL
 4    HISTORY.  DO YOU REMEMBER THAT?
 5    A.    YES.
 6    Q.    AND THE QUESTION WAS:  DID HE HAVE A SIGNIFICANT DRUG
 7    TRAFFICKING OFFENSE?
 8          CORRECT?  DO YOU REMEMBER THAT QUESTION?
 9    A.    I REMEMBER THE QUESTION, YES.
10    Q.    AND THE ANSWER WAS YES.
11          QUESTION:  IS THAT BECAUSE IT WAS A MANDATORY MINIMUM
12    AMOUNT?
13          ANSWER:  YES.
14          DO YOU REMEMBER THOSE QUESTIONS?
15    A.    I REMEMBER.
16    Q.    THREE AND A HALF KILOS OF COCAINE CARRIES A MANDATORY
17    MINIMUM?
18    A.    IT DOES.
19    Q.    SO THAT WOULD BE A SIGNIFICANT DRUG TRAFFICKING OFFENSE?
20    A.    IT DID -- IT WOULD.
21    Q.    NOW I WANT TO TALK TO YOU ABOUT ATAYEE'S TRUSTWORTHINESS
22    AND ABILITY TO FOLLOW DIRECTION.
23    A.    OKAY.
24    Q.    YOU WERE AWARE THAT ATAYEE WASN'T GOOD AT KEEPING HIS
25    PROMISES, CORRECT?
```

APRIL 14, 2014

CHEVIRON — CROSS-EXAMINATION

```
 1              MR. ROBINSON:  OBJECTION.  VAGUE.
 2              THE COURT:  SUSTAINED.
 3    Q.    (MR. ELLIS) WELL, SIR, YOU WERE AWARE THAT AT THE TIME
 4    HE PARTICIPATED IN THE 2008 CONSPIRACY HE WAS ON SUPERVISED
 5    RELEASE, CORRECT?
 6    A.    I WAS AWARE OF THAT, YES.
 7    Q.    AND THAT ONE OF THE CONDITIONS OF HIS SUPERVISED RELEASE
 8    WAS THAT HE NOT COMMIT ANOTHER FEDERAL, STATE OR LOCAL CRIME;
 9    IS THAT CORRECT?
10    A.    YES.
11    Q.    AND THIS WOULD BE TAB 6.
12    A.    OKAY.
13    Q.    HE WAS ALSO -- HE SHALL NOT ILLEGALLY POSSESS A
14    CONTROLLED SUBSTANCE, CORRECT?
15    A.    I DON'T SEE THAT IN TAB 6 -- OH, IS IT --
16    Q.    THE SECOND LINE, PAGE 4 OF 5.  IT IS ON THE SCREEN IN
17    FRONT OF YOU AS WELL.
18    A.    JUST TRYING TO SEE THE CONTEXT OF THIS PAGE.
19          YES, I AGREE IT SAYS THAT, AND THAT IS ONE OF HIS
20    CONDITIONS.
21    Q.    BUT WITHIN TWO YEARS OF BEING ON SUPERVISED RELEASE,
22    ATAYEE RETURNED TO SIGNIFICANT DRUG TRAFFICKING OFFENSES; IS
23    THAT CORRECT?
24    A.    HE DID.
25    Q.    NOW I WANT TO TALK TO YOU ABOUT WHAT TYPE OF C.I. OR
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1   C.H.S. ATAYEE WAS.
 2        NOW, I GUESS JUST TO BE CLEAR, THERE ARE DIFFERENT TYPES
 3   OF WHAT YOU MIGHT CALL A C.I. OR SOURCE OF INFORMATION; IS
 4   THAT CORRECT?
 5   A.   DIFFERENT LAW ENFORCEMENT AGENCIES HAVE DIFFERENT NAMES
 6   FOR THEM.  IN THE FBI THEY ARE CALLED CONFIDENTIAL HUMAN
 7   SOURCES.
 8   Q.   NOW, THERE ARE, AT LEAST THE F.B.I., YOU MIGHT HAVE A
 9   C.H.S. WHO IS A GOOD SAMARITAN WHO JUST WANTS TO REPORT ABOUT
10   WRONGDOING; IS THAT CORRECT?
11   A.   DIFFERENT C.H.S.'S HAVE DIFFERENT MOTIVATIONS.
12   Q.   ABSOLUTELY.  BUT ONE MOTIVATION MIGHT JUST BE A GOOD
13   SAMARITAN.
14           MR. ROBINSON:  OBJECTION.  RELEVANCE.
15           THE COURT:  OVERRULED.
16           YOU CAN ANSWER.
17           THE WITNESS:  YES.
18   Q.    (MR. ELLIS) SOME WANT TO GET PAID?
19   A.   YES.
20   Q.   AND SOME WANT TO WORK OFF A CASE.
21   A.   YES.
22   Q.   NOW, WHEN YOU LOOK AT SOMEONE LIKE ATAYEE, HE WAS
23   CONSIDERED A HIGH RISK CONFIDENTIAL HUMAN SOURCE; ISN'T THAT
24   CORRECT?
25           MR. ROBINSON:  OBJECTION.  VAGUE.
```

APRIL 14, 2014

CHEVIRON — CROSS-EXAMINATION

```
 1              THE COURT:  OVERRULED.
 2              THE WITNESS:  WE DON'T HAVE CLASSIFICATION -- THE
 3    FBI DOESN'T CLASSIFY THE C.H.S. AS A HIGH RISK OR LOW RISK.
 4    Q.    (MR. ELLIS) WAS A RISK ASSESSMENT DONE ON ATAYEE BEFORE
 5    HE BECAME A C.I. FOR THE FBI?
 6    A.    WE DON'T HAVE ANY FORMS THAT ARE CALLED RISK ASSESSMENT
 7    OR --
 8    Q.    I AM NOT ASKING YOU ABOUT A FORM, I AM ASKING IF THERE
 9    IS A PROCEDURE WHEREIN A C.I. IS VETTED TO DETERMINE IF THEY
10    ARE LIKELY TO RETURN TO THEIR FORMER CRIMINALITY.
11    A.    YES.
12    Q.    AND THAT WAS DONE IN THIS CASE?
13    A.    YES.
14    Q.    AND THROUGH THAT PROCESS, THOUGH, THERE IS THE DECISION
15    MADE IF THE PERSON NEEDS TO BE WATCHED CLOSER THAN OTHER
16    PEOPLE; IS THAT CORRECT?
17    A.    NO, IT IS JUST A DETERMINATION ON WHETHER THEY CAN BE
18    OPERATED AS A C.H.S. OR NOT OPERATED AS A C.H.S.
19    Q.    LET ME ASK YOU THIS, SIR.  IS IT -- WERE YOU INTENDING
20    TO WATCH ATAYEE MORE CLOSELY BECAUSE YOU WERE AWARE OF HIS
21    CRIMINAL HISTORY?
22    A.    YES.
23    Q.    BECAUSE SOMEONE WITH A PRIOR DRUG TRAFFICKING --
24    SIGNIFICANT DRUG TRAFFICKING OFFENSE WHO CATCHES ANOTHER
25    SIGNIFICANT DRUG TRAFFICKING OFFENSE WHILE ON SUPERVISED
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1    RELEASE IS SOMEONE WHO MIGHT COMMIT A NEW CRIME, CORRECT?

2    **A.**    YES.

3    **Q.**    NOW, ONE OF THE THINGS THAT THE FBI TELLS ITS

4    CONFIDENTIAL HUMAN SOURCES IS THAT THEY ARE NOT TO COMMIT ANY

5    ADDITIONAL CRIMINAL ACTIVITY WITHOUT PERMISSION, CORRECT?

6    **A.**    YOU ARE REFERENCING AUTHORIZED ILLEGAL ACTIVITY.

7    **Q.**    YES.

8    **A.**    YES, THAT'S CORRECT.

9    **Q.**    THEY ARE OBVIOUSLY AUTHORIZED TO ENGAGE IN SOME LEVEL OF

10   ILLEGAL ACTIVITY BECAUSE THAT IS THE WHOLE POINT, OFTEN, OF

11   WHAT THEY ARE DOING, CORRECT?  FOR INSTANCE, IF YOU TOLD HIM

12   TO GO BUY A KEY OF COCAINE, THAT WOULD BE WITHIN THE -- WITHIN

13   THE CONTEXT OF HIS AGREEMENT WITH THE FBI, CORRECT?

14   **A.**    IF IT WAS AT THE DIRECTION OF THE FBI, SURE.

15   **Q.**    YES.  BUT IF HE WAS TO GO OUT AND, SAY, BUY OR SELL A

16   KEY OF COCAINE ON HIS OWN, THAT WOULD VIOLATE HIS AGREEMENT;

17   IS THAT CORRECT?

18   **A.**    THAT IS CALLED UNAUTHORIZED ILLEGAL ACTIVITY.  AND, YES,

19   CORRECT.

20   **Q.**    EXACTLY.

21        NOW SWITCHING GEARS FOR A MOMENT TO TALKING ABOUT

22   MEETINGS BETWEEN ATAYEE AND MR. WRIGHT, IN-PERSON MEETINGS.

23   **A.**    OKAY.

24   **Q.**    THERE IS A PROTOCOL THAT IS IN PLACE BEFORE ATAYEE WOULD

25   MEET WITH MR. WRIGHT IN PERSON, CORRECT?

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1  **A.**    BY PROTOCOL?

2  **Q.**    WELL, YOU WOULD MEET IN PERSON?

3  **A.**    I WOULD MEET WITH THE C.H.S., IS THAT WHAT YOU ARE

4  ASKING?

5  **Q.**    YES.

6  **A.**    YES.

7  **Q.**    YOU WOULD CHECK HIM FOR CONTRABAND?

8  **A.**    YES.

9  **Q.**    FOR MONEY?

10  **A.**    LARGE AMOUNTS OF MONEY, SURE.

11  **Q.**    YOU WOULD PREPARE THE RECORDING DEVICE.

12  **A.**    YES.

13  **Q.**    AND YOU WOULD GIVE HIM INSTRUCTIONS.

14  **A.**    YES.

15  **Q.**    THERE WAS ALSO A PROTOCOL AFTER THE MEETING; IS THAT

16  CORRECT?

17  **A.**    YES.

18  **Q.**    YOU WOULD MEET WITH HIM?

19  **A.**    YES.

20  **Q.**    YOU WOULD CHECK FOR CONTRABAND?

21  **A.**    YES.

22  **Q.**    YOU WOULD DEBRIEF, EVEN IF IT WAS QUICKLY?

23  **A.**    MY DEBRIEFS WITH HIM WERE RARELY QUICK.

24  **Q.**    AND YOU WOULD DEBRIEF WITH HIM AFTERWARDS?

25  **A.**    YES.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1   **Q.**    AND TAKE THE RECORDING DEVICE FROM HIM.

2   **A.**    CORRECT.

3   **Q.**    NOW, DESPITE THE FACT THAT YOU AGREE THAT ATAYEE WAS

4   MORE OF A RISKY C.I., YOU DIDN'T ALWAYS MEET WITH HIM

5   IMMEDIATELY AFTER HIS IN-PERSON MEETINGS WITH MR. WRIGHT, DID

6   YOU?

7   **A.**    SURVEILLANCE WOULD TAKE PLACE AT TIMES, AND WE WOULD

8   HAVE TO FOLLOW THE TARGET BEFORE BRIEFING WITH THE C.H.S.

9   **Q.**    SO THE ANSWER TO MY QUESTION IS YES, SOMETIMES THERE WAS

10  A DELAY BETWEEN WHEN YOU WOULD MEET WITH ATAYEE AND WHEN THE

11  MEETING HAD ENDED; IS THAT CORRECT?

12  **A.**    YES.  NOT A LONG DELAY.

13  **Q.**    SOMETIMES UP TO AN HOUR?

14  **A.**    SURE.

15  **Q.**    NOW, AFTER YOU TOOK THE RECORDING DEVICES FROM HIM, YOU

16  WOULD IDENTIFY -- WELL, LET ME BACK UP.

17      THERE IS A REASON THAT YOU USE RECORDING DEVICES IN

18  PERSON-TO-PERSON MEETINGS; IS THAT CORRECT?

19  **A.**    YES.

20          **MR. ROBINSON:**  OBJECTION, YOUR HONOR.  WE ARE

21  DEPOSING THE WITNESS AGAIN.

22          **MR. ELLIS:**  WE ARE NOT, YOUR HONOR.  JUST A FEW MORE

23  QUESTIONS AND IT MOVES INTO THE NEXT CHAPTER.

24          **THE COURT:**  ALL RIGHT.

25          **MR. ROBINSON:**  EVEN IF IT IS ONE MORE QUESTION, IT

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1   IS STILL A DEPOSITION.
 2           THE COURT:  YOU MAY ANSWER THE QUESTION.
 3   Q.    (MR. ELLIS) IS THAT CORRECT?
 4   A.    I AM SORRY.  COULD YOU REPEAT IT?
 5   Q.    OF COURSE.  THE REASON -- ONE OF THE REASONS YOU WOULD
 6   WANT TO USE RECORDING DEVICE IS BECAUSE OF ITS EVIDENTIARY
 7   VALUE; IS THAT CORRECT?
 8   A.    YES.
 9   Q.    AND AFTER YOU TOOK THE RECORDING DEVICE FROM ATAYEE YOU
10   WOULD LISTEN TO IT TO CHECK THE ACCURACY OF THE MEETING; IS
11   THAT CORRECT?
12   A.    IT WOULD HAVE TO BE DOWNLOADED.  BUT, YES, THEN I WOULD
13   REVIEW IT.
14   Q.    AND YOU REVIEWED ALL OF THE RECORDINGS BETWEEN ATAYEE
15   AND WRIGHT; IS THAT CORRECT?
16   A.    YES.
17   Q.    AND YOU LISTENED TO ALL OF THEM.
18   A.    YES.
19   Q.    NOW, YOU ARE AWARE THAT ATAYEE CONTINUED TO BREAK THE
20   LAW WHILE HE WAS A CONFIDENTIAL INFORMANT; IS THAT CORRECT?
21           MR. ROBINSON:  OBJECTION.  VAGUE AS TO TIME.  I
22   THINK WE WILL STIPULATE HE DID, HE HAS BEEN CHARGED.
23           THE COURT:  SUSTAINED.
24   Q.    (MR. ELLIS) THROUGHOUT THE ENTIRE PERIOD THAT HE WAS A
25   CONFIDENTIAL INFORMANT, YOU ARE AWARE THAT HE WAS CONTINUING
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1   TO BREAK THE LAW, CORRECT?

2          **MR. ROBINSON:**  OBJECTION AS TO VAGUE AS TO TIME,

3   YOUR HONOR.

4          **THE COURT:**  SUSTAINED.

5   **Q.**    **(MR. ELLIS)** WELL, YOU ARE AWARE THAT HE BROKE THE LAW

6   IN 2010?

7   **A.**    YES.

8   **Q.**    YOU ARE AWARE THAT HE BROKE THE LAW IN 2011?

9   **A.**    YES.

10  **Q.**    AND 2012?

11  **A.**    COULD YOU BE MORE SPECIFIC AS FAR AS 2012?  WE HAVE

12  DISCUSSED THE 2010 INCIDENT, WE HAVE DISCUSSED THE 2011

13  INCIDENT, I AM NOT --

14  **Q.**    WELL, YOU ARE AWARE THAT ON MARCH 11TH OF THIS YEAR HE

15  PLED -- ATAYEE PLED GUILTY TO OPERATING AN ILLEGAL GAMBLING

16  BUSINESS?

17  **A.**    YES.

18  **Q.**    AND SPECIFICALLY YOU ARE AWARE THAT WHEN ATAYEE WAS

19  ARRESTED AND DEBRIEFED IN 2013 HE SAID THAT HE HAD BEEN

20  ENGAGED IN ILLEGAL ACTIVITY FOR THREE YEARS.

21  **A.**    THAT'S CORRECT.

22  **Q.**    SO IT WOULD BE FAIR TO SAY, THEN, THAT HE WAS BREAKING

23  THE LAW IN 2012?

24  **A.**    YES.

25  **Q.**    AND 2013?

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1   A.    YES.

 2   Q.    NOW, WHEN ATAYEE WAS WORKING WITH YOU, YOU KNEW HE WAS

 3   ON SUPERVISED RELEASE; IS THAT CORRECT?

 4   A.    THERE WAS A PORTION OF TIME WHEN HE WAS ON SUPERVISED

 5   RELEASE, YES.

 6   Q.    FAIR ENOUGH.  YOU ARE AWARE THAT AT THE BEGINNING HE WAS

 7   ON SUPERVISED RELEASE; IS THAT CORRECT?

 8   A.    YES.

 9   Q.    HE WAS ALSO, FOR A PERIOD OF TIME, ON PRETRIAL RELEASE;

10   IS THAT CORRECT?

11   A.    YES.

12   Q.    NOW, YOU OFTEN WENT TO COURT APPEARANCES WHEN ATAYEE HAD

13   TO GO, CORRECT?

14   A.    YES.

15   Q.    AND IN FACT YOU WERE THERE WHEN HE PLED GUILTY ON

16   MARCH 11TH.

17   A.    MARCH 11TH OF WHAT YEAR?

18   Q.    THIS YEAR.

19   A.    FOR THE GAMBLING BUSINESS?

20   Q.    YES.  I SAW YOU.  YOU WERE THERE, CORRECT?

21   A.    YES.

22   Q.    YOU WERE ALSO PRESENT IN JUDGE GONZALEZ'S COURTROOM ON

23   MULTIPLE OCCASIONS FOR THE HEARINGS ON THE ORDER TO SHOW

24   CAUSE; IS THAT CORRECT?

25   A.    YES.
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1   Q.    AND, SIR, YOU ACTUALLY MET WITH MR. ATAYEE PRIOR TO SOME
 2   OF THESE COURT APPEARANCES, CORRECT?
 3           MR. ROBINSON:  OBJECTION.  VAGUE.
 4           THE COURT:  SUSTAINED.
 5   Q.    (MR. ELLIS) YOU MET SPECIFICALLY WITH MR. ATAYEE PRIOR
 6   TO THE OSC PROCEEDINGS IN FRONT OF JUDGE GONZALEZ, INCLUDING
 7   THE ONE OF APRIL 2012, CORRECT?
 8           MR. ROBINSON:  OBJECTION.  VAGUE, YOUR HONOR.  OF
 9   COURSE HE DID, HE WAS COOPERATING FOR YEARS.
10           MR. ELLIS:  I MEAN THE MORNING OF, TO BE MORE
11   SPECIFIC.
12   Q.    (MR. ELLIS) YOU MET WITH HIM THAT MORNING BEFORE COURT
13   WHEN HE APPEARED IN FRONT OF JUDGE GONZALEZ ON THE APRIL 2012
14   OSC HEARING, CORRECT?
15   A.    SURE.  HE WAS STILL COOPERATING.
16   Q.    NOW, THERE WAS QUESTIONS A MOMENT AGO ABOUT THE 2009
17   INCIDENT, AS WELL AS THE -- EXCUSE ME -- THE 2010 INCIDENT
18   WITH MR. ATAYEE.  I WANT TO TALK TO YOU ABOUT THAT FOR A
19   MOMENT.
20   A.    OKAY.  THAT'S THE DECEMBER 4TH INCIDENT?
21   Q.    YES.  CAN YOU TURN TO TAB 7, PLEASE?
22   A.    OKAY.
23   Q.    YOU SAID THAT MR. ATAYEE CALLED YOU AROUND DECEMBER --
24   WITHIN A DAY OR TWO OF THE DECEMBER 10TH INCIDENT; IS THAT
25   CORRECT?
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1   **A.**   THE DECEMBER 4TH INCIDENT?

2   **Q.**   EXCUSE ME.  THE DECEMBER 4TH INCIDENT, CORRECT?

3   **A.**   YES.

4   **Q.**   AND HE CALLED YOU TO TELL YOU WHAT HAD HAPPENED.

5   **A.**   YES.

6   **Q.**   AND HE TOLD YOU THAT HE WAS ARRESTED.

7   **A.**   NO.

8   **Q.**   HE DIDN'T TELL YOU HE WAS ARRESTED?

9   **A.**   NO.

10  **Q.**   BUT HE DID TELL YOU WHAT HAPPENED DURING THE ARGUMENT,

11  CORRECT?

12  **A.**   HE GAVE ME HIS DESCRIPTION OF WHAT HAPPENED, YES.

13  **Q.**   HE DIDN'T DENY THE NAME HE CALLED THAT WOMAN, DID HE?

14  **A.**   HE DID NOT.

15  **Q.**   HE TOLD YOU WHAT HE CALLED HER.

16  **A.**   HE DID.

17  **Q.**   HE CALLED HER A NIGGER, CORRECT?

18  **A.**   THAT IS THE WORD HE USED, YES.

19  **Q.**   AND YOU ARE AWARE THAT THIS HAPPENED BACK IN 2010,

20  CORRECT?

21  **A.**   YEAH, YES.

22  **Q.**   AND YOU WERE LATER AWARE THAT CHARGES WERE FILED IN THIS

23  CASE, CORRECT?

24  **A.**   I WAS NOTIFIED, YES, THAT CHARGES WERE FILED.

25  **Q.**   NOW, YOU TOLD US EARLIER THAT YOU CALLED MS. PELOT

APRIL 14, 2014

1    PRETTY QUICKLY AFTER THE ARREST AND TALKED TO HER ABOUT THE

2    INCIDENT, CORRECT?  OR AFTER DECEMBER 4TH YOU CALLED HER TO

3    DISCUSS THE INCIDENT, CORRECT?

4    **A.**    WITHIN A FEW DAYS OF BEING NOTIFIED.

5    **Q.**    BUT YOU DIDN'T CONTACT HER ONCE YOU LEARNED CHARGES HAD

6    ACTUALLY BEEN FILED, DID YOU?

7                **MR. ROBINSON:**  OBJECTION.  RELEVANCE.

8                **THE COURT:**  OVERRULED.

9                YOU MAY ANSWER.

10               **THE WITNESS:**  I NOTIFIED MS. PELOT OF THE INCIDENT,

11   THE ALTERCATION, AND WHAT HAD HAPPENED.

12   **Q.**    **(MR. ELLIS)** SIR, MY QUESTION IS:  YOU DIDN'T CONTACT

13   HER WHEN YOU LEARNED THAT CHARGES HAD BEEN FILED; ISN'T THAT

14   CORRECT?

15   **A.**    I DIDN'T FEEL THAT THAT WAS MY DUTY.  I DIDN'T FEEL THAT

16   IT IS –– I DON'T –– THE ANSWER IS I DON'T KNOW WHETHER I DID

17   OR NOT.  BUT I DIDN'T FEEL THAT –– ONCE I NOTIFIED HER OF THE

18   INCIDENT OCCURRING, SHE IS THE COURT REPRESENTATIVE TO FOLLOW

19   UP.

20   **Q.**    SO YOU CALLED HER WHEN YOU FOUND OUT ABOUT THE ARREST

21   BUT NOT WHEN THERE WERE CHARGES, CORRECT?

22               **MR. ROBINSON:**  OBJECTION.  ASSUMES FACTS NOT

23   EVIDENCE THAT THERE WAS AN ARREST.

24               **THE COURT:**  SUSTAINED.

25   **Q.**    **(MR. ELLIS)** YOU CALLED HER WHEN YOU FOUND OUT ABOUT THE

CHEVIRON – CROSS–EXAMINATION

```
 1   INCIDENT BUT YOU DIDN'T CALL HER WHEN YOU FOUND OUT FORMAL
 2   CHARGES WERE FILED; IS THAT CORRECT?
 3   A.    I DON'T REMEMBER IF I CALLED HER OR NOT AFTER CHARGES
 4   WERE FILED.
 5   Q.    NOW, THAT IS NOT THE ONLY THING THAT ATAYEE WAS ACCUSED
 6   OF DOING AROUND THIS TIME, IS IT?  THERE WAS IN FACT ANOTHER
 7   INCIDENT THAT HAPPENED AT THAT SAME RESTAURANT; IS THAT
 8   CORRECT?  IN 2011?
 9   A.    YOU ARE REFERRING TO THIS AUGUST 4TH, 2011?
10   Q.    YES.
11   A.    YES, I AM AWARE OF THAT.
12   Q.    THIS IS AN INCIDENT WHERE HE WAS AT LEAST ACCUSED OF
13   STRIKING A WOMAN.
14   A.    YES, THOSE WERE THE ACCUSATIONS.
15   Q.    AND THAT THIS WOMAN ACCUSED HIM OF DOING SOME PRETTY
16   VIOLENT THINGS TO HER DAUGHTER.
17   A.    THOSE WERE THE ACCUSATIONS, YES.
18   Q.    NOW, HE WASN'T CHARGED FOR THAT, WAS HE, ULTIMATELY?
19   A.    NO.  INSUFFICIENT EVIDENCE.  HE WAS ARRESTED, CHARGES
20   WERE NOT --
21   Q.    WERE YOU CONTACTED BY STATE LAW ENFORCEMENT EITHER AFTER
22   THE DECEMBER 4TH, 2010 INCIDENT OR THE AUGUST 2011 INCIDENT?
23   A.    NOT FOR THE DECEMBER 4TH, 2010 INCIDENT.
24         AND REGARDING THE AUGUST 4TH, COULD YOU TELL ME WHAT TAB
25   IT IS?  YOU TOOK IT OFF MY SCREEN.
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1   Q.    IT IS 2011.
 2   A.    REGARDING THAT INCIDENT, I DON'T KNOW THAT I WAS
 3   CONTACTED BY THE SHERIFF'S OFFICE OR NOT.  I AM NOT SURE.  I
 4   DON'T REMEMBER.
 5   Q.    WOULD IT BE IN YOUR NOTES?
 6   A.    NO.
 7   Q.    OKAY.  NOW, IT IS FAIR TO SAY, SIR, THAT THE
 8   DECEMBER 10TH INCIDENT ISN'T THE ONLY TIME THAT YOU WERE AWARE
 9   OF ATAYEE USING OFFENSIVE RACIAL REMARKS, CORRECT?
10   A.    THAT'S CORRECT.
11   Q.    YOU HAVE HEARD HIM USE THEM ON OTHER OCCASIONS.
12   A.    YES.
13   Q.    NUMEROUS OTHER OCCASIONS?
14         MR. ROBINSON:  OBJECTION.  VAGUE AS TO NUMEROUS.
15         THE COURT:  OVERRULED.
16         YOU MAY ANSWER.
17         THE WITNESS:  HE HAS USED RACIAL COMMENTS LIKE THAT
18   MORE THAN A HANDFUL OF TIMES, AT WHICH TIME I WOULD TELL HIM I
19   DON'T CONDONE THOSE, THE F.B.I. DOESN'T CONDONE THOSE AND TO
20   STOP USING THEM.
21   Q.    (MR. ELLIS) IT DIDN'T STOP HIM FROM USING THEM, DID IT,
22   SIR?
23   A.    IN MY PRESENCE IT DID.
24   Q.    REALLY?  CAN YOU TURN TO TAB 2 AND LOOK AT LINE 283.
25   WELL, START BY GOING TO TAB 1 AND TELL ME WHO THE TEXT MESSAGE
```

APRIL 14, 2014

CHEVIRON - CROSS-EXAMINATION

```
 1   WITH 283 IS ASSOCIATED WITH, SIR.
 2   A.    OKAY.  283?
 3   Q.    YES.
 4   A.    OKAY.  283 SHOWS JUNE 2ND, 2012.  IT IS AN INCOMING
 5   MESSAGE.  SO IT IS FROM THE C.H.S. TO ME, AND --
 6   Q.    WHAT HE SAYS IS:  YOU KNOW THE CALDOS ARE WHERE IT'S AT.
 7   THEY ARE DUMB, IGNORANT, TRUST ANYBODY MIDDLE EASTERN AND ALL
 8   CROOKED.
 9   A.    I SEE THAT LINE, YES.
10   Q.    BY CALDOS HE WAS REFERRING TO CHALDEANS?
11   A.    YES.
12   Q.    AND INCIDENTALLY, CHALDEANS ARE WHO HE WAS COOPERATING
13   AGAINST, IN PART, IN THE USD BASKETBALL CASE; IS THAT CORRECT?
14   A.    THAT'S CORRECT.
15   Q.    YOU TESTIFIED THAT YOU FIRST LEARNED ABOUT THE INCIDENT,
16   THE DECEMBER 4TH INCIDENT, A COUPLE OF DAYS LATER, CORRECT?
17   A.    YES.
18   Q.    TO BE CLEAR, YOU NEVER AUTHORIZED ATAYEE TO CONDUCT
19   HIMSELF IN THAT WAY, CORRECT?  MEANING, YOU NEVER SPECIFICALLY
20   AUTHORIZED HIM TO CALL A BLACK WOMAN A NIGGER, DID YOU?
21   A.    NO.
22   Q.    BUT HOW MANY TIMES DID YOU HEAR HIM USE THAT WORD IN THE
23   COURSE OF YOUR DEALINGS WITH HIM?
24   A.    OVER SEVERAL YEARS, A HANDFUL OF TIMES.
25   Q.    AND YOU NEVER SPECIFICALLY AUTHORIZED ATAYEE TO
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1  VIOLENTLY EXPRESS HIS HATRED OF BLACK PEOPLE, DID YOU?
 2          MR. ROBINSON:  OBJECTION.  ASSUMES FACTS NOT IN
 3  EVIDENCE.
 4          THE COURT:  SUSTAINED.
 5  Q.    (MR. ELLIS) DID YOU EVER AUTHORIZE ATAYEE TO VIOLENTLY
 6  EXPRESS HIS HATRED OF BLACK PEOPLE?
 7          MR. ROBINSON:  OBJECTION.  LACK OF FOUNDATION.
 8  RELEVANCY.
 9          THE COURT:  SUSTAINED.  LACK OF FOUNDATION.
10  Q.    (MR. ELLIS) SIR, YOU WOULD AGREE WITH ME THAT YOU
11  DIDN'T AUTHORIZE THE CRIMINAL ACTIVITY FROM THE DECEMBER 4TH,
12  2010 INCIDENT, DID YOU?
13          MR. ROBINSON:  OBJECTION.  ASKED AND ANSWERED.
14          THE COURT:  SUSTAINED.
15          MR. ELLIS:  I DIDN'T ASK THAT PARTICULAR QUESTION.
16  THAT'S FINE.
17  Q.    (MR. ELLIS) NOW, DESPITE ATAYEE'S ONGOING CRIMINAL
18  ACTIVITY, HE WAS SIGNED UP AGAIN AS A C.I., CORRECT?
19          MR. ROBINSON:  OBJECTION.  VAGUE AS TO TIME.
20          MR. ELLIS:  WELL, I WILL GO QUESTION BY QUESTION.
21  JUST TRYING TO MOVE THINGS ALONG.
22  Q.    (MR. ELLIS) ALL RIGHT.  WE KNOW THAT HE VIOLATED THE
23  LAW IN 2008, CORRECT?  "HE" MEANING ATAYEE; IS THAT CORRECT?
24  A.    YES.  HE WASN'T COOPERATING FOR THE GOVERNMENT AT THAT
25  TIME.
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1   **Q.**    THAT IS NOT MY QUESTION.  BUT WE KNOW IN 2008 HE

2   VIOLATED THE LAW, CORRECT?

3   **A.**    YES.

4   **Q.**    YOUR TESTIMONY IS THAT IN 2010 HE SIGNED UP AS A C.H.S.

5   FOR THE FBI, CORRECT?

6   **A.**    YES.

7   **Q.**    BUT WE ALSO KNOW IN 2010 HE HAD THE INCIDENT WITH THE

8   WOMAN; IS THAT CORRECT?

9   **A.**    THE DECEMBER 4TH INCIDENT?

10  **Q.**    YES.

11  **A.**    YES.

12  **Q.**    BUT HE WAS SIGNED UP AFTER THAT AGAIN.

13  **A.**    HE WAS NEVER NOT SIGNED UP.  THERE IS A PROCESS TO WHICH

14  IF THE C.H.S. IS INVOLVED IN UNAUTHORIZED ILLEGAL ACTIVITY

15  THEY ARE MET WITH, DISCUSSED.  AND THEN THERE IS A

16  RECOMMENDATION TO CONTINUE TO OPERATE OR TO TERMINATE THE

17  OPERATION.

18  **Q.**    SO AFTER THE DECEMBER 4TH, 2010 INCIDENT WAS THERE A

19  MEETING TO DETERMINE WHETHER OR NOT ATAYEE SHOULD CONTINUE TO

20  BE A C.H.S.?

21  **A.**    YES.  AND HE WAS CONTINUED.

22  **Q.**    AFTER THE AUGUST 2011 INCIDENT WAS THERE A MEETING TO

23  DETERMINE WHETHER OR NOT ATAYEE SHOULD CONTINUE TO BE A

24  C.H.S.?

25  **A.**    YES.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1   **Q.**    AFTER ATAYEE CONTINUED TO USE RACIALLY OFFENSIVE

2   LANGUAGE WAS THERE A MEETING TO DETERMINE WHETHER OR NOT HE

3   COULD CONTINUE TO BE A C.H.S.?

4   **A.**    OTHER THAN THE DECEMBER 4TH INCIDENT WHERE HE USED A

5   RACIALLY CHARGED WORD TO -- PURSUANT TO CONDUCTING ILLEGAL

6   ACTIVITY, THAT WAS THE ONLY TIME THAT WE WOULD MEET TO DISCUSS

7   WHETHER TO OPERATE OR NOT.  HIS USE OF THE -- HIS USE OF THOSE

8   WORDS IS NOT AN ILLEGAL ACTIVITY THAT THE FBI WOULD WEIGH IN

9   ON WHETHER TO OPERATE HIM OR NOT.

10  **Q.**    WELL, SIR, MOVING BACK, THEN, TO ATAYEE AND THE

11  GAMBLING, YOU WERE AWARE, DURING THE TIME PERIOD OF THE

12  INVESTIGATION OF THIS CASE, THAT ATAYEE WAS ENGAGED IN

13  GAMBLING; IS THAT CORRECT?

14          **MR. ROBINSON:**  OBJECTION AS ON VAGUE, WHEN HE KNEW

15  THAT.

16          **THE COURT:**  SUSTAINED.

17  **Q.**    **(MR. ELLIS)** AT THAT TIME YOU WERE AWARE, IN JUNE AND

18  JULY OF 2012, THAT ATAYEE WAS ENGAGED IN GAMBLING, CORRECT?

19  **A.**    GAMBLING OR THE OPERATION OF A GAMBLING BUSINESS?

20  **Q.**    GAMBLING, SIR.

21  **A.**    YES.

22  **Q.**    YOU WERE AWARE THAT --

23          **MR. ROBINSON:**  OBJECTION.  MOTION TO STRIKE, YOUR

24  HONOR.  I THINK THE CONNOTATION IS SOME ILLEGAL ACTIVITY, IT

25  IS NOT ILLEGAL TO GAMBLE.

APRIL 14, 2014

```
 1              MR. ELLIS:  IT IS NOT.  THAT IS JUST THE FIRST
 2   QUESTION.
 3              THE COURT:  YOU CAN CLARIFY ON REDIRECT, IF
 4   NECESSARY.
 5   Q.     (MR. ELLIS) SIR, YOU ARE ALSO AWARE, FROM LISTENING TO
 6   THE AUDIO RECORDINGS OF THE MEETINGS BETWEEN ATAYEE AFTER HE
 7   WAS DONE WITH WRIGHT, THAT THERE ARE DISCUSSIONS ABOUT HIM
 8   TAKING POINTS OR BETTING SPORTS GAMES; IS THAT CORRECT?
 9              MR. ROBINSON:  OBJECTION.  VAGUE AS TO WHO WE ARE
10   TALKING ABOUT, YOUR HONOR.
11              THE COURT:  OVERRULED.
12              YOU CAN ANSWER.
13              THE WITNESS:  I GUESS COULD YOU SPECIFY?  YOU SAID
14   THERE WAS CONVERSATIONS AFTER THE --
15   Q.     (MR. ELLIS) YES.  SO THE WAY IT WORKS WITH A RECORDING
16   DEVICE, RIGHT, IS IT STAYS ON UNTIL YOU RETRIEVE IT?
17   A.     THAT'S CORRECT.
18   Q.     SO LET'S SAY ATAYEE WAS MAKING A PHONE CALL WITH THE
19   RECORDING DEVICE ON, IT WOULD PICK UP THE AUDIO OF THE PHONE
20   CALL?
21   A.     THAT'S CORRECT.
22   Q.     IF IT WAS ON SPEAKER IT WOULD PICK UP BOTH PARTIES?
23   A.     THAT'S CORRECT.
24   Q.     IF IT WASN'T IT WOULD PICK UP HIM?
25   A.     THAT'S CORRECT.
```

APRIL 14, 2014

CHEVIRON - CROSS-EXAMINATION

1   Q.    IN SOME OF THE RECORDINGS THAT HE HAD IT APPEARED AS IF

2   HE WAS IN FACT ENGAGING IN BOOKMAKING AT THAT TIME?

3   A.    I AM AWARE THAT THERE WAS DISCUSSIONS WHERE HE WAS

4   DISCUSSING WAGERING INFORMATION, SURE.

5   Q.    WHICH WOULD BE CONSISTENT WITH WHAT HE ULTIMATELY PLED

6   GUILTY TO?

7   A.    ULTIMATELY.  BUT AT THE TIME HE WAS DISCUSSING BETTING

8   LINES, WHICH EVERY -- MANY PEOPLE DO IN THIS SOCIETY.

9   Q.    BUT BETTING ON SPORTS, AT LEAST IN CALIFORNIA, IS LEGAL?

10  A.    NO, BUT MANY PEOPLE TALK ABOUT IT.

11  Q.    I UNDERSTAND.  BUT GAMBLING IS ILLEGAL WHEN YOU ARE

12  TALKING ABOUT BETTING ON LINES, CORRECT?

13          **MR. ROBINSON:**  OBJECTION.

14          **THE WITNESS:**  IF THEY ARE NOT IN A SPORTS BOOK IN

15  LAS VEGAS.

16  Q.    **(MR. ELLIS)** AND HE WASN'T.

17          **MR. ROBINSON:**  OBJECTION.  LACK OF FOUNDATION.

18          **THE COURT:**  OVERRULED.

19          YOU MAY ANSWER.

20  Q.    **(MR. ELLIS)** HE WASN'T, WAS HE?

21  A.    HE WASN'T HAVING THE DISCUSSION IN A LAS VEGAS SPORTS

22  BOOK, NO.

23  Q.    OKAY.  NOW I WANT TO TALK TO YOU ABOUT THE KIND OF

24  PEOPLE -- ABOUT DRUG DEALERS.

25          YOU SPOKE A MOMENT AGO ON DIRECT ABOUT MR. WRIGHT'S

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1   PRIOR CRIMINAL ACTIVITY; IS THAT CORRECT?

 2   A.    YES.

 3   Q.    SO YOU WOULD BE AWARE, FOR INSTANCE, THAT SOMEONE WITH A

 4   LARGE AMOUNT OF CASH, EXPENSIVE CAR, A ROLEX OR EXPENSIVE

 5   WATCH; THAT THIS MIGHT BE THE TYPE OF PERSON WHO IS CONTINUING

 6   -- OR IS ENGAGING IN CRIMINAL ACTIVITY, CORRECT?

 7              MR. ROBINSON:  OBJECTION.  RELEVANCE.

 8              THE COURT:  OVERRULED.

 9              YOU MAY ANSWER.

10              THE WITNESS:  OR IS WEALTHY.  YES.

11   Q.    (MR. ELLIS) BUT IT COULD ALSO BE INDICATIVE OF CRIMINAL

12   ACTIVITY.

13              MR. ROBINSON:  OBJECTION.  CALLS FOR SPECULATION.

14              THE COURT:  OVERRULED.

15              THE WITNESS:  YES.

16   Q.    (MR. ELLIS) NOW I WANT TO TALK TO YOU ABOUT A

17   JUNE 12TH, 2012 INCIDENT WITH ATAYEE.

18   A.    OKAY.

19   Q.    IF YOU WOULD TURN TO EXHIBIT A.

20   A.    WHICH IS TAB 1, CORRECT?

21   Q.    YES.

22   A.    OKAY.

23   Q.    AND LOOK AT 364.

24   A.    OKAY.

25   Q.    THAT IS A TEXT MESSAGE FROM ATAYEE TO YOU?
```

APRIL 14, 2014

CHEVIRON — CROSS—EXAMINATION

1    **A.**    LINE 364 IS JUNE 12TH, 2012.

2    **Q.**    YES.

3    **A.**    IT IS AN INCOMING MESSAGE, YES.

4    **Q.**    AND ATAYEE TELLS YOU ON THAT HE IS IN VEGAS AND HE WON

5    $138,000.

6    **A.**    I SEE THAT ON LINE 364, YES.

7    **Q.**    HE TOLD YOU HE STARTED WITH 7,000.

8    **A.**    IT SAYS:  I CAME UP WITH 7,000.

9    **Q.**    PRESUMABLY HE STARTED WITH 7?

10         **MR. ROBINSON:**  OBJECTION.  LACK OF FOUNDATION.

11   **Q.**    **(MR. ELLIS)** LET ME ASK YOU THIS WAY, SIR.

12        SAYING YOU WON MONEY GAMBLING WOULD BE A WAY THAT YOU

13   COULD HIDE A NEFARIOUS WAY FOR RECEIVING THAT MONEY; IS THAT

14   CORRECT?

15   **A.**    YES.

16         **MR. ROBINSON:**  OBJECTION.  ASSUMES FACTS NOT IN

17   EVIDENCE.

18         **THE COURT:**  OVERRULED.

19   **Q.**    **(MR. ELLIS)** THE ANSWER WAS YES?

20   **A.**    YES.

21   **Q.**    AND YOU WERE AWARE AT THIS POINT, OF COURSE, ATAYEE

22   HAD AT THIS POINT TWO CONVICTIONS FOR DRUG TRAFFICKING,

23   CORRECT?  THIS IS 2012.

24   **A.**    YES, THAT'S CORRECT.

25   **Q.**    AT ANY POINT DID YOU CONTACT THE CASINO IN LAS VEGAS TO

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1   DETERMINE WHETHER OR NOT HE WAS ACCURATELY REPORTING HIS
 2   WINNINGS?
 3   A.    NO.
 4   Q.    NOW, YOU ARE ALSO AWARE THAT MR. ATAYEE HAD SOME NICE
 5   CARS, RIGHT?
 6   A.    YES.
 7   Q.    THE BEEMER?
 8   A.    HE HAS DRIVEN A BMW IN THE PAST, YES.
 9   Q.    THE BENTLEY?
10   A.    THE C.H.S., AS A MATTER OF EMPLOYMENT, BUYS AND SELLS
11   HIGH-END VEHICLES, SO OFTENTIMES HE WOULD BE DRIVING THE
12   VEHICLES THAT HE WOULD HAVE ON CONSIGNMENT TO SELL FOR OTHER
13   CLIENTS.  SO TO SAY THAT HE OWNED THE BENTLEY, I DON'T KNOW.
14   Q.    657.
15   A.    OKAY.
16   Q.    GOT ME A NICE CAR FROM THE AUCTION CHEAP.  JUST BOUGHT
17   MY DREAM CAR.  READY FOR MY LAST CASE BEFORE COURT.
18         CORRECT?
19         WHAT KIND OF CAR?
20         THAT IS FROM YOU.
21         BENTLEY CONVERTIBLE.  BUT IT IS A REGULAR ONE, IT IS NOT
22   TOO FANCY.
23         IS THAT CORRECT?
24   A.    THAT IS WHAT IT SAYS, YES.
25   Q.    AND YOU WERE ALSO AWARE THAT ATAYEE HAD A VERY
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1   EXPENSIVE --
 2          MR. ROBINSON:  OBJECTION, YOUR HONOR.  THAT TAKES
 3   THAT STATEMENT OUT OF CONTEXT.  THE NEXT LINE ON THAT TEXT
 4   MESSAGE WAS:  IT IS TO SELL.
 5          SO I THINK IT IS UNFAIRLY TAKING IT OUT OF CONTEXT.
 6          I CAN'T DO IT ON REDIRECT BECAUSE HE POPPED IT UP ON
 7   THE SCREEN.  I DON'T KNOW WHERE HE IS --
 8          MR. ELLIS:  I AM HAPPY TO PUT IT BACK ON.  I AM ALSO
 9   HAPPY TO CONTROL THIS FOR YOU IF YOU WANT ME TO.
10          THE WITNESS:  THE NEXT LINE HERE IS --
11          THE COURT:  WHAT IS THE OBJECTION?
12          MR. ROBINSON:  THE OBJECTION IS IT MISCHARACTERIZES
13   THE WRITTEN STATEMENT.  HE IS ONLY GOING INTO HALF OF IT AND
14   NOT GIVING THE WITNESS AN OPPORTUNITY TO EXPLAIN THE SECOND
15   HALF.
16          THE COURT:  SUSTAINED.
17          MR. ELLIS:  THAT IS FINE.
18   Q.   (MR. ELLIS) THE POINT IS, SIR, YOU KNEW HE HAD -- AT
19   LEAST IN THIS TIME HE TOLD YOU HE BOUGHT A BENTLEY, IF HE
20   CLAIMED HE IS LATER GOING TO SELL IT?
21          MR. ROBINSON:  IT IS NOT A LATER CLAIM, IT IS THE
22   SAME TEXT MESSAGE.
23          THE COURT:  WOULD YOU RESTATE THE QUESTION?
24          MR. ELLIS:  THAT'S FINE.
25   Q.   (MR. ELLIS) YOU KNEW, AT LEAST AT SOME POINT, SIR, HE
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1    HAD PURCHASED A BENTLEY.  IS THAT A FAIR STATEMENT?

2    **A.**    BASED ON HIS DESCRIPTION OF BUYING IT.  I DIDN'T CONFIRM

3    WHETHER HE BOUGHT IT OR DIDN'T.

4    **Q.**    EXACTLY.  AND YOU DIDN'T FIND OUT IF HE PAID FOR THAT

5    WITH CASH?

6    **A.**    NO.

7    **Q.**    OR CREDIT?

8    **A.**    NO.

9    **Q.**    NOW, YOU ARE ALSO AWARE THAT MR. ATAYEE HAD A VERY

10   EXPENSIVE ROLEX; IS THAT CORRECT?

11   **A.**    HE –– YES.

12   **Q.**    NOW, YOU SAID THAT YOU –– YOU IMPLIED ON AN EARLIER

13   QUESTION THAT PERHAPS HE WAS ABLE TO GET THESE THINGS BECAUSE

14   HE WAS OTHERWISE WEALTHY.  IS THAT A FAIR ASSESSMENT OF WHAT

15   YOU WERE GETTING AT?

16   **A.**    NO.  YOU SPOKE IN GENERAL TERMS ABOUT NICE CARS, NICE

17   WATCHES.  SO I SAID THAT SURE IT COULD BE INDICATIVE OF

18   CRIMINAL HISTORY, BUT IT COULD ALSO BE JUST A WEALTHY PERSON.

19   **Q.**    457 –– OR 456.  IF YOU WERE TO LOOK AT TAB A YOU WOULD

20   FIND THAT THIS IS A TEXT MESSAGE FROM ATAYEE TO YOU ON JULY

21   6TH, 2012 WHERE HE IS ASKING YOU –– EXCUSE ME –– THAT IS FROM

22   YOU.  YOU ARE ASKING IF HE HAS THE RECEIPTS.

23        SO YOU SAID ONE OF THE THINGS, YOUR JOB AS THE HANDLER,

24   IS ADMINISTRATIVE DUTY; IS THAT CORRECT?  SIR?

25   **A.**    IT IS A LOT TO TAKE IN.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1   **Q.**    I KNOW.  I AM TAKING A STEP BACK.

2       ONE OF YOUR JOBS AS A HANDLER IS AS AN ADMINISTRATOR; IS

3   THAT CORRECT?

4   **A.**    YES.

5   **Q.**    MEANS YOU HAVE AN UN-FUN JOB OF COLLECTING -- BEING A

6   BUREAUCRAT, COLLECTING RECEIPTS, TRYING TO GET C.I.'S

7   REIMBURSED, ET CETERA; IS THAT A FAIR STATEMENT?

8   **A.**    C.I.'S ARE REIMBURSED FOR EXPENSES.

9   **Q.**    YOU WOULD LIKE THEM TO HAVE RECEIPTS.  SO THERE ARE

10  EMAILS AND TEXT -- EXCUSE ME -- TEXT MESSAGES WHERE YOU ARE

11  ASKING ATAYEE FOR RECEIPTS; IS THAT CORRECT?

12  **A.**    YES, AND THAT WOULD BE WHAT IT IS FOR.

13  **Q.**    AND HE IS ASKING YOU ABOUT THOSE; IS THAT CORRECT?

14  **A.**    OKAY.  SO 456 IS WHERE YOU ARE SAYING THIS CONVERSATION

15  BEGAN?

16  **Q.**    NO.

17  **A.**    AND THAT IS AN INCOMING MESSAGE?

18  **Q.**    IT BEGINS A LITTLE BIT EARLIER, BUT I AM FOCUSING ON

19  THAT POINT.

20  **A.**    SO YOU WANT ME TO FOCUS ON 456.

21  **Q.**    THEN THAT'S -- THE NEXT ONE ACTUALLY IS 457 WHERE YOU

22  SAY:  YOU CAN ALWAYS SELL THAT ROLEX IF YOU NEED MONEY.

23       THAT'S FROM YOU, CORRECT?

24  **A.**    457 IS OUTGOING FROM ME.  I WAS REVIEWING 457.

25  **Q.**    I AM SORRY.

APRIL 14, 2014

1    **A.**    I GUESS I CAN REVIEW IT ON HERE.

2         YES, I DID SAY YOU COULD SELL THE ROLEX IF YOU NEEDED

3    MONEY.

4    **Q.**    NOW, SIR, I WANT TO DIRECT YOUR ATTENTION NOW TO THE

5    JANUARY 2013 -- EXCUSE ME -- THE OCTOBER 2013 TIME FRAME.

6    OKAY?

7    **A.**    OKAY.

8    **Q.**    IN THE LATTER PART OF 2013 YOU LEARNED THAT ATAYEE WAS

9    IN FACT ACTING AS A BOOKIE; IS THAT CORRECT?

10         **MR. ROBINSON:**  OBJECTION.  RELEVANCE.  THIS

11    POSTDATES THE OFFENSE CONDUCT BY ALMOST A YEAR.

12         **THE COURT:**  SUSTAINED.

13    **Q.**    **(MR. ELLIS)** BUT THAT THE PERSON ADVISED THAT NOT ONLY

14    WAS ATAYEE A BOOKIE BUT THAT HE WAS ALSO SELLING COCAINE,

15    CORRECT?

16         **MR. ROBINSON:**  OBJECTION.  RELEVANCE, YOUR HONOR.

17         **THE COURT:**  SUSTAINED.

18         **MR. ELLIS:**  WELL, CAN I EXPLAIN WHY THIS IS

19    RELEVANT, YOUR HONOR?

20         **THE COURT:**  YES.

21         **MR. ELLIS:**  IT WAS ONGOING CRIMINAL ACTIVITY.  HE

22    WAS SELLING COCAINE PRESUMABLY DURING THE ENTIRE PERIOD OF HIS

23    COOPERATION.  THIS GOES TO THAT AND WHAT INVESTIGATION THEY

24    DID INTO IT.

25         **THE COURT:**  IT POSTDATES THE MOTION.

APRIL 14, 2014

CHEVIRON − CROSS−EXAMINATION

1        **MR. ELLIS:**  THE LEARNING −− THE GOVERNMENT DIDN'T

2   LEARN ABOUT THE INFORMATION UNTIL 2013, BUT THERE IS NO

3   INDICATION THAT THAT IS WHEN IT BEGAN, IT IS JUST WHEN IT

4   ENDED.

5        **MR. ROBINSON:**  HOW COULD IT BE OUTRAGEOUS GOVERNMENT

6   CONDUCT FOR THE GOVERNMENT TO IGNORE INFORMATION WHICH IT

7   WAS −−

8        **THE COURT:**  YOU ARE TRYING TO TIE IN THE TIME

9   FRAME −−

10        **MR. ELLIS:**  YES.

11        **THE COURT:**  −− AND THE AGENT'S KNOWLEDGE?

12        **MR. ELLIS:**  YES, YOUR HONOR.

13        **THE COURT:**  ALL RIGHT.

14        YOU CAN ANSWER THE QUESTION.

15  **Q.    (MR. ELLIS)** THERE WAS AN ALLEGATION THAT HE WAS ALSO

16  SELLING COCAINE, CORRECT?

17        **MR. ROBINSON:**  OBJECTION.  VAGUE AS TO TIME.

18  **Q.    (MR. ELLIS)** IN 2013 WHEN YOU MET WITH THE SOURCE OF

19  INFORMATION, THERE WAS AN INDICATION THAT ATAYEE WAS STILL

20  DEALING COCAINE, CORRECT?

21        **MR. ROBINSON:**  OBJECTION.  RELEVANCE.

22        **THE COURT:**  OVERRULED.

23        **MR. ROBINSON:**  IT IS ONLY RELEVANT IF HE WAS DEALING

24  COCAINE DURING THE COURSE OF HIS COOPERATION IN THIS CASE.

25        **MR. ELLIS:**  IT IS FOUNDATION, MR. ROBINSON.

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1            THE COURT:  OVERRULED.

 2            YOU MAY ANSWER.

 3            THE WITNESS:  THE OTHER C.H.S. INDICATED THAT ATAYEE

 4   MAY HAVE BEEN SELLING COCAINE FOR THE PAST SEVERAL MONTHS.

 5   Q.    (MR. ELLIS) NOT MAY HAVE, HE SAW HIM WITH COCAINE.

 6            MR. ROBINSON:  OBJECTION.  MOTION TO STRIKE.  FOR

 7   THE LAST SEVERAL MONTHS, YOUR HONOR.  IT CAN'T POSSIBLY HAVE A

 8   BEARING ON THIS PARTICULAR CASE.

 9            THE COURT:  WELL, YOU ARE TRYING TO TIE IN THIS

10   WITNESS'S KNOWLEDGE BASED ON AN OCTOBER 2013 INCIDENT.

11            MR. ELLIS:  YES, YOUR HONOR.

12            THE COURT:  YOU MAY ANSWER THE QUESTION.

13   Q.    (MR. ELLIS) HE WAS SEEN WITH COCAINE, CORRECT.

14   A.    CAN WE BE SPECIFIC ABOUT WHO WE ARE DISCUSSING?

15   Q.    HE MEANING ATAYEE.  I WILL TELL YOU THE REPORT I HAVE IS

16   SO HEAVILY REDACTED I ASSUME THIS IS ATAYEE.  I DON'T KNOW WHO

17   THE OTHER PERSON IS BUT I AM HAPPY TO -- IF YOU LOOK AT TAB 8.

18   A.    CAN I SEE THE REPORT?

19   Q.    IF YOU WANT TO LOOK AT TAB 8.

20   A.    SURE.  CAN I READ THIS?

21   Q.    YES.

22   A.    OKAY.

23            THE CLERK:  MR. ELLIS, IS THERE AN EXHIBIT NUMBER

24   FOR THIS?  YOU ARE REFERRING TO IT BY TAB NUMBER, IS IT ALSO

25   AN EXHIBIT?
```

APRIL 14, 2014

```
 1           MR. ELLIS:  YES.  I WILL MAKE THAT CLEAR IN JUST A
 2    MOMENT.
 3           THE WITNESS:  OKAY.  THANK YOU.  I HAVE REVIEWED IT.
 4    Q.    (MR. ELLIS) HE WAS SEEN –– ATAYEE WAS SEEN WITH
 5    COCAINE.
 6           MR. ROBINSON:  OBJECTION.  RELEVANCE AS TO TIME.
 7           THE COURT:  OVERRULED.
 8           YOU MAY ANSWER.
 9           THE WITNESS:  I GUESS I WANT TO BE CLEAR.
10    PARAGRAPH 1 REFERS TO ONE SOURCE OF INFORMATION, AND
11    PARAGRAPH 2 IS A DIFFERENT PERSON.  SO I GUESS IF YOU CAN
12    SPECIFY WHO SAW HIM WITH COCAINE I WOULD BE HAPPY TO ANSWER
13    THAT.
14    Q.    (MR. ELLIS) IF YOU LOOK AT PARAGRAPH 2, THE LAST
15    SENTENCE:  THE SOURCE THAT –– THE SOURCE ALSO SAW A PACKAGE IN
16    THE SAFE WHICH HE/SHE BELIEVED WAS COCAINE.
17           MR. ROBINSON:  OBJECTION.  RELEVANCE AS TO COCAINE
18    IN A SAFE IN 2013.  AGAIN, THE CONDUCT IN THIS CASE ENDED IN
19    2012.
20           THE COURT:  OVERRULED.
21           YOU MAY ANSWER.
22    Q.    (MR. ELLIS) SO AGAIN, TO BE CLEAR, HE WAS SEEN WITH
23    COCAINE, CORRECT?
24    A.    YES, BUT I WOULD MAKE ONE NOTE.  THAT THE REASON THIS
25    INDIVIDUAL IS CALLED A SOURCE OF INFORMATION IS BECAUSE HE IS
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

```
 1   NOT A VETTED C.H.S., HE IS JUST A PERSON COMING IN WITH
 2   INFORMATION THAT HASN'T BEEN VETTED OR CORROBORATED.  BUT,
 3   YES, THAT IS WHAT HE SAYS.
 4   Q.   YOU BELIEVED HIM.  YOU USED THIS INFORMATION ULTIMATELY
 5   TO GET AN ADDITIONAL SEARCH WARRANT; IS THAT CORRECT?
 6   A.   IT WAS AFTER THE INFORMATION HAD BEEN CORROBORATED, YES,
 7   THAT INFORMATION WAS USED TO GET A SEARCH WARRANT.
 8   Q.   SO THE ANSWER IS YOU BELIEVED HIM.
 9   A.   YES.
10   Q.   NOW -- I WANT TO MOVE NOW TO THE JULY 12TH SEIZURE OF
11   MONEY IN THIS CASE.  OKAY?
12   A.   OKAY.
13   Q.   NOW, WE OFTEN REFERRED TO IT AS THE JULY 12TH SEIZURE,
14   BUT THE ACTUAL SEIZURE OF THE MONEY TOOK PLACE ON JULY 13TH;
15   IS THAT CORRECT?
16   A.   THAT IS CORRECT.  THE MEETING WAS LATE ON JULY 12TH, THE
17   TRAFFIC STOP HAPPENED ON JULY 13TH.
18   Q.   OKAY.  NOW I WANT TO TALK TO YOU ABOUT THE TIME FRAME
19   FOR WHAT HAPPENED.
20   A.   OKAY.
21          MR. ELLIS:  YOUR HONOR, I AM MOVING AWAY SLIGHTLY
22   FROM THE MISCONDUCT MOTION INTO THE FOURTH AMENDMENT AREA, SO
23   THIS IS -- SINCE HE IS ON.
24          THE COURT:  ALL RIGHT.
25   Q.   (MR. ELLIS)  NOW, IF I UNDERSTAND THIS, SIR, THE PARTIES
```

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1    LEAVE THE HOTEL AROUND MIDNIGHT; IS THAT CORRECT?

2    **A.**    I THINK IT WAS JUST AFTER MIDNIGHT, SURE.

3    **Q.**    AND ULTIMATELY YOU ARE AWARE THAT MR. WRIGHT AND MR.

4    MCKENNIE WERE PULLED OVER UNTIL APPROXIMATELY 1:45 IN THE

5    MORNING -- OR THAT IS WHAT -- THEY WERE PULLED OVER

6    APPROXIMATELY 1:05; IS THAT CORRECT?

7    **A.**    I DON'T HAVE THE EXACT TIME IN FRONT OF ME.

8    **Q.**    AND ABOUT 1:45 THEY WERE STILL STOPPED ON THE SIDE OF

9    THE ROAD.

10           **MR. ROBINSON:**  OBJECTION.  LACK OF FOUNDATION, YOUR

11    HONOR.

12           **THE COURT:**  SUSTAINED.

13    **Q.**    **(MR. ELLIS)** I WANT TO TALK TO YOU ABOUT WHAT YOU WERE

14    DOING BETWEEN 1:00 A.M. AND 1:45 A.M.  OKAY, SIR?

15    **A.**    OKAY.

16    **Q.**    YOU MET WITH THE -- WITH MR. ATAYEE TO DISCUSS WHAT HAD

17    OCCURRED; IS THAT CORRECT?

18    **A.**    AT WHAT POINT?  WHAT TIME?

19    **Q.**    BETWEEN 1:05 AND 1:45 YOU MET WITH MR. ATAYEE, CORRECT?

20    **A.**    IT WAS AFTER THE TRAFFIC STOP HAD BEEN INITIATED.  AFTER

21    THE TRAFFIC STOP HAD BEEN INITIATED I WENT BACK TO MEET WITH

22    MR. ATAYEE.  I AM NOT SURE OF THE TIME.

23    **Q.**    AND AFTER YOU -- AFTER THE TRAFFIC STOP YOU MET WITH

24    HIM, YOU SPOKE WITH HIM, BUT YOU DIDN'T AT THAT TIME

25    PERSONALLY LISTEN TO THE PERSONAL RECORDING DEVICE THAT WAS ON

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1    HIM, DID YOU?

2    **A.**    NO.  IT NEEDS TO BE DOWNLOADED, AND THEN I REVIEW IT.

3    **Q.**    EXACTLY.  SO YOU WERE RELYING ON WHAT HE TOLD YOU AT

4    THAT TIME.

5    **A.**    AS WELL AS THE SEVERAL OTHER RECORDED MEETINGS.

6    **Q.**    NOW –– AND YOU SENT HIM A TEXT MESSAGE THAT NIGHT WHEN

7    IT WAS OVER?  "HE" MEANING YOU SENT ATAYEE A TEXT MESSAGE.

8    DO YOU RECALL THAT?

9    **A.**    DO YOU HAVE A SPECIFIC TEXT MESSAGE?

10   **Q.**    531.

11   **A.**    531 INDICATES IT IS AN OUTGOING MESSAGE AT 9:00 A.M.

12   9:16 A.M. –– EXCUSE ME –– TO BE EXACT.

13   **Q.**    YOU DID GOOD TONIGHT, MAN.  WE WILL TALK TOMORROW.

14   **A.**    YES, THAT'S WHAT THE TEXT MESSAGE SAYS.

15   **Q.**    NOW I WANT TO BACK UP NOW, THEN, SIR, AND TALK TO YOU

16   ABOUT WHAT HAPPENED PRIOR TO THE JULY 12TH MEETING BETWEEN

17   ATAYEE, MR. WRIGHT AND MCKENNIE.

18   **A.**    OKAY.

19   **Q.**    NOW, AS CONSISTENT WITH YOUR PROTOCOL YOU HAD A MEETING

20   WITH MR. ATAYEE BEFORE HIS MEETING WITH MR. WRIGHT AND MR.

21   MCKENNIE, CORRECT?

22   **A.**    CORRECT.

23   **Q.**    AND THE ADVICE YOU GAVE HIM ON THAT OCCASION WAS TO KEEP

24   HIS EYE ON THE PRIZE, CORRECT?

25   **A.**    I DON'T KNOW WHAT I SPECIFICALLY TOLD HIM DURING A

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1    MEETING.

2    **Q.**    BUT THIS IS AN EXPRESSION THAT YOU HAVE USED WITH HIM

3    BEFORE; IS THAT CORRECT?

4    **A.**    I MAY HAVE.  I DON'T KNOW.

5    **Q.**    CAN YOU TURN TO 150, TAB 2, WHICH IS EXHIBIT B –– I AM

6    SORRY.

7            **MR. ELLIS:**  FOR THE RECORD, TAB 2 IS EXHIBIT B.

8            FOR THE RECORD, MAKING THIS CLEAR, YOUR HONOR, TAB 1

9    IS EXHIBIT A, TAB 2 IS EXHIBIT B, SO FORTH.

10           **THE COURT:**  YES.

11           **MR. ELLIS:**  THANK YOU, YOUR HONOR.

12           **THE WITNESS:**  SO LINE 150, FEBRUARY 23RD, 2012 AT

13    3:49 A.M., IT IS AN INCOMING MESSAGE.  IT SAYS ––

14    **Q.**    **(MR. ELLIS)** I AM SORRY, THAT WAS JUST FOR CONTEXT.  IF

15    YOU LOOK AT 157.

16    **A.**    OKAY, LINE 157.

17    **Q.**    ATAYEE TO YOU:  LIKE YOU SAY, KEEP YOUR EYE ON THE

18    PRIZE.

19          CORRECT?

20    **A.**    YES, THAT IS WHAT THE TEXT MESSAGE SAYS.

21    **Q.**    AND THE EYE ON THE PRIZE FOR THE JULY 12TH MEETING WAS

22    5 MORE KILOGRAMS OF COCAINE, CORRECT?

23    **A.**    HE IS REFERENCING KEEP YOUR EYE ON THE PRIZE, I AM NOT

24    SURE WHAT HE IS REFERRING TO.

25    **Q.**    WELL, IF YOU LOOK AT LINE 240, THEN.

APRIL 14, 2014

CHEVIRON -- CROSS-EXAMINATION

1    **A.**    OKAY.  I SEE LINE 240 SAYS -- IS THIS AN INCOMING OR

2    OUT -- OKAY.

3          LINE 240, MAY 30TH, 2012, 5:22 A.M. IS AN OUTGOING

4    MESSAGE AND IT SAYS:  OKAY, 10, BUT HAVE YOUR --

5    **Q.**    HAVE YOUR PHONE IN CASE IT NEEDS TO BE EARLIER.  DON'T

6    WORRY ABOUT YOUR WORKOUT, KEEP YOUR EYE ON THE PRIZE.

7          CORRECT?

8    **A.**    YES, THAT IS WHAT IT SAYS.

9    **Q.**    AND THE PRIZE AT THE JULY 12TH MEETING WAS 5 MORE

10   KILOGRAMS OF COCAINE, CORRECT?

11   **A.**    AGAIN, I AM NOT SURE WHAT THE PRIZE MEANS.  I THINK IN

12   THAT TERM I AM SAYING STAY FOCUSED ON THE INVESTIGATION YOU

13   ARE WORKING ON, STAY FOCUSED, KEEP YOUR EYE ON THE PRIZE.  I

14   AM NOT SURE THAT IT REFERS TO A SPECIFIC QUANTITY OF

15   NARCOTICS.  MAY 23RD IS SEVERAL MONTHS BEFORE --

16   **Q.**    I UNDERSTAND.  IF YOU LOOK AT TAB 10, WHICH IS --

17   **A.**    OKAY.

18   **Q.**    SHOULD BE EXHIBIT J.

19          (EXHIBIT J MARKED FOR IDENTIFICATION)

20   **A.**    OKAY.

21   **Q.**    THAT'S A TRANSCRIPT OF THE JULY 12TH MEETING?

22   **A.**    IT IS.

23   **Q.**    IF YOU LOOK AT PAGE 61 OF THE TRANSCRIPT.

24   **A.**    OKAY.  I AM LOOKING AT PAGE 61.

25   **Q.**    FROM YOU.  LINE 5:  OKAY.  HOW WAS THE CONVERSATION, DID

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

```
 1    YOU GUYS AGREE TO IT?  LIKE WHAT, 6 OR WHAT?
 2         YEAH, 6 6 6.
 3              MR. ROBINSON:  OBJECTION, YOUR HONOR.  RELEVANCE AS
 4    TO VOLUNTARINESS OF THE STATEMENTS THAT ARE MADE ON THE
 5    ROADSIDE OR AFTER THE DEFENDANT GOES BACK TO HARBOR PATROL.
 6    THIS HAS NO BEARING ON IT WHATSOEVER.
 7              MR. ELLIS:  THIS GOES TO WHETHER OR NOT THERE WAS
 8    PROBABLE CAUSE TO INITIATE THE SEARCH.  THE GOVERNMENT HAS
 9    DECIDED THAT THEY ARE GOING WITH THE THEORY OF COLLECTIVE
10    KNOWLEDGE.  THEY INDICATED THERE WAS PROBABLE CAUSE.  THIS
11    GOES DIRECTLY TO PROBABLE CAUSE.
12              THE COURT:  ARE YOU READING --
13              MR. ELLIS:  YES, YOUR HONOR.
14              THE COURT:  -- FOLLOWING WITH A QUESTION?
15              MR. ELLIS:  YES, YOUR HONOR.
16    Q.    (MR. ELLIS) THAT IS WHAT YOU SAID; IS THAT CORRECT?
17    A.    YES, BUT -- YES.
18    Q.    NOW, YOU INDICATED -- JUST TO BE CLEAR, GOING BACK TO
19    THE OTHER MOTION FOR A MOMENT -- THAT YOU WERE PRESENT AT
20    ATTAYEE'S OSC REVOCATION HEARING ON APRIL 9TH, 2012; IS THAT
21    CORRECT?
22    A.    YES, I WAS PRESENT.
23    Q.    AND BY THIS TIME YOU WERE AWARE OF -- YOU HAD HEARD
24    ATAYEE USE OFFENSIVE LANGUAGE BEFORE?
25    A.    YES.
```

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1    **Q.**    SPECIFICALLY RACIAL SLURS ABOUT BLACK PEOPLE?

2    **A.**    YES.

3    **Q.**    AND YOU WERE THERE ON APRIL 9TH, 2012 WHERE ATAYEE IS

4    ALLOWED TO STAY OUT OF CUSTODY, AND HE IS GOING TO RE-UP

5    HIS –– AS A C.I.  DO YOU REMEMBER THAT?

6    **A.**    I WAS THERE AT THE HEARING, YES.

7    **Q.**    AND YOU REMEMBER THAT?

8    **A.**    I REMEMBER THE HEARING, YES.

9    **Q.**    AND YOU REMEMBER WHERE HE WAS STAYING OUT IN PART TO

10   RE-UP AS A C.I.?

11   **A.**    YES.

12   **Q.**    NOW, PRIOR TO APRIL 9TH, 2012 ATAYEE HAD NEVER MENTIONED

13   THE NAME CRAIG WRIGHT, HAD HE?

14   **A.**    COULD YOU REPEAT THE DATE AGAIN FOR ME?

15   **Q.**    PRIOR TO APRIL 9TH, 2012 ATAYEE HAD NEVER MENTIONED THE

16   NAME CRAIG WRIGHT, HAD HE?

17   **A.**    THAT'S CORRECT.

18   **Q.**    IT WASN'T UNTIL MAY.

19   **A.**    THAT'S CORRECT.

20   **Q.**    NOW, AGENT CHEVIRON, YOU DID WORK CLOSELY WITH MR.

21   ATAYEE FOR ABOUT THREE AND A HALF YEARS; IS THAT CORRECT?

22   **A.**    YES.

23   **Q.**    THE TWO OF YOU BECAME FRIENDS OVER THAT PERIOD OF TIME?

24   **A.**    NO.

25   **Q.**    YOU SENT FRIENDLY TEXT MESSAGES TO EACH OTHER.

APRIL 14, 2014

CHEVIRON – CROSS-EXAMINATION

1  **A.**   I GUESS DEFINE FRIENDLY.

2  **Q.**   GOT YOU AN ANNIVERSARY PRESENT.  GOING TO SEE A CHALDEAN

3  DOWN IN CHILD VISTA AT A CAR WASH LATER TODAY.  CALL YOU AFTER

4  THE GYM.  THAT IS THE PRESENT YOU OWE ME.  HAPPY BIRTHDAY.

5  ANNIVERSARY, I MEAN.

6      IS THAT CORRECT?

7  **A.**   YOU ARE SAYING 291 WAS AN OUTGOING MESSAGE?

8  **Q.**   YES.

9  **A.**   291 AND 292 ARE BOTH OUTGOING, SO THAT IS THE MESSAGE I

10  SENT, YES.

11  **Q.**   BY THE WAY.  IF WE LOOK AT LINE 293 IT SAYS:  THE CAR

12  WASH IS OFF THE XXXX.

13      IS THAT CORRECT?

14  **A.**   THAT IS WHAT IT SAYS, CORRECT.

15  **Q.**   THAT'S NOT WHAT IT SAID WHEN HE SENT THAT TO YOU.

16  **A.**   THAT'S CORRECT.

17  **Q.**   THIS IS A REDACTION?

18  **A.**   THAT'S CORRECT.

19  **Q.**   AND YOU WOULD AGREE WITH ME THAT THERE ARE NUMEROUS

20  REDACTIONS IN THESE TEXT MESSAGES; IS THAT CORRECT?

21  **A.**   I DON'T KNOW ABOUT NUMEROUS.  IT IS, YOU KNOW, THOUSANDS

22  OF LINES OF TEXT AND --

23  **Q.**   THAT IS FINE.  BUT YOU WOULD AGREE WITH ME THAT THERE

24  WERE.

25  **A.**   THERE WERE REDACTIONS.

APRIL 14, 2014

CHEVIRON – CROSS–EXAMINATION

1  **Q.**    NOW, AGENT CHEVIRON, FINALLY, SIR, YOU TOLD US THAT --

2  IF I UNDERSTAND THIS -- THERE WAS ONLY TWO OCCASIONS WHERE

3  YOUR SUPERVISORS WERE ALERTED ABOUT ATAYEE'S BEHAVIOR; IS THAT

4  CORRECT?

5  **A.**    SUPERVISORS ARE ALERTED WHEN ATAYEE, THE C.H.S., IS

6  INVOLVED IN UNAUTHORIZED ILLEGAL ACTIVITY; SO THE DECEMBER 4TH

7  INCIDENT AND THE AUGUST 4TH, 2011 INCIDENT.

8  **Q.**    THEY WEREN'T ADVISED OR ALERTED ABOUT ANYTHING ELSE?

9  **A.**    NO, THAT IS NOT CORRECT.  THEY WERE ALERTED ALSO AFTER

10  ALLEGATIONS HAD BEEN MADE OF HIS BOOKMAKING OPERATION, AND

11  THAT INFORMATION WAS CORROBORATED.  THEY WERE CONFERRED WITH

12  AND, YOU KNOW, I INFORMED THEM THAT I WOULD BE CONDUCTING AN

13  INVESTIGATION INTO TARGETING MR. ATAYEE.

14  **Q.**    SO IT IS, IN FACT, JUST THREE OCCASIONS YOUR SUPERVISORS

15  WERE ALERTED TO HIS CONDUCT.

16  **A.**    YES.  AGAIN, THEY ARE ONLY NOTIFIED IF UNAUTHORIZED

17  ILLEGAL ACTIVITY HAS BEEN NOTED.

18          **MR. ELLIS:**  THANK YOU FOR YOUR TIME, SIR.

19          **THE COURT:**  REDIRECT.

20                    REDIRECT EXAMINATION

21  **Q.**    **(MR. ROBINSON)** IS THERE A DIFFERENCE IN THE WAY IN

22  WHICH THE FBI CHARACTERIZES SOMEONE WHO IS A COOPERATING

23  DEFENDANT AS OPPOSED TO A C.H.S.?  ARE THOSE TWO DIFFERENT

24  TYPES OF INDIVIDUALS FROM THE PERSPECTIVE OF THE FBI IN TERMS

25  OF THE REALM OF COOPERATION?

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1   **A.**   YES.

2   **Q.**   SO FOR A POINT OF TIME THE C.I. OR C.H.S., THE

3   INDIVIDUAL AT ISSUE HERE, WAS A COOPERATING DEFENDANT; IS THAT

4   YOUR TESTIMONY?

5   **A.**   THAT'S CORRECT.

6   **Q.**   AND THEN IN MAY OF 2010 HE WAS SIGNED UP AS A C.H.S.

7   **A.**   THAT'S CORRECT.

8   **Q.**   SO THAT IS THE DIFFERENCE BETWEEN THE TWO STATUSES YOU

9   TESTIFIED TO?

10  **A.**   THAT'S CORRECT.

11  **Q.**   OKAY.  WITH RESPECT TO THE DECEMBER 4TH, 2010 INCIDENT,

12  DID YOU TAKE ANY STEPS WHATSOEVER TO AFFECT THE WAY IN WHICH

13  THAT CASE WAS EITHER PROSECUTED OR NOT PROSECUTED BY THE

14  DISTRICT ATTORNEY'S OFFICE?

15  **A.**   NO.

16  **Q.**   DID YOU TAKE ANY STEPS WHATSOEVER TO EITHER HELP OR

17  HINDER ANY FOLLOW-UP INVESTIGATION OF THAT INCIDENT BY THE

18  AFFECTED LAW ENFORCEMENT AGENCY?

19  **A.**   NO.

20  **Q.**   YOU HAD NO INVOLVEMENT IN THAT CASE AT ALL, EXCEPT

21  REPORTING IT TO KIM PELOT, THE SUPERVISING OFFICER?

22  **A.**   THAT'S CORRECT.

23  **Q.**   DOES THE SAME THING HOLD TRUE WITH RESPECT TO THE AUGUST

24  4TH, 2011 INCIDENT?

25  **A.**   THAT'S CORRECT.

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1   **Q.**   DID YOU TAKE ANY STEPS WHATSOEVER IN REGARDS TO THAT

2   INCIDENT TO AFFECT THE DISTRICT ATTORNEY'S OFFICE DECISION

3   WHETHER OR NOT TO GO FORWARD WITH THE PROSECUTION STEMMING

4   FROM THAT INCIDENT?

5   **A.**   NO.

6   **Q.**   DID YOU TAKE ANY STEPS WHATSOEVER TO AFFECT, ONE WAY OR

7   THE OTHER, THE AFFECTED LAW ENFORCEMENT AGENCY'S FOLLOW-UP OF

8   THAT INCIDENT?

9   **A.**   NO.

10  **Q.**   THE DRUG QUANTITIES INVOLVED IN THE CASE LEADING TO

11  DEFENDANT WRIGHT'S ARREST, WHO CAME UP WITH THE DRUG

12  QUANTITIES UNDER NEGOTIATION?

13  **A.**   IT WAS AN ONGOING NEGOTIATION, BUT ALL AMOUNTS WERE

14  BROUGHT TO THE C.H.S.' ATTENTION.

15  **Q.**   OKAY.  THERE WAS AN EFFORT, ALBEIT IT NOT ONE THAT CAME

16  TO FRUITION, TO PEG TO THE 5 KILOGRAMS OF COCAINE.  DID YOU --

17        **MR. ELLIS:**  OBJECTION, YOUR HONOR.  THIS IS

18  ARGUMENTATIVE AND IMPROPER QUESTIONING.

19        **THE COURT:**  SUSTAINED.  ARGUMENTATIVE.

20  **Q.**   **(MR. ROBINSON)** DID YOU EVER DIRECT THE CONFIDENTIAL

21  HUMAN SOURCE TO TAKE THE NEGOTIATIONS IN A PARTICULAR

22  DIRECTION SUCH THAT THERE WOULD BE MORE THAN 5 KILOGRAMS OF

23  COCAINE INVOLVED IN THE ULTIMATE TRANSACTION?

24  **A.**   NO.

25  **Q.**   ARE YOU CERTAIN ABOUT THAT FACT?

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1  **A.**    YES.

2  **Q.**    DID YOU SUGGEST ANY DRUG QUANTITY TO THE CONFIDENTIAL

3  HUMAN SOURCE WITH RESPECT TO THIS INVESTIGATION, HOW MUCH YOU

4  WOULD LIKE TO SEE PURCHASED AND/OR NEGOTIATED FOR?

5  **A.**    NO.

6  **Q.**    ARE YOU ABSOLUTELY CERTAIN OF THAT FACT?

7  **A.**    YES.

8  **Q.**    AS THE FBI AGENT RESPONSIBLE FOR HANDLING THE

9  CONFIDENTIAL HUMAN SOURCE IN THIS CASE, WOULD YOU DRAW A

10 DISTINCTION BETWEEN BEING THAT INDIVIDUAL'S FRIEND AND

11 MAINTAINING A RAPPORT WITH THAT INDIVIDUAL?

12 **A.**    SURE.  IT IS IMPORTANT TO REMAIN -- OR TO HAVE A

13 RAPPORT.

14 **Q.**    AND DID EACH AND EVERY ONE OF YOUR TEXT MESSAGES CONCERN

15 THE CONTROL OF THAT CONFIDENTIAL HUMAN SOURCE AND DIRECTED

16 CRIMINAL ACTIVITY; OR WERE SOME OF THOSE TEXT MESSAGES

17 DIRECTED AT MAINTAINING A RAPPORT WITH THAT INDIVIDUAL?

18 **A.**    THAT'S CORRECT.

19 **Q.**    IS THERE A DISTINCTION IN YOUR MIND BETWEEN KEEPING THAT

20 RAPPORT AND BECOMING THAT INDIVIDUAL'S FRIEND?

21 **A.**    ABSOLUTELY.

22          **MR. ELLIS:**  THIS IS ALL LEADING AT THIS POINT.  I

23 WOULD OBJECT.

24          **THE COURT:**  SUSTAINED.

25 **Q.**    **(MR. ROBINSON)** TELL ME ABOUT THE DIFFERENCE BETWEEN --

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1   IN YOUR MIND AND HOW YOU WOULD CHARACTERIZE THE DIFFERENCE

2   BETWEEN MAINTAINING RAPPORT AND BECOMING SOMEONE'S FRIEND AS

3   IT PERTAINS TO YOUR OPERATION OF THE CONFIDENTIAL HUMAN SOURCE

4   IN THIS CASE.

5           **MR. ELLIS:**  OBJECTION.  RELEVANCE.

6           **THE COURT:**  OVERRULED.

7           **THE WITNESS:**  IT IS IMPORTANT TO KEEP THE C.H.S.

8   FEELING COMFORTABLE, MOTIVATED; BUT IT IS A STRICTLY OFFICIAL

9   RELATIONSHIP.  I MADE THAT VERY CLEAR TO HIM SEVERAL TIMES.

10  IT IS IMPORTANT TO KEEP THE RELATIONSHIP OFFICIAL, BUT STILL

11  HAVE A GOOD RAPPORT.  SIMILAR TO CONDUCTING AN INTERVIEW, YOU

12  MIGHT BE HAVING AN INTERVIEW WITH A PERSON THAT IS CONVICTED

13  OF SOME VERY SERIOUS CRIMES, HOWEVER YOU STILL NEED TO

14  MAINTAIN A RAPPORT TO ELICIT INFORMATION FROM THEM.

15  **Q.**    **(MR. ROBINSON)** WITH REGARD TO YOUR TESTIMONY THAT YOU

16  INSTRUCTED THE C.H.S. ON SEVERAL OCCASIONS NOT TO USE

17  DEROGATORY RACIAL TERMS, WERE ANY OF THE INSTRUCTIONS GIVEN IN

18  THE TEXT MESSAGE CONTEXT, TO YOUR RECOLLECTION?

19  **A.**    I DON'T BELIEVE SO.  MOST --

20  **Q.**    WOULD REVIEWING YOUR TEXT MESSAGES REFRESH YOUR

21  RECOLLECTION AS TO WHETHER OR NOT YOU GAVE HIM SUCH

22  INSTRUCTIONS?

23  **A.**    IT WOULD.

24  **Q.**    COULD YOU PLEASE TURN TO THE TEXT MESSAGE IN DEFENSE

25  BINDER EXHIBIT B, AS IN BRAVO.  AND SPECIFICALLY REFERRING TO

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

 1   TEXT MESSAGE NO. 286.  DO YOU HAVE THAT IN FRONT OF YOU?

 2   **A.**   I DO.

 3   **Q.**   I AM GOING TO JOIN YOU.  I DON'T HAVE A COPY.

 4        COULD YOU READ THE INCOMING MESSAGE THAT YOU RECEIVED

 5   FROM THE CONFIDENTIAL HUMAN SOURCE REFLECTED AS MESSAGE

 6   NO. 284, PLEASE.  AND IT GOES INTO 285.

 7   **A.**   LINE 284 STATES:  IS A LOT OF THEM, AND I DEFINITELY

 8   WANT TO GET YOUR PLATE FILLED.  I HAVE JUST BEEN DOING ONE

 9   THING AT A TIME.  I KNOW WE ARE NOT DEA.  ALL I DO IS PULL

10   WHATEVER --

11        THAT GOES ON TO LINE 285.

12        -- FISH THAT IS IN THE NET, BUT I WILL FOCUS MORE ON THE

13   BOTTOM-FEEDING CALDOS THAT DON'T KNOW ME, AND THESE GUYS MIGHT

14   BE ONE.

15   **Q.**   AND TO BE CLEAR, WAS THAT AN INCOMING MESSAGE THAT YOU

16   RECEIVED FROM THE CONFIDENTIAL HUMAN SOURCE?

17   **A.**   IT WAS.

18   **Q.**   IN WHAT WAY DID YOU RESPOND TO HIS USE OF THE TERM

19   BOTTOM-FEEDING CALDOS?

20   **A.**   LINE 286:  OKAY.  STOP USING RACIAL STEREOTYPES.  WE

21   WILL TALK THIS WEEKEND.

22   **Q.**   IS THAT AN ADMONISHMENT SIMILAR TO THE WAY YOU

23   ADMONISHED THE CONFIDENTIAL HUMAN SOURCE WHEN HE WOULD USE

24   RACIALLY INSENSITIVE TERMS OR DESCRIPTIONS THROUGHOUT HIS

25   COOPERATION?

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1   **A.**   YES.

2           **MR. ROBINSON:**  I HAVE NO FURTHER QUESTIONS AT THIS

3   TIME.

4           **THE COURT:**  RECROSS.

5           **MR. ELLIS:**  VERY FEW, JUST IN THOSE AREAS.

6                      RECROSS-EXAMINATION

7   **Q.**   **(MR. ELLIS)** AGENT CHEVIRON, I JUST WANT TO BE CLEAR.

8   DID YOU, OR ANY OTHER FBI AGENTS OR DEA AGENTS, TO YOUR

9   KNOWLEDGE, EVER INFORM THE STATE AUTHORITIES IN -- AFTER THE

10  DECEMBER 4TH, 2010 INCIDENT THAT ATAYEE WAS A C.I.?

11          **MR. ROBINSON:**  OBJECTION.  RELEVANCE.

12          **THE COURT:**  OVERRULED.

13          YOU MAY ANSWER.

14          **THE WITNESS:**  JUST REPEAT THE TIME FRAME, IF YOU

15  COULD.

16  **Q.**   **(MR. ELLIS)** YES, SIR.

17      AT ANY TIME AFTER THE DECEMBER 4TH, 2010 INCIDENT, TO

18  YOUR KNOWLEDGE DID YOU OR ANY OTHER FEDERAL AGENTS ALERT THE

19  STATE AUTHORITIES THAT ATAYEE WAS A C.I. --

20          **MR. ROBINSON:**  OBJECTION.

21  **Q.**   **(MR. ELLIS)** -- IN RELATION TO THAT CASE?

22  **A.**   I AM NOT SURE IF I -- CERTAINLY, I DON'T KNOW ABOUT

23  ANYONE ELSE.  AS FAR AS MYSELF, I MAY HAVE.  IN WHAT CONTEXT?

24  **Q.**   IN THE CONTEXT OF:  THE PERSON THAT WE ARE THINKING OF

25  CHARGING, OH, YEAH, HE IS A C.I.

APRIL 14, 2014

CHEVIRON – RECROSS–EXAMINATION

1    **A.**    OKAY.  NOT TO SWAY THEIR DECISION.

2    **Q.**    THAT WASN'T MY POINT, SIR.  DID YOU EVER TELL THEM THAT

3    ATAYEE WAS A C.I.?

4    **A.**    AGAIN BY THEM, MAYBE.

5    **Q.**    ANY STATE AUTHORITIES, SIR.

6    **A.**    MAYBE.

7    **Q.**    YES IS THE ANSWER, ISN'T IT?

8    **A.**    I DON'T KNOW FOR SURE.

9    **Q.**    AND YOU ARE SUGGESTING THAT YOU WOULDN'T HAVE TOLD THEM

10   THAT TO SWAY THEM THAT THIS PERSON IS WORKING ON AN ONGOING

11   FEDERAL INVESTIGATION, YOU DIDN'T THINK THAT WOULD SWAY THE

12   STATE AUTHORITIES?

13   **A.**    NO.  IN FACT, FOR INSTANCE, WHEN I BEGAN INVESTIGATING

14   HIM IN 2013, I WOULD USE IT AS:  IF YOU NEED ANY HELP

15   PROSECUTING, I MAY HAVE SOME INFORMATION.

16   **Q.**    SIR, YOU ARE NOT A STATE AUTHORITY, ARE YOU?

17   **A.**    NO.

18   **Q.**    TURNING TO THE AUGUST 2011 INCIDENT, SIR.  DID YOU OR

19   ANY OTHER FEDERAL AGENT, TO YOUR KNOWLEDGE, ALERT THE STATE

20   AUTHORITIES THAT ATAYEE WAS A FEDERAL C.I.?

21   **A.**    I DON'T KNOW.

22   **Q.**    NOW GOING BACK TO YOUR KNOWLEDGE OF THE DECEMBER 4TH,

23   2010 INCIDENT.  YOU SAID THAT YOU CALLED MR. ATAYEE'S

24   PROBATION OFFICER; IS THAT CORRECT?

25   **A.**    YES.

APRIL 14, 2014

CHEVIRON – RECROSS–EXAMINATION

1  **Q.**    YOU ALSO CALLED THE PROSECUTOR?

2  **A.**    YES.

3         **MR. ROBINSON:**  OBJECTION.  RELEVANCE.  BEYOND THE

4  SCOPE.

5         **THE COURT:**  OVERRULED.

6         **THE WITNESS:**  YES.

7  **Q.**    **(MR. ELLIS)** WAS IT MR. STARITA OR MR. CHUN?

8  **A.**    IT WAS PROBABLY AUSA STARITA, AND POSSIBLY BOTH.

9  **Q.**    AND YOU WOULD HAVE TOLD THEM THE RACIALLY INSENSITIVE

10  THINGS THAT ATAYEE SAID ON THAT OCCASION, CORRECT?

11  **A.**    I WOULD HAVE TOLD THEM OF THE ALTERCATION, YES, AND THE

12  FACTS THAT SURROUNDED IT.

13  **Q.**    SAME HOLDS TRUE FOR THE AUGUST 2011 INCIDENT, SIR?

14  **A.**    I WOULD HAVE DESCRIBED THE FACTS SURROUNDING THE EVENT,

15  YES.

16  **Q.**    NOW, THE LAST TWO QUESTIONS, SIR, IS YOU WERE ASKED

17  ABOUT THE DIFFERENCE, BEING FRIENDLY VERSUS CONTROLLING A

18  CONFIDENTIAL INFORMANT.  DO YOU REMEMBER THAT?

19  **A.**    YES.

20  **Q.**    AND YOU SAID THERE WAS A LINE; IS THAT CORRECT?

21  **A.**    THERE IS A DIFFERENTIATION, YES.

22  **Q.**    BETWEEN MAINTAINING A RAPPORT AND BEING FRIENDS?

23  **A.**    YES.

24  **Q.**    WHERE DOES OFFERING A PRESENT FOR AN ANNIVERSARY, WHAT

25  LINE DOES THAT FALL ON, SIR?

APRIL 14, 2014

CHEVIRON − RECROSS−EXAMINATION

1  **A.**    I DIDN'T GIVE HIM A PRESENT FOR HIS ANNIVERSARY.

2  **Q.**    NOW, FINALLY, YOU WERE ASKED ABOUT THE TEXT MESSAGE

3  WHERE YOU ADVISED ATAYEE TO QUITE USING RACIALLY INSENSITIVE

4  STEREOTYPES ABOUT CHALDEANS.  DO YOU REMEMBER THAT?

5  **A.**    YES.

6  **Q.**    THAT WAS IN 2012?

7  **A.**    286.  286, YES, IT WAS IN 2012.

8  **Q.**    IS IT FAIR TO SAY THAT YOU HAD ADMONISHED HIM BEFORE

9  THAT DATE ABOUT USING RACIALLY INSENSITIVE WORDS?

10  **A.**    YES.

11  **Q.**    AND THAT YOU ADMONISHED HIM AFTER THAT DATE.

12  **A.**    YES, I HAD TO ADMONISH HIM SEVERAL TIMES.

13            **THE COURT:**  ANY MORE?

14          **MR. ROBINSON:**  YOUR HONOR, IT IS NOT TECHNICALLY

15  REDIRECT, BUT I LIMITED MY INITIAL QUESTIONING TO OUTRAGEOUS

16  GOVERNMENT CONDUCT.  IF I COULD JUST ELICIT SOME FACTS

17  SURROUNDING THE COLLECTIVE KNOWLEDGE ARGUMENT?

18            **THE COURT:**  YES.

19          **MR. ROBINSON:**  THANK YOU.

20                  REDIRECT EXAMINATION

21  **Q.**    **(MR. ROBINSON)** YOU TESTIFIED EARLIER ABOUT DOING SOME

22  DUE DILIGENCE WITH RESPECT TO MR. WRIGHT AND THEN DECIDING

23  THAT HE WAS A LEGITIMATE TARGET FOR AN ONGOING INVESTIGATION.

24  DO YOU RECALL GIVING THAT TESTIMONY?

25  **A.**    I DO.

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1   **Q.**   CAN YOU BRIEFLY DESCRIBE THE WAY IN WHICH YOU HAD THE

2   C.H.S. CONDUCT THE INVESTIGATION OF MR. WRIGHT; WAS IT ALL

3   THROUGH TELEPHONE CONVERSATIONS, IN-PERSON MEETINGS, OR A

4   COMBINATION?

5   **A.**   A COMBINATION.  MOSTLY IN-PERSON MEETINGS.

6   **Q.**   DID YOUR REVIEW OF THE RECORDED CONVERSATIONS BETWEEN

7   THE C.H.S. AND MR. WRIGHT, WERE THEY CONSISTENT OR

8   INCONSISTENT WITH THE INFORMATION THAT THE C.H.S. HAD

9   INITIALLY PROVIDED TO YOU ABOUT BOTH THEIR HISTORY OF DRUG

10  DEALING AND MR. WRIGHT'S CURRENT DRUG DEALING ACTIVITIES?

11  **A.**   THEY WERE CONSISTENT.

12  **Q.**   HOW MANY RECORDED CONVERSATIONS WERE THERE,

13  APPROXIMATELY, BETWEEN THE C.H.S. AND DEFENDANT WRIGHT PRIOR

14  TO THE TIME OF THE MONEY SEIZURE ON JULY THE 12TH AND INTO THE

15  EARLY MORNING HOURS OF JULY 13TH OF 2010 -- OR 2012.  I AM

16  SORRY.

17  **A.**   THERE WAS APPROXIMATELY NINE RECORDED MEETINGS,

18  FACE-TO-FACE CONVERSATIONS.  AND A HANDFUL, FIVE TO 10,

19  TELEPHONE CONVERSATIONS, PROBABLY, ARRANGING THOSE MEETINGS.

20  **Q.**   DID YOU HAVE OCCASION TO REVIEW THOSE RECORDED

21  CONVERSATIONS PRIOR TO JULY 12TH OF 2012?

22  **A.**   I DID.

23  **Q.**   WERE THE CONVERSATIONS BETWEEN DEFENDANT WRIGHT AND THE

24  C.H.S. CENTERED ON ANY ONE TYPE OF TRANSACTION?

25  **A.**   A COCAINE TRANSACTION.

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1  **Q.**    WHAT WERE THE QUANTITIES BEING DISCUSSED FOR THAT

2  COCAINE TRANSACTION?

3  **A.**    IT RANGED, FROM ITS EARLIEST DISCUSSION, FROM

4  100 KILOGRAMS OF COCAINE, AND ESSENTIALLY DOWN TO 6, BUT WITH

5  VARIED AGREED-UPON AMOUNTS DURING THE TWO-MONTH INVESTIGATION.

6  **Q.**    SO AS YOU PREPARED FOR THE MEETING BETWEEN THE C.H.S.

7  AND DEFENDANT WRIGHT ON JULY THE 12TH OF 2012, DID YOU POSSESS

8  THAT KNOWLEDGE THAT THERE HAD BEEN ONGOING NEGOTIATIONS FOR

9  THAT LARGE COCAINE TRANSACTION?

10  **A.**    I DID.

11  **Q.**    WAS THERE AN INDIVIDUAL IDENTIFIED TO YOU DURING THOSE

12  RECORDED CONVERSATIONS COMING FROM CHICAGO TO PARTICIPATE IN

13  THE ULTIMATE SALE OF COCAINE?

14  **A.**    YES.

15        **MR. ELLIS:**  MY OBJECTION, THIS IS ALL LEADING.

16        **THE COURT:**  THAT WAS FOUNDATIONAL.

17        YOU MAY CONTINUE.

18  **Q.**   **(MR. ROBINSON)** WHO WAS THAT INDIVIDUAL?

19  **A.**    LONZO MCKENNIE.

20  **Q.**    WERE YOU ABLE TO OBTAIN A PHOTOGRAPH OF MR. MCKENNIE

21  PRIOR TO JULY 12TH OF 2012?

22  **A.**    I WAS.

23  **Q.**    WERE YOU ACTUALLY ABLE TO OBSERVE A MEETING BETWEEN MR.

24  MCKENNIE, MR. WRIGHT AND THE C.H.S. PRIOR TO JULY 12TH OF

25  2012?

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1    **A.**    YES, TWO SEPARATE MEETINGS.

2    **Q.**    WERE THOSE MEETINGS RECORDED?

3    **A.**    YES.

4    **Q.**    WHAT WAS THE PURPOSE OF THOSE MEETINGS, BASED UPON YOUR

5    PERSONAL REVIEW OF THE RECORDINGS OF THOSE MEETINGS?

6    **A.**    TO CONDUCT ANYWHERE FROM A 25-KILOGRAM COCAINE DEAL TO

7    40-KILOGRAM COCAINE DEAL.

8    **Q.**    DID YOU HAVE PRIOR INFORMATION THAT MR. MCKENNIE WOULD

9    BE TRAVELING TO SAN DIEGO FROM CHICAGO ON JULY THE 12TH OF

10   2012?

11   **A.**    HIS FLIGHT HAD BEEN CONFIRMED PRIOR TO HIS ARRIVAL.

12   **Q.**    DID YOU MAKE CERTAIN ARRANGEMENTS, BASED UPON YOUR

13   POSSESSION OF THAT INFORMATION?

14   **A.**    YES.  WE INITIATED SURVEILLANCE AT THE AIRPORT.

15   **Q.**    WHAT WAS THE PURPOSE OF MR. MCKENNIE'S TRAVEL TO SAN

16   DIEGO ON JULY THE 12TH OF 2012, BASED SOLELY ON THE RECORDED

17   CONVERSATIONS THAT YOU HAD REVIEWED PRIOR TO THAT DATE?

18   **A.**    TO CONDUCT A COCAINE TRANSACTION.

19   **Q.**    ARE COCAINE TRANSACTIONS CONDUCTED WHEN THE DOPE IS NOT

20   FRONTED BASED ON A CASH BASIS?

21   **A.**    YES, CORRECT.

22   **Q.**    WHAT WERE THE ARRANGEMENTS THAT WERE BEING MADE FOR THE

23   COCAINE TRANSACTION AT ISSUE IN THIS CASE?

24   **A.**    APPROXIMATELY 6 KILOGRAMS OF COCAINE FOR APPROXIMATELY

25   $120,000.

APRIL 14, 2014

CHEVIRON - REDIRECT EXAMINATION

1  **Q.**    WAS IT ON A CASH-AND-DELIVERY BASIS OR A FRONTING BASIS?

2  **A.**    CASH UPON DELIVERY.

3  **Q.**    DID YOU HAVE A BELIEF AS TO WHERE THE MONEY WAS COMING

4  FROM ON JULY THE 12TH OF 2012 BASED UPON THE RECORDED

5  CONVERSATIONS AND NEGOTIATIONS THAT YOU HAD REVIEWED PRIOR TO

6  THAT DATE?

7  **A.**    BASED ON THE CONVERSATIONS, MR. MCKENNIE WAS BRINGING

8  THE MONEY.

9  **Q.**    WAS THERE ANYTHING THAT YOU OBSERVED DURING THE

10  SURVEILLANCE ON JULY THE 12TH OF 2012 THAT SERVED TO DISPEL

11  YOUR BELIEF IN THAT REGARD; THAT IS, THAT MR. MCKENNIE WAS

12  COMING OUT TO PURCHASE 6 OR MORE KILOGRAMS OF COCAINE VIA

13  CASH?

14  **A.**    NO.

15  **Q.**    WERE THE OBSERVATIONS THAT YOU PERSONALLY MADE, AND THE

16  OTHER AGENTS WHO WERE CONDUCTING SURVEILLANCE, CONSISTENT WITH

17  WHAT YOU BELIEVED TO BE THE PURPOSE OF THAT TRAVEL?

18  **A.**    THEY WERE.

19  **Q.**    AT THE CONCLUSION OF THE MEETING, OR TOWARD THE END OF

20  THE MEETING BETWEEN DEFENDANT WRIGHT, MR. MCKENNIE AND THE

21  C.H.S., DID THE C.H.S. PLACE A TELEPHONE CALL TO YOU?

22  **A.**    HE DID.

23  **Q.**    AND, IN GENERAL TERMS, WHAT DID THE C.H.S. INFORM YOU?

24  **A.**    HE INFORMED ME THAT MR. MCKENNIE HAD INDICATED THAT HE

25  HAD BROUGHT THE MONEY WITH HIM, AND THAT HE PLANNED TO SHOW

CHEVIRON - REDIRECT EXAMINATION

1    HIM THE MONEY AFTER THE MEETING.

2    **Q.**    AFTER YOU RECEIVED THAT TELEPHONE CALL FROM THE C.H.S.,

3    DID YOU AND OTHER SURVEILLANCE AGENTS OBSERVE ANY ACTIONS

4    CONSISTENT WITH THAT INFORMATION THAT HAD BEEN PROVIDED TO

5    YOU?

6    **A.**    THE THREE INDIVIDUALS -- THE C.H.S., MR. MCKENNIE AND

7    MR. WRIGHT -- EXITED THE HOTEL AND WALKED TOWARDS THE AREA OF

8    MR. WRIGHT'S VEHICLE.

9    **Q.**    HOW SOON AFTER MAKING THAT OBSERVATION DID YOU MAKE AN

10   INVESTIGATORY DECISION TO HAVE A WALL STOP CONDUCTED OF THE

11   VEHICLE IN WHICH DEFENDANT WRIGHT AND MR. MCKENNIE WERE

12   TRAVELING THAT EVENING OR THE EARLY MORNING HOURS OF THE 13TH

13   OF JULY OF 2012?

14   **A.**    AFTER THE C.H.S. BROKE CONTACT WITH MR. MCKENNIE AND MR.

15   WRIGHT HE MADE ANOTHER PHONE CALL TO CONFIRM HIS OBSERVATION

16   OF SEVERAL THOUSANDS OF DOLLARS.  AND HE STATED THAT THE

17   AGREEMENT WAS FOR 6 KILOGRAMS OF COCAINE FOR $120,000.  HE

18   STATED THAT MR. MCKENNIE REPRESENTED THAT HE HAD $110,000.

19        UPON THE TERMINATION OF THAT CONVERSATION MY PARTNER,

20   DEA SPECIAL AGENT RYAN STACY, S-T-A-C-Y, CONTACTED A TASK

21   FORCE OFFICER TO HAVE HIM COORDINATE THE WALL STOP.

22   **Q.**    WHEN THE C.H.S. COMMUNICATED TO YOU THE INFORMATION THAT

23   HAD TRANSPIRED DURING THE MEETING AT THE HOTEL, THAT IS THE

24   SHERATON HOTEL, WAS THE C.H.S. AWARE THAT ALL OF HIS

25   INTERACTIONS WITH BOTH THE DEFENDANT MR. WRIGHT AND MR.

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

1   MCKENNIE WERE BEING RECORDED AND WOULD BE REVIEWED BY YOU

2   SUBSEQUENT TO THAT REPORT?

3   **A.**   HE WAS AWARE OF THAT.

4   **Q.**   ARE YOU AWARE OF ANY SUCH OCCASION PRIOR TO JULY THE

5   12TH OF 2012 WHERE THE C.H.S. REPORTED TO YOU INFORMATION THAT

6   HAD OCCURRED DURING A RECORDED MEETING WITH A TARGET THAT WAS

7   NOT BORNE OUT BY YOUR REVIEW OF THAT RECORDING?

8   **A.**   THAT'S CORRECT.

9   **Q.**   DID THE C.H.S. ALWAYS REPORT TO YOU ACCURATELY THOSE

10  MEETINGS IN WHICH HE ENGAGED TARGETS IN CONVERSATION WHILE

11  WEARING A SURREPTITIOUS RECORDING DEVICE?

12  **A.**   YES.

13  **Q.**   WAS THERE ANY REASON FOR YOU TO BELIEVE THE VERACITY OF

14  THE C.H.S. WHEN HE REPORTED TO YOU WHAT HAD TRANSPIRED DURING

15  THE MEETING WITH DEFENDANT WRIGHT AND MR. MCKENNIE THAT

16  EVENING, THAT IS JULY 12TH OF 2012, PRIOR TO THE INITIATION OF

17  THE TRAFFIC STOP OF THEIR VEHICLE?

18  **A.**   THERE WERE SEVERAL REASONS TO BELIEVE HIM.  THE REVIEW

19  OF THE PREVIOUS MEETINGS, THE OBSERVATIONS THAT SURVEILLANCE

20  AGENTS HAD MADE.

21  **Q.**   WAS THERE ANY OTHER REASON, TO YOUR KNOWLEDGE, THAT MR.

22  MCKENNIE TRAVELED FROM CHICAGO TO SAN DIEGO, OTHER THAN TO

23  CONSUMMATE A 6-KILOGRAM OR MORE COCAINE SALE?

24  **A.**   NONE TO MY KNOWLEDGE.

25       **MR. ELLIS:**  OBJECTION.  SPECULATION.

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

```
 1          THE COURT:  OVERRULED.

 2          THE ANSWER WILL STAND.

 3          THE WITNESS:  NONE TO MY KNOWLEDGE.

 4          THE COURT:  CROSS-EXAMINATION.

 5          MR. ELLIS:  SOME HOUSEKEEPING, YOUR HONOR.

 6          CAN I BE CLEAR WHAT EXHIBITS I WAS REFERRING TO?

 7          THE COURT:  YES.

 8          MR. ELLIS:  TAB 1 IS EXHIBIT A, WHICH, TO BE CLEAR,

 9   IS THE SUMMARY OF THE CALL OR TEXT MESSAGE RECORDS.  I MOVE TO

10   ADMIT A.

11          THE COURT:  ANY OBJECTION?

12          MR. ROBINSON:  NO.

13          THE COURT:  THEY ARE RECEIVED.

14          (EXHIBIT A RECEIVED INTO EVIDENCE)

15          MR. ELLIS:  TAB 2 IS EXHIBIT B, WHICH IS THE ACTUAL

16   BODY OF THE TEXT MESSAGES.  I MOVE TO ADMIT.

17          MR. ROBINSON:  NO OBJECTION.

18          THE COURT:  IT IS RECEIVED.

19          (EXHIBIT B RECEIVED INTO EVIDENCE)

20          MR. ELLIS:  EXHIBIT 6, YOUR HONOR -- EXCUSE ME.

21          TAB 6, WHICH IS EXHIBIT G, WHICH IS THE JUDGMENT AND

22   CONVICTION FROM THE '09 CASE NUMBER --

23          THE COURT:  I THINK IT IS EXHIBIT F.

24          MR. ELLIS:  MY APOLOGIES.  IT IS F, YOUR HONOR.

25          THE COURT:  YES.
```

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

```
 1              MR. ELLIS:  TAB 7, WHICH IS EXHIBIT G, WHICH IS THE

 2  SECOND AMENDED PETITION IN THE '09 CASE NUMBER.  I MOVE TO

 3  ADMIT.

 4              MR. ROBINSON:  NO OBJECTION.

 5              THE COURT:  THEY ARE RECEIVED.

 6              (EXHIBIT F, G MARKED FOR IDENTIFICATION AND RECEIVED

 7              INTO EVIDENCE)

 8              MR. ELLIS:  TAB 8, WHICH IS EXHIBIT H, IS THE

 9  10/18/2013 REPORT OF INVESTIGATION.  I MOVE TO ADMIT.

10              MR. ROBINSON:  I WOULD OBJECT ON RELEVANCE GROUNDS,

11  YOUR HONOR.

12              THE COURT:  I WOULD OVERRULE THE OBJECTION.  IT IS

13  RECEIVED.

14              (EXHIBIT H MARKED FOR IDENTIFICATION AND RECEIVED

15              INTO EVIDENCE)

16              MR. ELLIS:  THANK YOU, YOUR HONOR.

17              THEN FINALLY, TAB 10, WHICH WAS EXHIBIT J, WHICH IS

18  THE TRANSCRIPT FROM THE JULY 12TH MEETING.  I MOVE TO ADMIT.

19              MR. ROBINSON:  NO OBJECTION.

20              THE COURT:  IT IS RECEIVED.

21              (EXHIBIT J RECEIVED INTO EVIDENCE)

22                       RECROSS-EXAMINATION

23  Q.    (MR. ELLIS) NOW TURNING VERY BRIEFLY, SIR, TO THE STOP

24  THAT WAS CALLED IN.  YOU USED AN EXPRESSION CALLED A WALL

25  STOP.
```

APRIL 14, 2014

CHEVIRON – RECROSS–EXAMINATION

1   **A.**    I DID.

2   **Q.**    WHAT'S THAT?

3   **A.**    IT IS WHERE A FEDERAL INVESTIGATION IS BEING CONDUCTED

4   INTO A LARGER CONSPIRACY, LARGER ORGANIZATION.  AND THEY ARE

5   REQUESTING LOCAL AUTHORITIES TO CONDUCT A TRAFFIC STOP, TO

6   GATHER OR COLLECT EVIDENCE WITHOUT REVEALING THE LARGER NATURE

7   OF THE INVESTIGATION.

8   **Q.**    SO WALL MEANS THAT THE STATE IS WALLED OFF FROM THE

9   FEDERAL INVESTIGATION; ISN'T THAT CORRECT?

10  **A.**    YES.

11  **Q.**    MEANING THAT NONE OF THE STATE OFFICERS WOULD HAVE BEEN

12  TOLD THAT THIS WAS BASED ON AN ALLEGED CONSPIRACY TO POSSESS

13  WITH INTENT TO DISTRIBUTE 5 OR MORE KILOGRAMS OF COCAINE.

14  **A.**    THAT IS INCORRECT.

15  **Q.**    THEY WERE TOLD THAT?

16  **A.**    THEY WERE –– THEY WERE TOLD, FROM THE TASK FORCE OFFICER

17  WHO HAD BEEN INSTRUCTED ABOUT THE INVESTIGATION, AND THAT TASK

18  FORCE OFFICER THEN INSTRUCTED THE OFFICERS OF THE SURROUNDING

19  EVENTS.  BUT SEPARATE PROBABLE CAUSE WAS DEVELOPED ANYWAYS FOR

20  THE TRAFFIC STOP.

21  **Q.**    I AM SORRY, I WASN'T ASKING FOR YOUR LEGAL CONCLUSION, I

22  WAS ASKING FOR THE FACTS.

23      YOUR TESTIMONY TODAY IS THAT OFFICER SNELL SPECIFICALLY

24  TOLD THE STATE AGENTS THE EVENTS SURROUNDING THE JULY 12TH

25  MEETING?

APRIL 14, 2014

CHEVIRON – RECROSS–EXAMINATION

1   **A.**   I DON'T KNOW WHAT OFFICER SNELL TOLD THEM.  I KNOW THAT

2   WE DISCUSSED THE INVESTIGATION WITH OFFICER SNELL.

3   **Q.**   OFFICER SNELL WAS NOT A PRIMARY INVESTIGATOR ON THE

4   ATAYEE/WRIGHT/MCKENNIE TRANSACTION?

5   **A.**   THAT IS CORRECT.  BUT WE HAD MET WITH HIM PRIOR TO THIS

6   EVENING AND BRIEFED HIM.

7   **Q.**   I UNDERSTAND.  BUT PRIOR TO JULY 12TH HE WASN'T INVOLVED

8   IN THIS CASE; IS THAT CORRECT?

9   **A.**   HE ASSISTED, ACTUALLY, I BELIEVE, ON THE MAY 22ND

10  ARRIVAL OF MR. MCKENNIE AS WELL.

11  **Q.**   WHEN YOU SAID PARTICIPATED, YOU MEAN THAT HE WAS SIMPLY

12  A SURVEILLANCE OFFICER?

13  **A.**   HE ASSISTED WITH THE SURVEILLANCE AT THE AIRPORT,

14  MEANING HE WAS AN AIRPORT LIAISON OFFICER, SO HE ASSISTED THE

15  SURVEILLANCE.

16  **Q.**   AND I GUESS JUST TO BE CLEAR, SIR, BECAUSE I STILL DON'T

17  UNDERSTAND IT.

18       YOUR TESTIMONY AS FAR AS THE WALL STOP IS THAT, DESPITE

19  THE FACT THAT THE WALL STOP, THE IDEA IS TO WALL OFF THE STATE

20  AGENCY, IN THIS CASE YOUR TESTIMONY IS THE FEDS ACTUALLY

21  EXPLAINED THE REASON FOR THE STOP.

22  **A.**   I DON'T KNOW WHAT OFFICER SNELL TOLD HIM.  I KNOW THAT

23  IT WAS NOT IN THE TRADITIONAL SENSE BECAUSE WE WEREN'T WORRIED

24  ABOUT THE ENTIRE INVESTIGATION BEING REVEALED AT THAT POINT

25  ANYWAYS.

APRIL 14, 2014

1          **MR. ELLIS:** THANK YOU.

2          **THE WITNESS:** THANK YOU.

3                    REDIRECT EXAMINATION

4  **Q.    (MR. ROBINSON)** ARE YOU FAMILIAR WITH THE CONCEPT OF

5  INDEPENDENT PROBABLE CAUSE?

6  **A.** I AM.

7  **Q.** HOW DOES THAT CONCEPT PLAY INTO THE WALL STOP --

8          **MR. ELLIS:** OBJECTION. THIS CALLS FOR A LEGAL

9  CONCLUSION, YOUR HONOR. IT IS BEYOND THE SCOPE OF THE CROSS.

10         **MR. ROBINSON:** I AM NOT ASKING ABOUT WHETHER OR NOT

11 THE STOP IN THIS CASE CONSTITUTED INDEPENDENT PROBABLE CAUSE,

12 I AM JUST ASKING ABOUT THE CONCEPT.

13         **THE COURT:** ALL RIGHT.

14         YOU MAY ANSWER.

15         **MR. ELLIS:** I WOULD ALSO OBJECT ON FOUNDATION, THEN,

16 YOUR HONOR, AS FAR AS THIS PERSON'S KNOWLEDGE AS TO THE LAW.

17         **THE COURT:** OVERRULED.

18         YOU MAY ANSWER.

19         **THE WITNESS:** MY UNDERSTANDING OF INDEPENDENT

20 PROBABLE CAUSE, AT LEAST IN RELATION TO A TRAFFIC STOP, WOULD

21 BE THAT THE POLICE OFFICER DEVELOPS HIS OWN PROBABLE CAUSE

22 BASED ON A VIOLATION OF SOME CRIME OR SOME CALIFORNIA VEHICLE

23 CODE VIOLATION.

24 **Q.    (MR. ROBINSON)** AND THEN IS THERE A GOAL, ONCE THE

25 VEHICLE IS ACTUALLY STOPPED, IN TERMS OF PUSHING FORWARD THE

CHEVIRON – REDIRECT EXAMINATION

1    INVESTIGATION?

2    **A.**    I AM SORRY, I GUESS I DON'T UNDERSTAND.

3    **Q.**    SURE.  IS THERE ALSO AN INVESTIGATIVE PLAN WHEREAS THE

4    VEHICLE AND ITS CONTENTS MAY OR MAY NOT BE SEARCHED IF THERE

5    IS CONSENT GIVEN AT THE SITE OF THE STOP?

6            **MR. ELLIS:**  OBJECTION.  SPECULATION, YOUR HONOR, AND

7    BEYOND THE SCOPE.

8            **THE COURT:**  SUSTAINED.  SPECULATION.

9    **Q.**    **(MR. ROBINSON)** WHAT IS THE WHOLE POINT OF DOING A WALL

10   STOP WHEN YOU HAVE A FEDERAL INVESTIGATION?

11   **A.**    TO DETERMINE –– TO DETERMINE OR COLLECT EVIDENCE TO BE

12   USED FOR THE LARGER INVESTIGATION.

13   **Q.**    WITHOUT COMPROMISING THE ONGOING INVESTIGATION?

14   **A.**    CORRECT.

15   **Q.**    IS THE WAY IN WHICH THE ONGOING INVESTIGATION IS NOT

16   COMPROMISED IS THE CONCEPT OF INDEPENDENT PROBABLE CAUSE THAT

17   YOU HAVE TESTIFIED TO?

18   **A.**    THAT'S CORRECT.

19   **Q.**    IS THE ONGOING INVESTIGATION ALSO PROTECTED OR NOT

20   PROTECTED IF THE OFFICER CONDUCTING THE TRAFFIC STOP, BASED

21   UPON INDEPENDENT PROBABLE CAUSE, ALSO RECEIVES CONSENT TO

22   SEARCH THE VEHICLE?

23   **A.**    THAT'S CORRECT.

24   **Q.**    DOES THAT ALSO PROTECT THE INVESTIGATION?

25   **A.**    YES.

APRIL 14, 2014

CHEVIRON - REDIRECT EXAMINATION

```
 1          MR. ROBINSON:  NO FURTHER QUESTIONS.

 2          THE COURT:  ANY MORE?

 3          MR. ELLIS:  NOTHING, YOUR HONOR.

 4          THE COURT:  THANK YOU VERY MUCH.

 5          THE WITNESS:  THANK YOU.

 6          THE COURT:  HOW MANY MORE WITNESSES ARE THERE?

 7          MR. CHUN:  THREE MORE WITNESSES, YOUR HONOR.

 8          THE COURT:  ARE THEY GOING TO BE BRIEF?

 9          MR. CHUN:  OUR QUESTIONING WILL BE BRIEF, YOUR

10   HONOR.

11          THE COURT:  LET'S TAKE A 10-MINUTE BREAK HERE, AND

12   THEN WE WILL PROBABLY GO INTO THE LUNCH HOUR.  BUT IF WE CAN

13   FINISH UP -- WE WILL HAVE TO RECESS.  IF WE ARE NOT DONE BY

14   1:00 WE WILL HAVE TO RECESS FOR LUNCH.  BUT LET'S TAKE 10

15   MINUTES HERE, AND THEN WE WILL GO FOR AS LONG AS WE NEED TO UP

16   TO 1:00 O'CLOCK.

17          MR. CAHN:  I THINK WE WILL BE DONE BY 1:00, YOUR

18   HONOR.  I DON'T THINK THERE IS GOING TO BE LENGTHY

19   CROSS-EXAMINATION OF THESE OTHER WITNESSES.

20          THE COURT:  OKAY.  VERY GOOD.  THANK YOU.

21          (RECESS)

22          THE COURT:  OKAY.  WE ARE PRESENT WITH ALL ACCOUNTED

23   FOR.

24          GOVERNMENT'S NEXT WITNESS.

25          MR. CHUN:  YES, YOUR HONOR.  AT THIS TIME WE CALL
```

APRIL 14, 2014

CHEVIRON – REDIRECT EXAMINATION

```
 1  OFFICER TORRES.
 2          MR. CAHN:  BEFORE WE START, CAN I RAISE AN UNRELATED
 3  ISSUE?  I HADN'T NOTICED IT BEFORE BUT I NOTICE IT NOW.
 4  MR. WRIGHT IS SHACKLED AT HIS ANKLES.  I NOTICE THAT WE HAVE
 5  GOT ENOUGH MARSHALS TO BE IN COMPLIANCE WITH THEIR NATIONAL
 6  POLICY WITHOUT HIM BEING SHACKLED AT HIS ANKLES.  I WOULD ASK
 7  THAT THEY BE REMOVED FOR HIS COMFORT.
 8          THE COURT:  I WOULD RESPECTFULLY OVERRULE THE
 9  OBJECTION.  I WILL SIMPLY DEFER TO THE MARSHAL'S POLICY AT
10  THIS TIME AT THIS SETTING.  THANK YOU.
11          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.
12          DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
13  YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE
14  TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
15          THE WITNESS:  I DO.
16          THE CLERK:  PLEASE TAKE THE STAND.
17          SIR, PLEASE STATE YOUR FULL NAME, AND SPELL YOUR
18  FIRST AND LAST NAMES FOR THE RECORD.
19          THE WITNESS:  IT IS JOSE TORRES.  FIRST NAME IS
20  SPELLED J-O-S-E.  LAST NAME IS T-O-R-R-E-S.
21          THE COURT:  THANK YOU.  GOOD MORNING.
22          THE WITNESS:  GOOD MORNING, YOUR HONOR.
23          THE COURT:  COUNSEL.
24                      DIRECT EXAMINATION
25  Q.    (MR. CHUN) GOOD MORNING, OFFICER TORRES.  HOW ARE YOU
```

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

1    EMPLOYED?

2    **A.**    I AM EMPLOYED WITH THE SAN DIEGO HARBOR POLICE.

3    **Q.**    WHAT IS YOUR POSITION WITH THEM?

4    **A.**    A POLICE OFFICER.

5    **Q.**    AND HOW LONG HAVE YOU BEEN A POLICE OFFICER?

6    **A.**    A LITTLE OVER SIX YEARS.

7    **Q.**    AND BEFORE BECOMING A SAN DIEGO HARBOR POLICE OFFICER,

8    WHAT DID YOU DO BEFORE THAT?

9    **A.**    I WORKED AT SAN DIEGO POLICE DEPARTMENT.

10   **Q.**    HOW LONG WERE YOU WITH SAN DIEGO POLICE DEPARTMENT?

11   **A.**    ABOUT TWO YEARS.

12   **Q.**    IN BECOMING A POLICE OFFICER, DID YOU RECEIVE TRAINING

13   ON CALIFORNIA VEHICLE CODE VIOLATIONS?

14   **A.**    YES, SIR.

15   **Q.**    HOW ABOUT CALIFORNIA PENAL CODE?

16   **A.**    YES.

17   **Q.**    AS A HARBOR POLICE OFFICER, WHAT AREA DO YOU COVER?

18   **A.**    WELL, WE COVER THREE DIFFERENT LOCATIONS.  WE COVER ALL

19   AREAS PERTAINING TO THE AIRPORT, SAN DIEGO AIRPORT.  ALL AREAS

20   IN THE SAN DIEGO BAY, FROM THE OPENING OF THE BAY LEADING FROM

21   INTERNATIONAL WATERS INTO U.S. WATERS, DOWN PAST THE BRIDGE.

22   AND THEN ON THE STREETS FROM POINT LOMA AREA DOWN TO IMPERIAL

23   BEACH, WHICH WE CALL THE TIDELANDS, WHICH IS BASICALLY MANMADE

24   WATER AREAS THAT HUG THE COAST.

25   **Q.**    AND WERE YOU WORKING DURING THE LATE EVENING OF

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1    JULY 12TH, 2012 AND INTO THE EARLY MORNING OF JULY 13TH, 2012?

2    **A.**   YES.

3    **Q.**   WHAT WAS YOUR DUTY THAT NIGHT?

4    **A.**   I WAS A PATROL OFFICER.

5    **Q.**   AND WHAT AREA WERE YOU PATROLLING?

6    **A.**   I WAS PATROLLING FROM -- LET'S SEE, I WAS 504, WAS MY

7    CALL SIGN.  SO I WAS FROM ABOUT ROUGHLY GRAPE STREET AT NORTH

8    HARBOR DRIVE DOWN ALL THE WAY TO IMPERIAL BEACH.

9    **Q.**   ON THAT NIGHT WERE YOU INFORMED THAT A FORD RANGER

10   PICKUP TRUCK BEARING CALIFORNIA LICENSE PLATE 7H40259 WAS

11   INVOLVED IN SUSPICIOUS ACTIVITY?

12   **A.**   YES.

13   **Q.**   DID YOU SEE THAT FORD RANGER THAT NIGHT?

14   **A.**   YES, I DID.

15   **Q.**   WHERE DID YOU FIRST SEE THE CAR?

16   **A.**   IT WAS ROUGHLY GRAPE STREET AND PACIFIC HIGHWAY.

17   **Q.**   AND AFTER PUTTING EYES ON THAT CAR, DID YOU NOTICE THAT

18   IT WAS IN VIOLATION OF CALIFORNIA VEHICLE CODE?

19   **A.**   YES.

20   **Q.**   WHAT VIOLATION?

21   **A.**   IT WAS A BRAKE LIGHT VIOLATION AND A TOW HITCH

22   OBSTRUCTIVE PLATE VIOLATION.

23   **Q.**   AND THE BRAKE LIGHT WOULD BE VEHICLE CODE 24242A?

24   **A.**   I BELIEVE SO, YES.

25   **Q.**   WHICH BRAKE LIGHT WAS IT?

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1   **A.**    IT WAS THE THIRD BRAKE LIGHT, SO IT WAS THE TOP BRAKE

2   LIGHT ON THE CAR.

3   **Q.**    OKAY.  SO NOT THE LEFT, RIGHT OR THE LOWER; BUT A TOP

4   MIDDLE?

5   **A.**    CORRECT, YES.

6   **Q.**    AS FOR THE TOW HITCH, WOULD THAT BE VEHICLE CODE 290038?

7   **A.**    YES.

8   **Q.**    COULD YOU JUST EXPLAIN WHAT THAT IS?

9   **A.**    WHAT THAT IS IS NOTHING IS ALLOWED TO OBSTRUCT A LICENSE

10  PLATE OF A VEHICLE, AND IN THIS CASE THE TOW HITCH WAS

11  BLOCKING, LIKE, ONE OR TWO LETTERS.  SO IF YOU NEEDED TO RUN A

12  PLATE ON THE CAR YOU WOULD ONLY GET THE OUTSIDE LETTERS AND

13  THE FIRST TWO LETTERS WOULD BE OBSTRUCTED.

14  **Q.**    OKAY.  SO YOU COULDN'T SEE THE LETTERS OF THE PLATE

15  CLEARLY?

16  **A.**    CORRECT.

17  **Q.**    NOW, AFTER NOTICING THESE VIOLATIONS DID YOU PULL THE

18  PICKUP TRUCK OVER?

19  **A.**    EVENTUALLY I DID, YES.

20  **Q.**    WHY NOT IMMEDIATELY?

21  **A.**    I TAKE A NUMBER OF CONSIDERATIONS BEFORE I STOP A

22  VEHICLE.  MOSTLY, NUMBER ONE, IS SAFETY ISSUES.  IF THERE IS

23  NO SAFE PLACE TO STOP I AM NOT GOING TO PULL OVER THE VEHICLE

24  UNTIL I FIND A SAFE LOCATION.

25  **Q.**    YOU SAID YOU SAW THIS FORD RANGER INITIALLY AROUND GRAPE

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

1    STREET?

2    **A.**    YES, SIR.

3    **Q.**    DID YOU FOLLOW IT ALONG?

4    **A.**    YES.

5    **Q.**    WHAT ROUTE DID YOU FOLLOW IT?

6    **A.**    GRAPE STREET UNTIL WE WENT UP ENTERING THE FREEWAY

7    ONRAMP, 5 SOUTHBOUND.

8    **Q.**    NOW, AS YOU ARE ENTERING THE 5 FREEWAY AND DRIVING ON

9    THE 5 FREEWAY DID YOU NOTICE ANY OTHER INFRACTIONS?

10    **A.**    YES, I DID.

11    **Q.**    WHAT DID YOU NOTICE?

12    **A.**    THE VEHICLE WAS STRADDLING IN BETWEEN ITS LANES.

13    **Q.**    WHAT DOES THAT MEAN?

14    **A.**    BASICALLY, IF YOU HAVE A LANE THAT YOUR VEHICLE IS

15    SUPPOSED TO OCCUPY, HE WAS STRADDLING WITHIN HIS LANE,

16    SWERVING BACK AND FORTH.  NOT BREAKING THE OUTER MARGINS, BUT

17    WITHIN HIS OWN LANE, CONSISTENT FOR SOMEONE WHO WAS POSSIBLY

18    AN INTOXICATED OR DISTRACTED DRIVER.

19    **Q.**    OKAY.  SOMEONE WHO IS UNABLE TO DRIVE IN A STRAIGHT

20    LINE?

21    **A.**    THAT IS CORRECT, YES.

22    **Q.**    THEN DID YOU EVENTUALLY PULL THIS CAR OVER?

23    **A.**    YES, I DID.

24    **Q.**    WHERE WAS THAT?

25    **A.**    I BELIEVE IT WAS 5 SOUTH AROUND THE MAIN STREET EXIT.

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

1   **Q.**    WAS THAT AT ABOUT 12:52 A.M.?

2   **A.**    YES.

3   **Q.**    THIS WAS ON JULY 13TH, 2012 NOW?

4   **A.**    RIGHT, YES.

5   **Q.**    NOW, AFTER YOU PULL OVER THIS TRUCK, WHAT DO YOU DO

6   NEXT?

7   **A.**    AFTER I PULL THE VEHICLE, I SAFELY APPROACH THE VEHICLE.

8   I APPROACH FROM THE PASSENGER'S SIDE, SINCE WE WERE ON THE

9   FREEWAY.  AND I BASICALLY INFORMED THE DRIVER WHY I STOPPED

10  THEM.

11  **Q.**    AS YOU ARE APPROACHING THE CAR, WHAT DO YOU NOTICE ABOUT

12  THE OCCUPANTS, THE CAR ITSELF?

13  **A.**    IT IS A TRUCK.  THERE IS TWO OCCUPANTS INSIDE.  IT IS

14  A -- WHAT'S THE WORD FOR IT -- A BEDDED TRUCK, OPEN BED TRUCK,

15  I GUESS.

16  **Q.**    SO THIS IS A PICKUP TRUCK.

17  **A.**    PICKUP TRUCK, YES.  SORRY.  THAT IS THE WORD, YES.

18  **Q.**    YOU SAY OPEN BED, MEANING THERE IS NO COVER ON THE BED?

19  **A.**    CORRECT.  JUST WIDE OPEN.

20  **Q.**    DID YOU SEE ANYTHING WITHIN THAT BED OF THE TRUCK?

21  **A.**    YES, I DID.

22  **Q.**    WHAT DID YOU SEE?

23  **A.**    IT WAS A SUITCASE BACK THERE.

24  **Q.**    SO THAT SUITCASE WAS PLAINLY VISIBLE AS YOU WALKED UP?

25  **A.**    YES.

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1   **Q.**   AND YOU WERE JUST TELLING US THAT YOU WERE MAKING

2   CONTACT ON THE PASSENGER SIDE OF THE TRUCK.

3   **A.**   YES, SIR.

4   **Q.**   GO AHEAD AND TELL US ABOUT THAT.  WHAT OCCURRED?

5   **A.**   WELL, I CAN'T REMEMBER THE EXACT WORDS BECAUSE IT HAS

6   BEEN A COUPLE OF YEARS, BUT MY NORMAL ROUTINE IS THAT I MAKE

7   CONTACT WITH THE DRIVER.  INFORM THEM WHY I AM STOPPING THEM.

8   AND ASK THEM FOR THEIR LICENSE, INSURANCE, REGISTRATION.  AND

9   THEN ONCE I GET THAT INFORMATION I WILL GO BACK TO THE VEHICLE

10  AND RUN IT FOR ANY WANT AND WARRANTS.

11  **Q.**   DID YOU RECEIVE LICENSE AND REGISTRATION FROM THE

12  DRIVER?

13  **A.**   YES, I DID.

14  **Q.**   AND AFTER RECEIVING THIS, DID YOU RUN IT THROUGH

15  DISPATCH?

16  **A.**   YES.

17  **Q.**   WHAT DID YOU LEARN?

18  **A.**   THE INDIVIDUAL HAD A HISTORY OF -- THE DRIVER HAD A

19  HISTORY OF DRUG USE.  AND IT WAS -- THE CODE IS 1127, BUT

20  BASICALLY A HISTORY OF DRUG USE, SOME OTHER VIOLATIONS HE HAS

21  HAD.  I CAN'T RECALL RIGHT NOW.  OH, IT WAS -- I THINK IT WAS

22  190 SOMETHING PC, ATTEMPT SOMETHING, MURDER, ASSAULT OR

23  SOMETHING HE HAD.

24  **Q.**   SO THAT 100 SERIES PC VIOLATION, WHAT DID THAT TELL YOU?

25  **A.**   IT WAS NOT A VERY NICE INDIVIDUAL.

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1    **Q.**    SO THERE WAS SERIOUS CRIMINAL HISTORY?

2    **A.**    CORRECT.

3    **Q.**    AND AFTER LEARNING THESE THINGS, DID YOU PROCEED BACK TO

4    THE CAR?

5    **A.**    YES, I DID.

6    **Q.**    WHAT DID YOU DO NEXT?

7    **A.**    AT THAT TIME I ASKED HIM IF HE -- ASKED HIM FOR

8    CONSENSUAL PERMISSION TO BASICALLY SEARCH THE VEHICLE.

9    **Q.**    WHO DID YOU ASK?

10   **A.**    THE DRIVER.  INITIALLY IT WAS THE DRIVER.

11   **Q.**    AND WAS THAT DRIVER'S NAME CRAIG WRIGHT?

12   **A.**    I BELIEVE SO, YES.

13   **Q.**    AND WHEN YOU ASKED HIM FOR CONSENT, WHAT DID HE SAY?

14   **A.**    HE SAID SURE, GO AHEAD.

15   **Q.**    AND YOU ARE HERE ON THE SIDE OF THE FREEWAY.  IS HE

16   STILL SITTING INSIDE THE TRUCK?

17   **A.**    YES, HE IS.

18   **Q.**    COULD YOU HEAR HIM CLEARLY?

19   **A.**    YES.

20   **Q.**    COULD YOU SEE HIM?

21   **A.**    YES.

22   **Q.**    HOW ARE YOU DRESSED ON THAT OCCASION?

23   **A.**    FULL DUTY UNIFORM, SIMILAR TO WHAT I AM WEARING RIGHT

24   NOW.

25   **Q.**    AND I IMAGINE YOU WERE WEARING A FIREARM AT THE TIME

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1   THEN?

2   **A.**    YES, I WAS.

3   **Q.**    DID YOU EVER BRANDISH THAT FIREARM?

4   **A.**    NO.  YOU MEAN REMOVE IT?  NO, I DIDN'T.

5   **Q.**    AS FOR YOUR TONE OF VOICE WHEN YOU WERE TALKING TO HIM

6   ASKING FOR CONSENT, DID YOU EVER RAISE YOUR VOICE AND YELL AT

7   HIM?

8   **A.**    NO, JUST EVEN TONE.

9   **Q.**    SO JUST CASUAL CONVERSATION, JUST LIKE THIS?

10  **A.**    YES.

11  **Q.**    SO YOU ASKED HIM IF YOU COULD SEARCH THE VEHICLE,

12  CORRECT?

13  **A.**    CORRECT.

14  **Q.**    WHAT DID YOU DO NEXT?

15  **A.**    BEFORE I SEARCHED IT I ASKED HIM, I SAID WHOSE SUITCASES

16  WERE THEY IN THE BACK?  AND THE PASSENGER SAID THEY WERE HIS.

17  AND I ASKED HIM IF I COULD SEARCH THOSE ALSO.

18  **Q.**    SO YOU ASKED ABOUT THE LUGGAGE IN THE BACK?

19  **A.**    YES.

20  **Q.**    AND THEN AT THAT TIME THE PASSENGER SAID IT WAS HIS.

21  **A.**    YES.

22  **Q.**    DID YOU ASK THE PASSENGER FOR CONSENT TO SEARCH THE

23  LUGGAGE?

24  **A.**    YES, I DID.

25  **Q.**    WHAT DID HE SAY.

APRIL 14, 2014

1   **A.**   HE SAID YES, GO AHEAD.

2   **Q.**   NOW, AFTER RECEIVING CONSENT TO SEARCH, NOW THE CAR AND

3   THE LUGGAGE, WHAT DID YOU DO?

4   **A.**   I HAD EACH INDIVIDUAL STEP OUT OF THE CAR, ONE AT A

5   TIME.  SO IT PROBABLY -- I DON'T REMEMBER WHO WAS FIRST, BUT I

6   WOULD HAVE ONE COME OUT, COME BACK TOWARDS ME.  AND THEN I

7   WOULD HAVE SEARCHED THEM, FRISK THEM, YOU KNOW, SEARCH THEM

8   FOR WEAPONS, MAKE SURE THEY DON'T HAVE ANYTHING.  THEY

9   CONSENTED, THOSE TWO.

10      THEN I HAD THEM STAND TO THE BACK WITH THE COVER

11   OFFICERS.  THEN THE SECOND ONE CAME OUT, DID THE SAME THING,

12   AND HAVE THEM STAND TO THE BACK.

13   **Q.**   NOW, WHY DO YOU PAT THEM DOWN?

14   **A.**   FOR MY SAFETY, MAKE SURE THEY DON'T HAVE ANY WEAPONS OR

15   ANYTHING LIKE THAT.  BECAUSE MY BACK IS GOING TO BE TURNED TO

16   THESE GUYS AS I AM SEARCHING THEIR VEHICLE.

17   **Q.**   SO IT IS FOR OFFICER SAFETY?

18   **A.**   CORRECT.

19   **Q.**   YOU SAID YOUR COVER OFFICER.  SO JUST SO WE ALL KNOW,

20   HOW MANY OTHER OFFICERS WERE AT THE SCENE NOW?

21   **A.**   THERE WAS TWO.

22   **Q.**   SO YOU AND TWO OTHERS?

23   **A.**   YES.

24   **Q.**   SO THREE TOTAL?

25   **A.**   YES, THREE TOTAL.

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

1   **Q.**    NOW, AS THEY COME OUT OF THE CAR, BOTH DRIVER AND

2   PASSENGER, WHERE ARE THEY IN RELATION TO THE VEHICLE?

3   **A.**    THE DRIVER AND PASSENGER I JUST TOOK OUT?

4   **Q.**    YES.

5   **A.**    ON THE SHOULDER OF THE ROAD, ABOUT A CAR LENGTH BEHIND

6   ME, WITH THE OTHER TWO OFFICERS.

7   **Q.**    OKAY.  AND ARE THEY HANDCUFFED?

8   **A.**    NO.  THEY ARE NOT -- NOT UNDER ARREST OR ANYTHING, SO

9   THEY WOULDN'T BE HANDCUFFED.

10  **Q.**    SO THEY ARE NOT UNDER ARREST.

11  **A.**    NO.

12  **Q.**    THEY ARE NEVER INFORMED THEY ARE UNDER ARREST.

13  **A.**    NO, THEY ARE JUST DETAINED.

14  **Q.**    ARE THEY ORDERED TO SIT ON THE GROUND?

15  **A.**    IF I WAS ON SURFACE STREETS AND IT WAS SAFE I WOULD;

16  BEING ON THE FREEWAY NO, I HAVE THEM STAND UP.

17  **Q.**    SO ON THIS OCCASION DID YOU ORDER THEM TO SIT ON THE

18  GROUND?

19  **A.**    NO, DEFINITELY NOT.

20  **Q.**    SO THEY WERE JUST STANDING AROUND.

21  **A.**    CORRECT.

22  **Q.**    AND THEN DID YOU GO AHEAD AND PROCEED TO SEARCH THE CAR?

23  **A.**    YES, I DID.

24  **Q.**    AND WALK US THROUGH THAT.  HOW DID YOU SEARCH THE

25  VEHICLE?

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1  **A.**    WELL, I USUALLY START WITH THE DRIVER'S SIDE.  WENT TO

2  THE DRIVER'S SIDE.  I WOULD HAVE CHECKED UNDERNEATH THE SEATS,

3  JUST DIFFERENT AREAS BETWEEN THE SEATS.  THE VISOR, UNDERNEATH

4  THE DASH.  DIFFERENT AREAS WHERE THERE COULD POSSIBLY BE

5  WEAPONS OR CONTRABAND.  WORK MY WAY TOWARDS THE MIDDLE OF THE

6  VEHICLE, THEN COME BACK AROUND TO THE PASSENGER SIDE AND

7  FINISH MY SEARCH.  THEN ONCE I COMPLETED THE CAB OF THE

8  VEHICLE, I WOULD GO TO THE BACK WHERE THE LUGGAGE WAS.

9  **Q.**    DID YOU FIND ANYTHING WITHIN THE CAB OF THE PICKUP

10  TRUCK?

11  **A.**    NO, I DIDN'T.

12  **Q.**    THEN GO AHEAD AND EXPLAIN TO US THE SEARCH OF THE

13  LUGGAGE.

14  **A.**    OKAY.  THE LUGGAGE WAS BACK THERE.  I UNZIPPED THE

15  LUGGAGE, OPENED THE TOP.  I NOTICED THERE WAS LOTS OF CLOTHES

16  JUST PACKED REALLY SOLID.  IT WAS PECULIAR THAT THE JEANS --

17  THERE WERE JEANS THAT WERE REALLY -- I REMEMBER THEM BEING

18  REALLY, LIKE BRAND NEW, LIKE REALLY PRESSED, ALMOST LIKE THEY

19  WERE VACUUM SEALED OR SOMETHING AT ONE POINT.  JUST REALLY,

20  REALLY NICE.  LIKE SOMEBODY -- LIKE BRAND NEW BUT CRUNCHED.  I

21  DON'T KNOW HOW TO EXPLAIN IT.

22  **Q.**    THEY WERE FOLDED NEATLY?

23  **A.**    THEY WERE FOLDED REALLY NEATLY.  REALLY, REALLY PRESSED.

24  **Q.**    OKAY.

25  **A.**    SO I WAS GOING THROUGH THE LUGGAGE AND JUST SEARCHING

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

```
1    ONE AT A TIME.  WHEN I GOT DOWN TO THE SECOND PAIR OF JEANS
2    THAT IS WHERE I NOTICED AN UNUSUAL LUMP INSIDE THE JEAN PANTS.
3    Q.    DID YOU INVESTIGATE THAT LUMP?
4    A.    YES.  AS I PULLED THE PANTS OUT I NOTICED -- I THINK IT
5    WAS A $20 BILL OR ANOTHER BILL FELL OUT.  AND I SECURED IT SO
6    IT WOULDN'T GET BLOWN ON TO THE HIGHWAY.  AS I TOOK THE PANTS
7    UP, JUST A BUNCH OF MONEY JUST STARTED FALLING OUT OF THE
8    PANTS.
9    Q.    DO YOU REMEMBER WHERE IN THE PANTS THE MONEY WAS?
10   A.    IN THE PANTS LEG.
11   Q.    IN THE LEG OF THE PANTS?
12   A.    YES.
13   Q.    YOU SAID YOU PICKED UP THE PANTS?
14   A.    CORRECT.
15   Q.    YOU SAID MONEY JUST STARTED FALLING OUT OF THE LEG?
16   A.    YES.  I PICKED IT UP, JUST KIND OF SHOOK IT A LITTLE
17   BIT, AND JUST HUNDREDS OF DOLLARS STARTED COMING OUT.
18   Q.    AS YOU WERE SHAKING, JUST GIVE US A ROUGH ESTIMATE OF
19   HOW MUCH MONEY YOU THOUGHT WAS FALLING OUT OF THOSE PANTS.
20   A.    OVER 10,000, EASY.  JUST LOTS.
21   Q.    SO TENS OF THOUSANDS OF DOLLARS?
22   A.    YES.  THERE WAS A LOT.
23   Q.    AFTER FINDING THIS MONEY DID YOU GO AND THEN ASK THE
24   PASSENGER ABOUT IT?
25   A.    YES.  AFTER I SECURED THE SUITCASE SO IT WOULDN'T --
```

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

```
 1   STUFF WOULDN'T FLY OUT, THEN I ASKED THE PASSENGER WAS THAT

 2   HIS.

 3   Q.   AS YOU TALKED TO THAT PASSENGER, WHAT WAS YOUR DEMEANOR?

 4   A.   I AM SORRY.  WHAT WAS MY DEMEANOR?

 5   Q.   YES.

 6   A.   JUST SAME AS WHEN I MADE CONTACT WITH THEM.

 7   Q.   WHAT WAS HIS DEMEANOR?

 8   A.   HE WAS -- HE WAS CALM, COOL AND COLLECTED.  LIKE IT WAS

 9   NOT A BIG DEAL.

10   Q.   DID THE TWO OF YOU EVER BECOME CONFRONTATIONAL WITH EACH

11   OTHER?

12   A.   NO, NOT AT ALL.

13   Q.   ANYONE BECOME HEATED?

14   A.   NO.

15   Q.   IF YOU HAD TO DESCRIBE YOUR CONVERSATION AND HOW YOUR

16   DISCUSSIONS WENT, HOW WOULD YOU DO SO?

17   A.   JUST CALM CONVERSATION.  IT WASN'T -- IT WAS JUST

18   INVESTIGATIVE, THAT'S ALL.  I WAS ASKING HIM QUESTIONS BUT IT

19   WASN'T -- THERE WASN'T ANY ARGUMENT OR ANYTHING.

20   Q.   SO IT WAS VERY CONGENIAL.

21   A.   YES.

22   Q.   HE WASN'T PANICKING.

23   A.   NO.  I JUST THOUGHT IT WAS KIND OF ODD BECAUSE NORMALLY

24   IF I COME ACROSS A SITUATION USUALLY A PERSON TENDS TO BE

25   NERVOUS AND SHAKY.
```

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

1  **Q.**    WHAT STICKS OUT IN YOUR MIND ABOUT THE SITUATION IS THAT

2  AFTER FINDING TENS OF THOUSANDS OF DOLLARS, THE PASSENGER

3  REMAINED REALLY CALM?

4          **MR. CAHN:**  I AM GOING TO OBJECT.  CAN WE HAVE LESS

5  LEADING?

6          **THE COURT:**  YES.  SUSTAINED.

7          **MR. CHUN:**  I AM SORRY?

8          **THE COURT:**  IF YOU COULD REPHRASE.

9  **Q.**    **(MR. CHUN)** COULD YOU THEN –– AFTER FINDING ALL OF THIS

10 MONEY WHAT STICKS OUT IN YOUR MIND ABOUT HIS DEMEANOR?

11 **A.**    ACTUALLY HE WAS REALLY CALM.  I DIDN'T NOTICE ANY

12 SHAKING AND NO BEADS OF SWEAT ON HIS HEAD.  IT WAS JUST LIKE

13 IT WAS AN EVERYDAY THING.  TO ME IT WAS JUST LIKE HE PACKS

14 MONEY LIKE THIS, AND IT WAS NOT A BIG DEAL.  I THOUGHT I WOULD

15 ASK HIM, WHY WAS THIS MONEY –– WHY IS THIS MONEY HERE?  WHAT

16 IS IT FOR?

17 **Q.**    AND DID YOU EVER WRITE A CITATION FOR THIS OFFENSE?

18 **A.**    YES, I DID.

19         **MR. CHUN:**  YOUR HONOR, MAY I APPROACH?

20         **THE COURT:**  YES.

21 **Q.**    **(MR. CHUN)** SHOWING YOU WHAT HAS BEEN MARKED AS

22 GOVERNMENT EXHIBIT 3.  DO YOU RECOGNIZE THAT?

23         (EXHIBIT 3 MARKED FOR IDENTIFICATION)

24 **A.**    YES, I DO.

25 **Q.**    WHAT IS IT?

APRIL 14, 2014

TORRES – DIRECT EXAMINATION

1   **A.**   THIS IS A COPY OF THE CITATION I WROTE.

2   **Q.**   THAT IS THE CITATION YOU ACTUALLY WROTE?

3   **A.**   YES.

4   **Q.**   IS THAT A FAIR AND ACCURATE REPRESENTATION OF THE

5   CITATION YOU WROTE THAT EVENING?

6   **A.**   YES, IT IS.

7          **MR. CHUN:**  YOUR HONOR, WE MOVE TO ADMIT GOVERNMENT

8   EXHIBIT 3.

9          **THE COURT:**  ANY OBJECTION?

10          **MR. CAHN:**  NO OBJECTION.

11          **THE COURT:**  IT IS RECEIVED.

12          (EXHIBIT 3 RECEIVED INTO EVIDENCE)

13   **Q.**   **(MR. CHUN)** WHAT IS THE NAME OF THE DRIVER LISTED ON

14   THAT?

15   **A.**   CRAIG WRIGHT.  MIDDLE NAME LASALLE, L-A-S-A-L-L-E.

16   **Q.**   WHAT KIND OF VEHICLE WAS IT?

17   **A.**   THIS WAS A 1996 FORD RANGER PICKUP, GREEN.

18   **Q.**   WHAT WAS THE LICENSE PLATE OF THAT VEHICLE?

19   **A.**   IT IS A LITTLE BLURRY HERE.  7H40259.

20   **Q.**   WHAT TIME WAS THAT ISSUED AT?  OR THE STOP CONDUCTED?

21   **A.**   THE TIME THE CITATION IS?

22   **Q.**   YES.

23   **A.**   052 HOURS.

24   **Q.**   AND JUST BECAUSE IT IS IN SHORTHAND AND KIND OF HARD TO

25   READ, COULD YOU JUST GO AHEAD AND READ YOUR NOTES ON THE SIDE

APRIL 14, 2014

TORRES - DIRECT EXAMINATION

1    OF THAT CITATION?

2    **A.**    READ OUT LOUD?

3    **Q.**    YES, PLEASE.

4    **A.**    WHILE DRIVING BEHIND THE SUBJECT AT NORTH HARBOR DRIVE

5    AND GRAPE STREET I OBSERVED HIS THIRD, IN PARENTHESES, TOP

6    BRAKE LIGHT WAS INOP.  I ALSO OBSERVED HIS TOW HITCH WAS

7    BLOCKING HIS LICENSE PLATE AND I WAS UNABLE TO READ IT

8    CLEARLY.  AS WE ENTERED THE 5 SOUTH FREEWAY I OBSERVED HIM

9    STRADDLE WITHIN HIS LANES.

10        THEN MY NOTES BELOW THAT I HAVE GAVE VERBAL FOR

11   STRADDLING, WHICH IS A VERBAL WARNING FOR STRADDLING.

12        AND THEN WHERE I YIELDED AT, 28TH AND MAIN, 5

13   SOUTHBOUND.

14   **Q.**    YOU HAD SAID INOP.  IS THAT SHORT FOR INOPERATIVE?

15   **A.**    YES.

16   **Q.**    THE THIRD BRAKE LIGHT WASN'T WORKING?

17   **A.**    CORRECT.

18   **Q.**    NOW, AFTER APPROXIMATELY ONE HOUR AT THAT SCENE DID YOU

19   THEN DEPART?

20   **A.**    YES.

21           **MR. CHUN:**  NO FURTHER QUESTIONS.

22           **THE COURT:**  CROSS-EXAMINATION.

23                    CROSS-EXAMINATION

24   **Q.**    **(MR. CAHN)** SO, OFFICER, A FEW QUESTIONS FOR YOU.

25           BEFORE JULY 13TH YOU HAD NEVER SEEN CRAIG WRIGHT, HAD

APRIL 14, 2014

1    YOU?

2    **A.**    NO, SIR.

3    **Q.**    AND YOU HAD NEVER HEARD OF CRAIG WRIGHT?

4    **A.**    NO.

5    **Q.**    YOU DIDN'T KNOW ANYTHING ABOUT AN INVESTIGATION INTO

6    CRAIG WRIGHT.

7    **A.**    NO, SIR.

8    **Q.**    AND YOU MENTIONED THAT YOU RECEIVED INFORMATION OVER

9    DISPATCH THAT LED YOU TO MAKE THE STOP.

10   **A.**    YES.

11   **Q.**    AND YOUR DISPATCH IS A COMPUTER-AIDED DISPATCH, ISN'T

12   IT?

13   **A.**    A COMPUTER-AIDED DISPATCH.  IS THAT LIKE A COMPUTER

14   VOICE?  I AM NOT SURE WHAT YOU ARE ASKING ME.

15   **Q.**    LET ME PUT IT THIS WAY.  YOUR CONVERSATIONS BETWEEN YOU

16   AND YOUR DISPATCHER ARE RECORDED, AREN'T THEY?

17   **A.**    YES, SIR.

18   **Q.**    ALL RIGHT.  AND THEY CAN BE PRINTED OUT IN A TRANSCRIPT.

19   **A.**    YES.

20   **Q.**    AND YOU HAVE SEEN THOSE TRANSCRIPTS THAT HAVE BEEN

21   PRINTED OUT BEFORE IN OTHER CASES, HAVEN'T YOU?

22   **A.**    YES.

23   **Q.**    NOW, THE INSTRUCTIONS OR THE INFORMATION THAT CAME OUT

24   OVER YOUR DISPATCH WERE THAT THERE WAS AN OLDER MODEL FORD

25   RANGER, POSSIBLY DARK GRAY.  AND THAT FEDERAL AGENTS WERE

APRIL 14, 2014

TORRES – CROSS-EXAMINATION

 1  INTERESTED IN IT.  IS THAT RIGHT?

 2  **A.**    YES.

 3  **Q.**    AND YOU WERE TOLD THAT THE OLDER MODEL FORD RANGER WAS

 4  LEAVING THE SHERATON ON HARBOR ISLAND.

 5  **A.**    I DON'T RECALL THEM SAYING LEFT THE SHERATON, BUT IT

 6  SOUNDS ABOUT RIGHT.

 7  **Q.**    LET ME ASK YOU.  WE MENTIONED THESE TRANSCRIPTS OF THE

 8  COMPUTER-AIDED DISPATCH.  WOULD HAVING THAT IN FRONT OF YOU

 9  HELP REFRESH YOUR RECOLLECTION ABOUT EXACTLY WHAT YOU HEARD

10  OVER THE DISPATCH THAT NIGHT?

11  **A.**    YES, SIR.  IT IS A COUPLE YEARS AGO.

12  **Q.**    I AM GOING TO SHOW YOU WHAT IS MARKED AS DEFENSE EXHIBIT

13  N FOR PURPOSES OF IDENTIFICATION.

14          (EXHIBIT N MARKED FOR IDENTIFICATION)

15          **MR. CAHN:**  AND I HAVE A COPY FOR THE COURT.

16          **THE COURT:**  YES.  THANK YOU.

17  **Q.**    **(MR. CAHN)** I IMAGINE -- THIS HAS BEEN QUITE A WHILE, I

18  IMAGINE --

19          **MR. CHUN:**  CAN I SEE THAT?  THANKS.

20  **Q.**    **(MR. CAHN)** I AM GOING TO ASK YOU SOME QUESTIONS ABOUT

21  TIME AS WELL.  I IMAGINE YOUR RECOLLECTION OF THE EXACT TIME

22  THINGS OCCURRED IS NOT PERFECTLY CRYSTAL CLEAR AT THIS MOMENT,

23  MANY MONTHS LATER; IS THAT FAIR?

24  **A.**    YES, THAT WOULD BE FAIR.

25  **Q.**    IN REGARD TO THE QUESTIONS I ASK YOU ABOUT TIME, DO YOU

APRIL 14, 2014

1  THINK LOOKING AT THIS SAME DOCUMENT, THE COMPUTER–AIDED

2  DISPATCH TRANSCRIPT, DO YOU THINK THAT WOULD HELP YOU IN

3  GETTING THE TIMES CORRECT AS WELL?

4  **A.**     YEAH, SURE.

5  **Q.**     TAKE A LOOK AT THAT EXHIBIT.  IS THAT A COMPUTER–AIDED

6  DISPATCH TRANSCRIPT OF THE CALLS THAT YOU GOT THAT NIGHT AND

7  THE RESPONSES YOU MADE TO DISPATCH THAT NIGHT?  YOU AND THE

8  FELLOW OFFICERS YOU WERE WORKING WITH.

9  **A.**     YES.

10  **Q.**     SO WITH THAT, FEEL FREE TO LOOK AT THAT TO REFRESH YOUR

11  RECOLLECTION IN REGARD TO THE QUESTIONS I ASK YOU.

12  **A.**     OKAY.

13  **Q.**     OKAY.  SO THE CALL YOU GOT WAS THAT A COUPLE OF FEDERAL

14  AGENTS WERE INTERESTED IN THIS GRAY PICKUP TRUCK, RIGHT?

15  **A.**     YES.

16  **Q.**     AND THEY WANTED YOU TO DO A WALL STOP ON IT; IS THAT

17  RIGHT?

18  **A.**     YES.

19  **Q.**     AND BY A WALL STOP, THAT MEANS THEY WANT YOU TO STOP THE

20  CAR AND SEARCH IT, BUT THEY ARE NOT GOING TO TELL YOU WHAT

21  THEIR INVESTIGATION IS ABOUT, RIGHT?

22  **A.**     NOT ENTIRELY CORRECT.

23  **Q.**     TELL ME WHAT YOUR UNDERSTANDING OF A WALL STOP IS.

24  **A.**     A WALL STOP IS BASICALLY WHEN YOU SEE A VEHICLE, FIND

25  PC, PROBABLE CAUSE, TO STOP A VEHICLE.  NOT NECESSARILY SEARCH

APRIL 14, 2014

TORRES — CROSS—EXAMINATION

```
 1    IT, JUST STOP A VEHICLE.
 2    Q.    SO AT THAT POINT ALL YOU KNEW IS THEY WANTED IT STOPPED.
 3    A.    YES.
 4    Q.    AND YOU, ON YOUR OWN INITIATIVE, DECIDED TO SEARCH IT.
 5    IS THAT WHAT YOU ARE TELLING US?
 6    A.    FOR ME, YES.
 7    Q.    SO THERE WAS NO —— IN YOUR MIND THERE WAS NO OBLIGATION
 8    ON YOUR PART, ONCE YOU HAD STOPPED IT, TO REQUEST CONSENT TO
 9    SEARCH.
10    A.    CORRECT.
11    Q.    OKAY.  SO WE CAN BE CLEAR.  YOU DIDN'T WITH YOUR —— YOU
12    KNOW, WITH THAT DISPATCH THAT AGENTS WANTED YOU TO DO A WALL
13    STOP, YOU WERE GIVEN ONE OTHER PIECE OF INFORMATION ABOUT
14    THIS, WEREN'T YOU?
15            MR. CHUN:  OBJECTION.  VAGUE.
16            THE COURT:  SUSTAINED.
17            MR. CAHN:  I WILL CLARIFY.
18    Q.    (MR. CAHN) YOU WERE TOLD THAT THERE WAS 120, MEANING
19    120,000 IN THE CAR, RIGHT?
20    A.    I DON'T RECALL THAT INFORMATION BEING RELAYED TO ME.
21    Q.    TAKE A LOOK AT THE DISPATCH, THE COMPUTER—AIDED DISPATCH
22    AT 12:42:50.
23    A.    I SEE IT.
24    Q.    CAN YOU TELL US WHAT THAT SAYS?
25    A.    AGENTS STATE 120, 120,000 AND A WALL STOP, SLASH, PC
```

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

1   VIOLATION.

2   **Q.**    DOES THAT REFRESH YOUR RECOLLECTION OF WHETHER THEY TOLD

3   YOU -- WHETHER YOU WERE TOLD THAT THERE WAS 120,000 IN THE

4   CAR?

5   **A.**    I STILL DON'T REMEMBER THAT BEING SAID OVER THE AIR.

6   JUST BECAUSE IT IS WRITTEN HERE DOESN'T NECESSARILY MEAN THIS

7   IS WHAT THEY SAID OVER THE AIR.  THIS IS WHAT DISPATCH KNOWS.

8   A LOT OF THAT STUFF ISN'T NECESSARILY PUT OVER THE AIR FOR

9   PUBLIC USE.

10  **Q.**    OKAY.  SO YOU KNEW NOTHING OTHER -- YOUR RECOLLECTION IS

11  YOU KNEW NOTHING OTHER THAN FEDERAL AGENTS WANTED THIS CAR

12  STOPPED.

13  **A.**    WHAT I RECALL, YES.

14  **Q.**    I AM ASKING YOUR RECOLLECTION.

15  **A.**    YES.

16  **Q.**    OKAY.  NOW, YOU WERE ASKED TO STOP THE CAR.

17  **A.**    YES.

18  **Q.**    AND TO FIND AN INDEPENDENT REASON TO STOP THE CAR.

19  **A.**    CORRECT.

20  **Q.**    YOU DIDN'T KNOW IF THEY HAD JUSTIFICATION TO STOP THE

21  CAR IF YOU DIDN'T FIND SOMETHING, SOME REASON, RIGHT?

22  **A.**    CORRECT.

23  **Q.**    AND IN THIS CASE YOU HAVE TOLD US THAT THE REASONS THAT

24  YOU STOPPED THE CAR WERE AN INOPERABLE TOP THIRD BRAKE LIGHT.

25  **A.**    YES.

APRIL 14, 2014

TORRES - CROSS-EXAMINATION

1    **Q.**    A TRAILER HITCH OBSTRUCTING THE LICENSE PLATE.

2    **A.**    YES.

3    **Q.**    AND THEN YOU MENTIONED, ALSO, STRADDLING WITHIN THE

4    LANES.

5    **A.**    YES.

6    **Q.**    I AM JUST CURIOUS ABOUT THAT LAST ONE.  THE CALIFORNIA

7    VEHICLE CODES REQUIRE A CAR TO STAY WITHIN ITS OWN LANE,

8    RIGHT?

9    **A.**    YES.

10   **Q.**    THEY DON'T REQUIRE IT NOT TO MOVE WITHIN THAT LANE; IS

11   THAT CORRECT?

12   **A.**    I AM SORRY.  THEY DON'T REQUIRE IT --

13   **Q.**    CALIFORNIA VEHICLE CODES DON'T REQUIRE THAT THE CAR

14   MAINTAIN THE EXACT SAME DISTANCE FROM THE LEFT OR RIGHT HAND

15   EDGE OF ITS LANE AT ALL TIMES, DO THEY?

16   **A.**    I DON'T KNOW THE ACTUAL CODE, BUT THERE IS A VIOLATION

17   FOR STRADDLING WITHIN YOUR LANES, BUT I JUST CAN'T RECALL WHAT

18   IT IS.

19   **Q.**    YOU DON'T KNOW THAT CODE.

20   **A.**    NOT OFF THE TOP OF MY HEAD.  THERE IS TOO MANY CODES.

21   **Q.**    YOU ARE QUITE FAMILIAR WITH ALL OF THESE OTHER CODES,

22   THOUGH, ON VEHICLE VIOLATIONS, CORRECT?  BUT YOU DON'T KNOW

23   THAT CODE.

24   **A.**    I NEVER WRITTEN THAT CODE, BUT I KNOW IT EXISTS.

25   **Q.**    NEVER WRITTEN THAT CODE.

APRIL 14, 2014

1  **A.**    NOT FOR STRADDLING, NO.

2  **Q.**    THANKS.

3  **A.**    THAT IS WHY I GAVE THEM A WARNING FOR THAT.

4  **Q.**    NOW, I AM GOING TO ASK YOU SOME QUESTIONS ABOUT

5  TIMING --

6  **A.**    SURE.

7  **Q.**    -- SO FEEL FREE TO LOOK AT THIS.

8      MY UNDERSTANDING IS THAT IT IS 12:52 WHEN YOU LIGHT THE

9  CAR UP, RIGHT?

10  **A.**    YES.

11  **Q.**    AND THAT MEANS YOU PUT ON YOUR OVERHEAD LIGHTS, RIGHT?

12  **A.**    CORRECT.

13  **Q.**    THAT IS A SIGNAL TO THE CAR THAT YOU ARE FOLLOWING TO

14  STOP.

15  **A.**    CORRECT.

16  **Q.**    TO PULL OVER AS QUICKLY AS POSSIBLE -- AS QUICKLY AS

17  SAFELY POSSIBLE.

18  **A.**    YES.

19  **Q.**    AND YOU MENTIONED A MOMENT AGO WHEN YOU WERE ON DIRECT

20  EXAMINATION THAT THERE WERE TWO OTHER OFFICERS THERE ONCE YOU

21  HAD STOPPED THE CAR.

22  **A.**    YES.

23  **Q.**    NOW, WERE THEY THERE WHEN YOU STOPPED, OR ONLY

24  AFTERWARDS?

25  **A.**    ONE OF THEM PULLED UP WITHIN SECONDS AFTER I STOPPED,

APRIL 14, 2014

TORRES — CROSS—EXAMINATION

```
 1   AND THEN THE OTHER ONE SHORTLY AFTERWARDS.
 2   Q.   AND BOTH OF THESE TWO OFFICERS WERE HARBOR POLICE
 3   OFFICERS?
 4   A.   YES.
 5   Q.   BOTH OF THEM WOULD HAVE HAD THE ABILITY TO LISTEN TO THE
 6   SAME DISPATCH CALLS YOU WERE LISTENING TO?
 7   A.   YES, OF COURSE.
 8   Q.   AND YOU SAID YOU WERE DRESSED IN A NORMAL POLICE
 9   OFFICER'S UNIFORM LIKE THE SORT YOU ARE WEARING TODAY?
10   A.   YES, SIR.
11   Q.   AND THAT'S A BLUE UNIFORM WITH INSIGNIA ON THE SHOULDERS
12   AND A BADGE OVER YOUR LEFT CHEST AREA?
13   A.   YES.
14   Q.   AND YOU WOULD HAVE BEEN ARMED WITH A GUN?
15   A.   YES.
16   Q.   AND YOU WERE DRIVING A MARKED POLICE CAR AT THAT TIME.
17   A.   YES.
18   Q.   DO YOU REMEMBER WHAT KIND IT WAS?
19   A.   WHAT MARK?
20   Q.   WHAT KIND OF CAR IT WAS THAT YOU WERE DRIVING?
21   A.   CROWN VIC.
22   Q.   OKAY.  WHAT ABOUT THE OTHER OFFICERS, WERE THEY ALSO IN
23   UNIFORM?
24   A.   YES.
25   Q.   WERE THEY ALSO ARMED?
```

APRIL 14, 2014

TORRES – CROSS-EXAMINATION

1   **A.**    YES.

2   **Q.**    AND WERE THEY ALSO DRIVING MARKED POLICE CARS?

3   **A.**    YES, THEY WERE.

4   **Q.**    I DON'T THINK YOU MENTIONED, DID THE RANGER, WHEN IT

5   PULLED OVER TO THE SIDE OF THE ROAD, DID IT PULL OVER TO THE

6   LEFT OR RIGHT SIDE OF THE ROAD?

7   **A.**    RIGHT SIDE OF THE ROAD.

8   **Q.**    AND IT PULLED OVER ONTO THE SHOULDER, BUT STILL ON THE

9   HIGHWAY.

10  **A.**    YES.

11  **Q.**    IT DIDN'T GET OFF AT AN EXIT.

12  **A.**    NO, IT WAS ON A FREEWAY.

13  **Q.**    SO I WANT TO SEE IF I UNDERSTAND THE SITUATION.  THE

14  RANGER IS THE FIRST CAR IN LINE.

15  **A.**    YES.

16  **Q.**    IT IS A TRUCK, BUT THE FIRST VEHICLE IN LINE, RIGHT?

17  **A.**    I UNDERSTAND, YES.

18  **Q.**    YOU ARE BEHIND IT.

19  **A.**    UM-HUM.

20  **Q.**    AND THEN THERE IS TWO MORE POLICE CARS BEHIND YOU.

21  **A.**    CORRECT.

22  **Q.**    AND YOU ARE ALL ON THE SHOULDER ON THE SIDE OF THE ROAD.

23  **A.**    YES.

24  **Q.**    AT CLOSE TO 2:00 IN THE MORNING.

25  **A.**    YEAH.  IT WAS -- EVENTUALLY ENDED AT 2:00 O'CLOCK.  I

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

1   THINK IT WAS A LITTLE AFTER MIDNIGHT.

2   **Q.**    OKAY.  I AM SORRY.  CLOSE TO 1:00 IN THE MORNING.  IT

3   WAS 12:52 NOT 1:52 WHEN YOU PULLED THEM OVER, RIGHT?

4   **A.**    YES.

5   **Q.**    AND THERE IS TRAFFIC ON THE ROAD, ISN'T THERE?

6   **A.**    YES, THERE IS.

7   **Q.**    I MEAN, THIS IS SAN DIEGO SO THERE IS CARS ALL HOURS OF

8   THE DAY AND NIGHT ON THE 5, RIGHT?

9   **A.**    YES.

10  **Q.**    AND YOU GO UP TO THE PASSENGER'S SIDE OF THE CAR.

11  **A.**    YES.

12  **Q.**    AND YOU SPEAK TO MR. WRIGHT.

13  **A.**    YES.

14  **Q.**    AND MR. WRIGHT GIVES YOU HIS LICENSE AND REGISTRATION.

15  **A.**    YES, HE DOES.

16  **Q.**    YOU GO BACK TO YOUR CAR.

17  **A.**    YES.

18  **Q.**    YOU CALL THAT INFORMATION IN.

19  **A.**    UM–HUM, YES.

20  **Q.**    AND YOU GET THE INFORMATION YOU TOLD MR. CHUN ABOUT,

21  THAT MR. WRIGHT HAS A PRIOR RECORD, RIGHT?

22  **A.**    CORRECT, YES.

23  **Q.**    BUT YOU ALSO GET THE INFORMATION THAT HIS LICENSE AND

24  REGISTRATION ARE VALID.

25  **A.**    CORRECT.

APRIL 14, 2014

TORRES – CROSS-EXAMINATION

1  **Q.**    AND YOU ALREADY KNOW WHAT YOU INTEND TO WRITE YOUR

2  TICKETS FOR, CORRECT?

3  **A.**    YEAH, FOR THE MOST PART, YES.

4  **Q.**    YOU TOLD ME YOU OBSERVED THOSE VEHICLE VIOLATIONS BEFORE

5  YOU PULLED HIM OVER.

6  **A.**    RIGHT, BUT I DON'T NECESSARILY KNOW I AM GOING TO

7  ACTUALLY WRITE THOSE CITATIONS OR NOT.  AND THEN IF THERE IS

8  ANYTHING ELSE ADDITIONALLY WHILE I AM THERE, I CONSIDER THAT

9  TOO.

10  **Q.**    SO YOU KNOW THAT AT LEAST THE BRAKE LIGHT AND THE

11  OBSCURED OR OBSTRUCTED LICENSE PLATE ARE POSSIBLE --

12  **A.**    YES.

13  **Q.**    -- VIOLATIONS YOU WILL WRITE A TICKET FOR.

14  **A.**    CORRECT.

15  **Q.**    AND YOU CAN SEE IN YOUR -- WHEN YOU WALK UP TO THE CAR

16  YOU DIDN'T NOTICE ANY OTHER VIOLATIONS, YOU TOLD US, RIGHT?

17  **A.**    CORRECT.

18  **Q.**    SO THERE IS NO OTHER VIOLATIONS AT THAT POINT YOU ARE

19  GOING TO WRITE A TICKET FOR; IS THAT CORRECT?

20  **A.**    CORRECT.

21  **Q.**    AT MOST YOU HAVE THESE THREE POTENTIAL VIOLATIONS, ONE

22  OF WHICH YOU DON'T HAVE A CODE FOR, THAT YOU ARE GOING TO

23  WRITE A TICKET FOR.

24  **A.**    CORRECT.

25  **Q.**    DO YOU IMMEDIATELY WRITE THAT TICKET?

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

1    **A.**    IMMEDIATELY, NO.

2    **Q.**    WHEN DO YOU WRITE THAT TICKET?

3    **A.**    SOMETIME DURING THE CONTACT.  I CAN'T GIVE YOU, LIKE, A

4    CERTAIN TIME.  WHEN I AM DONE SEARCHING, ONCE I FINISH, I

5    CONCLUDE THE SEARCH, IF THERE WAS NOTHING ELSE I NEED TO ASK

6    THEM I WILL WRITE THE TICKET.

7    **Q.**    SO YOU DON'T WRITE THE TICKET UNTIL AFTER THE SEARCH IS

8    DONE.

9    **A.**    CORRECT.

10   **Q.**    AND SO THE TRAFFIC STOP PORTION OF THIS ISN'T OVER, AT

11   LEAST UNTIL THE SEARCH IS DONE, RIGHT?

12   **A.**    CORRECT.

13   **Q.**    RIGHT.  SO MR. WRIGHT IS STILL DETAINED, HE IS NOT FREE

14   TO LEAVE AT LEAST UNTIL YOU FINISH THE SEARCH.

15   **A.**    CORRECT.

16   **Q.**    BECAUSE YOU HAVEN'T GIVEN HIM THE TICKET, RIGHT?

17   **A.**    RIGHT.

18   **Q.**    THAT MEANS YOU HAVE GOT BOTH HIS REGISTRATION, RIGHT?

19   **A.**    RIGHT.

20   **Q.**    AND HIS LICENSE?

21   **A.**    UM–HUM, YES.

22   **Q.**    YOU HAVE GOT THOSE IN YOUR POSSESSION.

23   **A.**    CORRECT.

24   **Q.**    YOU HAVEN'T GIVEN THOSE BACK TO HIM.

25   **A.**    NO.  HE IS STILL DETAINED.

APRIL 14, 2014

TORRES – CROSS-EXAMINATION

1    **Q.**    HE IS NOT FREE TO LEAVE.

2    **A.**    NO, OF COURSE NOT.

3    **Q.**    PLUS HE HAS GOT THESE THREE POLICE OFFICERS BEHIND HIM,

4    RIGHT?

5    **A.**    RIGHT.

6    **Q.**    ALL IN UNIFORM, ALL IN MARKED CARS, ALL ARMED.

7    **A.**    YES.

8    **Q.**    AND, NOW, YOU DO ASK -- AS YOU TOLD MR. CHUN, YOU ASKED

9    FOR CONSENT TO SEARCH THE CAR.

10    **A.**    YES, I DID.

11    **Q.**    AND YOU ASKED -- I AM SORRY -- THE TRUCK.  I KEEP SAYING

12    THE CAR, BUT IT IS A TRUCK.  YOU ASKED FOR CONSENT TO SEARCH

13    THE TRUCK.

14    **A.**    YES.

15    **Q.**    YOU ASKED MR. WRIGHT FOR CONSENT TO SEARCH THE TRUCK.

16    **A.**    YES.

17    **Q.**    AND THEN YOU ASKED ABOUT THE SUITCASES THAT YOU HAD SEEN

18    IN THE BED OF THE TRUCK.

19    **A.**    YES.

20    **Q.**    AND YOU ASKED WHO THOSE BELONGED TO.

21    **A.**    CORRECT.

22    **Q.**    AND THE PASSENGER IN THE CAR SAYS:  THOSE ARE MINE.

23    **A.**    YES.

24    **Q.**    DID YOU EVER GET HIS NAME?

25    **A.**    I AM SURE I DID AT THE SCENE, BUT I DON'T HAVE IT

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

```
 1   WRITTEN DOWN.
 2   Q.   THAT'S OKAY.  I AM JUST CURIOUS.
 3        AND HE TELLS YOU IT IS OKAY TO SEARCH THE LUGGAGE AS
 4   WELL.
 5   A.   CORRECT.
 6   Q.   SO YOU THEN ASK -- YOU AND THE THREE OTHER POLICE
 7   OFFICERS, ARMED AND IN MARKED CARS, ASK THE TWO OF THEM TO GET
 8   OUT OF THE CAR.
 9   A.   I ASKED THEM, THEY DIDN'T ASK.
10   Q.   AND YOU ASK THEM TO WALK TO THE BACK OF THE TRUCK.
11   A.   CORRECT.
12   Q.   AND AT THE BACK OF THE TRUCK YOU PAT THEM DOWN.
13   A.   YES.
14   Q.   DID YOU PAT BOTH OF THEM DOWN, OR JUST ONE OF THEM DOWN?
15   A.   THAT WOULD HAVE BEEN BOTH.
16   Q.   WELL, I AM ASKING YOU, WERE YOU THE ONE WHO PATTED EACH
17   OF THEM DOWN?
18   A.   YES.
19   Q.   WHERE ARE THESE OTHER TWO OFFICERS STANDING WHEN YOU ARE
20   PATTING DOWN MR. WRIGHT?
21   A.   ONE OF THEM IS BEHIND ME, BEHIND ME BETWEEN -- BEHIND ME
22   BUT BEHIND WHERE I AM PATTING DOWN THE TWO INDIVIDUALS.  AND
23   THE OTHER OFFICER, SHE IS -- I DON'T KNOW.  SHE IS BACK
24   TOWARDS HER VEHICLE.
25   Q.   SO YOU ARE NOT WATCHING THEM AT THAT TIME, RIGHT?
```

APRIL 14, 2014

TORRES - CROSS-EXAMINATION

1   **A.**    NOT WATCHING WHO?

2   **Q.**    YOU ARE NOT WATCHING THE TWO OFFICERS.

3   **A.**    NO.

4   **Q.**    YOU ARE WATCHING MR. WRIGHT.

5   **A.**    CORRECT.

6   **Q.**    SO YOU DON'T SEE IF WHILE YOU ARE PATTING MR. WRIGHT

7   DOWN THE OFFICERS ARE PUTTING THEIR HANDS ON THEIR WEAPONS,

8   NOT DRAWING THEM, JUST PUTTING THEIR HANDS ON THEIR WEAPONS.

9   **A.**    RIGHT.

10  **Q.**    THAT IS A NORMAL PROTECTIVE GESTURE FOR AN OFFICER WHEN

11  THEY ARE CONCERNED ABOUT A RISK, TO JUST KEEP THEIR HAND ON

12  THEIR WEAPON, RIGHT?

13  **A.**    IF THEY ARE CONCERNED OF A RISK YES, THAT MAKES SENSE.

14  **Q.**    YOU HAVE DONE THAT BEFORE YOURSELF, HAVEN'T YOU?

15  **A.**    SURE.

16  **Q.**    DID YOU EVER DO THAT DURING THIS PARTICULAR TRAFFIC

17  STOP?

18  **A.**    NO.

19  **Q.**    SO YOU ARE DONE PATTING DOWN MR. WRIGHT.  WHERE DO YOU

20  HAVE MR. WRIGHT STAND AFTER YOU PATTED HIM DOWN?

21  **A.**    AS FAR BACK TO THE CURB AS POSSIBLE, TO KEEP HIM OUT OF

22  TRAFFIC.

23  **Q.**    IS HE BEHIND YOUR CAR, IN BETWEEN YOUR CAR AND THE

24  TRUCK?

25  **A.**    HE WAS BEHIND MY CAR, AND CLOSER TO THE OTHER CAR, THE

APRIL 14, 2014

```
 1   OTHER PATROL CAR THAT IS BEHIND ME.
 2   Q.    SO HE IS A LITTLE OVER A CAR LENGTH FROM HIS TRUCK AT
 3   THAT POINT, HE HAS BEEN SEPARATED THAT FAR.
 4   A.    CORRECT.
 5   Q.    AND HE IS CLOSE TO THE OTHER OFFICERS?
 6   A.    YES, AT LEAST ONE.  THE OTHER OFFICER, SHE WAS -- AS FAR
 7   AS THAT NIGHT, I AM NOT SURE WHERE SHE -- SHE WAS MORE
 8   TOWARDS -- I REMEMBER HER BEING CLOSER TO THE BACK OF HER CAR.
 9   Q.    AND THEN YOU ASKED MR. MCKENNIE -- I AM SORRY -- THE
10   PASSENGER TO GET OUT OF THE CAR.
11   A.    YEAH, AFTER THE FIRST ONE.
12   Q.    OUT OF THE TRUCK.  YOU ASKED THE PASSENGER TO GET OUT OF
13   THE TRUCK.
14   A.    YES.
15   Q.    COME TO THE BACK OF THE TRUCK.
16   A.    CORRECT.
17   Q.    THEN YOU PAT HIM DOWN.
18   A.    YES, SIR.
19   Q.    THEN YOU DO THE SEARCH THAT YOU TOLD US ABOUT.
20   A.    YES.
21   Q.    AND YOU FIND THE MONEY.
22   A.    YES.
23   Q.    AND NO ONE REACTS NERVOUSLY TO THIS MONEY.
24   A.    NOT AT ALL.
25   Q.    THEN YOU WRITE THE TICKET, RIGHT?
```

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

1    **A.**    WELL, NOT IMMEDIATELY, BUT EVENTUALLY, YES.

2    **Q.**    OKAY.  THEN SO YOU DON'T WRITE THE TICKET AFTER YOU

3    FOUND THE MONEY?

4    **A.**    IF YOU PUT IT THAT WAY, YES.  BUT NOT IMMEDIATELY.

5    **Q.**    BUT NOT IMMEDIATELY.

6    **A.**    IT WASN'T LIKE I FOUND THE MONEY AND THEN WROTE THE

7    TICKET.  IT DIDN'T HAPPEN THAT WAY.

8    **Q.**    OKAY.  SO I AM TRYING TO FIGURE THIS OUT.  YOU HAVE DONE

9    THE SEARCH.

10   **A.**    UM–HUM.

11   **Q.**    YOU FOUND THE MONEY.

12   **A.**    UM–HUM.

13   **Q.**    JUST SO WE CAN BE CLEAR.  HAVING MONEY IS NOT ILLEGAL,

14   RIGHT?

15   **A.**    NO, IT IS NOT.

16   **Q.**    HAVING MONEY IN YOUR SUITCASE ISN'T ILLEGAL, RIGHT?

17   **A.**    NO.

18   **Q.**    EVEN HAVING MONEY IN THE PANT LEG OF YOUR JEANS ISN'T

19   ILLEGAL.

20   **A.**    THAT I KNOW OF.

21   **Q.**    OKAY.  SO AT THIS POINT YOU HAVE A TRAFFIC STOP, YOU

22   KNOW, WHERE YOU HAVE GOT SOME VEHICLE CODE VIOLATIONS.  AND

23   YOU DECIDED THERE IS NO OTHER VIOLATIONS, RIGHT?

24   **A.**    RIGHT.

25   **Q.**    YOU FOUND MONEY, BUT THE MONEY IS NOT ILLEGAL, RIGHT?

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

1   **A.**     RIGHT.

2   **Q.**     YOU HAVEN'T BEEN TOLD OF ANY PARTICULAR SUBJECT THAT THE

3   FEDERAL AGENTS WANT YOU TO INVESTIGATE; IS THAT RIGHT?

4   **A.**     CORRECT.

5   **Q.**     SO YOU ARE NOT INVESTIGATING ANY PARTICULAR CRIME AT

6   THAT MOMENT, ARE YOU?

7   **A.**     NO, I AM NOT.

8   **Q.**     THE CONSENT TO SEARCH WAS GIVEN AT 1:03 A.M.; IS THAT

9   RIGHT?

10  **A.**     YES.

11  **Q.**     HOW LONG DID IT TAKE YOU TO COMPLETE THAT SEARCH?

12  **A.**     I DON'T REMEMBER THE EXACT TIME, AND ACCORDING TO THIS

13  IT DOESN'T HAVE AN ENDING TIME WHEN I FINISHED.  IT WOULD HAVE

14  ONLY BEEN MAYBE 10, 15 MINUTES.

15  **Q.**     SO SOMETIME BETWEEN 1:13 AND 1:18 YOU ARE DONE WITH THE

16  SEARCH.

17  **A.**     YOU MEAN 1:03 TO 1:18?

18  **Q.**     1:03 IS WHEN YOU GET CONSENT, RIGHT?

19  **A.**     RIGHT.

20  **Q.**     IT TAKES YOU, YOU SAID, 10 TO 15 MINUTES TO DO THE

21  SEARCH.

22  **A.**     OH, I SEE WHY, YOUR MATH.  YES.

23  **Q.**     I AM ADDING THAT 10 TO 15 MINUTES TO THE TIME.

24  **A.**     GOT YOU.

25  **Q.**     SO SOMETIME BETWEEN 1:13 AND 1:18 YOU ARE DONE WITH THE

APRIL 14, 2014

TORRES – CROSS–EXAMINATION

1   SEARCH.

2   **A.**   SOUNDS ABOUT RIGHT.

3   **Q.**   AT THAT POINT YOU ARE FREE TO WRITE YOUR TICKET, RIGHT?

4   **A.**   YES.

5   **Q.**   GIVE THE LICENSE AND REGISTRATION BACK TO MR. WRIGHT,

6   CORRECT?

7   **A.**   CORRECT.

8   **Q.**   AND ALLOW THEM TO GO ON THEIR WAY.  YOU ARE FREE TO DO

9   THAT.

10   **A.**   YES.

11   **Q.**   BUT YOU DON'T DO THAT.

12   **A.**   NO.

13   **Q.**   AND, IN FACT, MR. WRIGHT AND MR. MCKENNIE ARE KEPT ON

14   THE SIDE OF THE ROAD UNTIL 1:54, AREN'T THEY?

15   **A.**   YES.

16   **Q.**   AND IT IS ONLY AT 1:54, AFTER A FURTHER DELAY OF OVER 30

17   MINUTES, THAT YOU BEGIN ESCORTING THEM BACK TO YOUR POLICE

18   HEADQUARTERS; IS THAT RIGHT?

19   **A.**   YES.

20   **Q.**    SO I CAN BE CLEAR, YOU NEVER READ MR. WRIGHT ANY

21   MIRANDA RIGHTS, DID YOU?

22   **A.**   NO.

23   **Q.**   YOU NEVER TOLD HIM HE HAD A RIGHT TO REMAIN SILENT.

24   **A.**   NO.

25   **Q.**   NEVER TOLD HIM HE DIDN'T HAVE TO ANSWER ANY QUESTIONS.

APRIL 14, 2014

TORRES – CROSS-EXAMINATION

1    **A.**    NO.

2    **Q.**    NEVER TOLD HIM HE HAD A RIGHT TO AN ATTORNEY IF HE

3    WANTED ONE.

4    **A.**    NO.

5    **Q.**    NOTHING LIKE THAT.

6    **A.**    WITHOUT ARREST, NO.

7    **Q.**    WHEN, IN YOUR MIND, WAS MR. MCKENNIE FREE TO LEAVE, TO

8    DRIVE –– I AM SORRY –– MR. WRIGHT FREE TO LEAVE, TO DRIVE AWAY

9    AND GO HOME?

10   **A.**    AFTER ISSUING THE CITATION AND SIGNING FOR IT.

11   **Q.**    AND THAT WAS AT 1:54 WHEN YOU FINALLY BEGAN ESCORTING

12   HIM BACK TO THE STATION HOUSE?

13   **A.**    IT WAS SLIGHTLY BEFORE THAT.  THAT IS WHEN THEY ESCORTED

14   HIM BACK, BUT IT WAS DONE A LITTLE BEFORE THAT.

15   **Q.**    ESCORTED HIM BACK, EVEN THOUGH HE WAS FREE TO LEAVE.

16   **A.**    CORRECT.

17   **Q.**    THANK YOU –– OH, ONE LAST QUESTION.

18          SIR, WERE YOU WEARING ANY SORT OF A PERSONAL RECORDER,

19   EITHER ON YOUR PERSON OR WAS THERE ONE ON YOUR DASHBOARD?

20   **A.**    NO, NOT AT ALL.

21             **THE COURT:**  REDIRECT.

22             **MR. CHUN:**  BRIEFLY, YOUR HONOR.

23                       REDIRECT EXAMINATION

24   **Q.**    **(MR. CHUN)** IN REGARDS TO THE MINUTE BY MINUTE OR THE

25   MINUTES THAT DEFENSE COUNSEL HANDED YOU, IS THAT COMMONLY

APRIL 14, 2014

TORRES – REDIRECT EXAMINATION

1   CALLED A CAD REPORT?

2   **A.**    YES, IT IS.

3   **Q.**    JUST FOR CLARIFICATION, IS THAT LIKE A VERBATIM

4   TRANSCRIPT THAT IS TAKEN DOWN BY DISPATCH?

5   **A.**    YES.

6   **Q.**    LIKE WORD BY WORD?

7   **A.**    NOT NECESSARILY.  IT IS WHATEVER THE DISPATCH –– HOW

8   FAST SHE CAN TYPE IT IN AND WHAT SHE HEARS.  SO IF SOMEONE IS

9   TALKING ON THE PHONE, SHE WILL TYPE THAT UP.  WHATEVER GOES

10  OVER THE AIR, SHE WILL TYPE THAT UP TOO.

11  **Q.**    SO THIS IS A SUMMARY DONE BY DISPATCH.

12  **A.**    CORRECT.

13  **Q.**    NOT A COMPUTER PROGRAM THAT IS JUST ––

14  **A.**    NO.

15  **Q.**    –– TAKING DOWN THE WORDS YOU ARE SAYING.

16  **A.**    JUST A HUMAN BEING ON A MIKE TYPING AWAY.

17  **Q.**    IN REGARDS TO THIS OFFENSE OF STRADDLING WITHIN A LANE

18  THAT YOU TALK ABOUT, DID YOU ACTUALLY ISSUE A CITATION FOR IT?

19  **A.**    NO, I DIDN'T.

20  **Q.**    YOU JUST MADE NOTE OF IT.

21  **A.**    JUST MADE NOTE.  I VERBALLY TOLD HIM TO STAY WITHIN THE

22  LINES NEXT TIME HE DRIVES.

23  **Q.**    AND YOU HAD TESTIFIED –– OR YOU WERE JUST ASKED ABOUT

24  THE OTHER TWO OFFICERS PRESENT REACHING FOR THEIR FIREARMS.

25  **A.**    YES.

APRIL 14, 2014

TORRES – REDIRECT EXAMINATION

1   **Q.**    JUST TO BE CLEAR, DID YOU EVER SEE THEM REACH FOR THEIR

2   FIREARMS?

3   **A.**    NO, I DIDN'T.  I DIDN'T SEE THEM, NO.

4   **Q.**    YOU WERE JUST SAYING YOU DIDN'T KNOW.

5   **A.**    RIGHT.  I DIDN'T KNOW.  THAT'S CORRECT.

6   **Q.**    AND WHAT YOU -- ONCE YOU FOUND THIS MONEY IN THE PANT

7   LEG, DID YOU FIND THAT TO BE SUSPICIOUS?

8   **A.**    YES, I DID.

9   **Q.**    SO AFTER SEARCHING THIS CAR FOR A PERIOD OF TIME,

10  EARLIER YOU TESTIFIED YOU ALSO INTERVIEWED THEM?

11  **A.**    YES.

12  **Q.**    THIS WAS JUST FOLLOWING UP ABOUT YOUR SUSPICIONS?

13  **A.**    RIGHT.  ASKING THEM WHERE DID THE MONEY COME FROM, WHY

14  IS THERE MONEY THERE.

15  **Q.**    SO IS IT SAFE TO SAY THIS ALSO EXTENDED THE TIME OF THE

16  STOP OF THE VEHICLE?

17           **MR. CAHN:**  OBJECTION.  LEADING.

18           **THE COURT:**  SUSTAINED.

19  **Q.**    **(MR. CHUN)** WAS THE LENGTH OF YOUR INTERVIEW -- OR WAS

20  THE LENGTH OF THE STOP -- LET ME REPHRASE.

21           DID YOU INTERVIEW THE DRIVER AND PASSENGER AFTER YOUR

22  SEARCH?

23  **A.**    YES.

24  **Q.**    WHAT DID THAT DO FOR THE DURATION OF THAT STOP?

25  **A.**    IT EXTENDED THE TIME.

APRIL 14, 2014

TORRES - REDIRECT EXAMINATION

1   **Q.**    AND JUST TO BE CLEAR, EARLIER YOU WERE ASKED WHEN YOU

2   FELT THAT THIS CAR OR THE DRIVER AND PASSENGER WERE FREE TO

3   LEAVE.  WHAT WAS YOUR ANSWER THERE?

4   **A.**    I AM SORRY.  ONE MORE TIME.

5   **Q.**    WHEN DID YOU BELIEVE THE DRIVER AND PASSENGER WERE FREE

6   TO LEAVE?

7   **A.**    AFTER I WROTE THE CITATION.

8   **Q.**    SO YOU BELIEVED, ONCE YOU ISSUED THAT CITATION, THEY

9   COULD GO ON THEIR WAY?

10  **A.**    YES, BECAUSE THEY ARE BASICALLY -- THEY ARE PROMISING TO

11  APPEAR IN COURT.  SO THAT IS SATISFACTORY.  I AM DONE WITH

12  THEM THEN.

13  **Q.**    DID YOU WRITE THE CITATION BEFORE OR AFTER YOU

14  INTERVIEWED BOTH DRIVER AND PASSENGER?

15  **A.**    I BELIEVE IT WAS AFTER.

16         **MR. CHUN:**  NO FURTHER QUESTIONS, YOUR HONOR.

17         **THE COURT:**  RECROSS.

18                    RECROSS-EXAMINATION

19  **Q.**    **(MR. CAHN)** SO MR. WRIGHT WASN'T FREE TO LEAVE WHILE YOU

20  WERE INTERVIEWING HIM?

21  **A.**    NO.

22  **Q.**    AND DID YOU WRITE ANY REPORTS ON YOUR INTERVIEW OF MR.

23  WRIGHT?

24  **A.**    NO, I DIDN'T, JUST --

25  **Q.**    ANY NOTES?

APRIL 14, 2014

TORRES – RECROSS–EXAMINATION

1   **A.**    NO.  JUST WHAT YOU HAVE, WHAT I HAVE HERE.

2   **Q.**    SO YOU DIDN'T RECORD ANYTHING ABOUT YOUR INTERVIEW OF

3   MR. WRIGHT.

4   **A.**    NO.

5   **Q.**    NOTHING ABOUT HOW HE EITHER ALLAYED OR FAILED TO ALLAY

6   YOUR SUSPICIONS.

7   **A.**    NO, THERE WAS NO NEED TO.

8   **Q.**    WHILE MR. WRIGHT WAS BEING ESCORTED BACK TO THE POLICE

9   STATION, WHERE WAS THE MONEY?

10  **A.**    IN THE BACK OF MY PATROL CAR.

11  **Q.**    I AM CONFUSED.  YOU TOLD ME THERE WAS NOTHING ILLEGAL

12  ABOUT THIS MONEY.

13  **A.**    CORRECT.

14  **Q.**    WHY WAS THE MONEY TAKEN FROM MR. WRIGHT'S CAR AND PUT IN

15  YOUR CAR?

16  **A.**    FROM WHAT I UNDERSTAND --

17          **MR. CHUN:**  OBJECTION.  CALLS FOR SPECULATION.

18  **Q.**   **(MR. CAHN)** I AM ASKING WHY YOU PUT IT IN YOUR CAR.

19          **MR. CHUN:**  OBJECTION.  MISSTATES THE TESTIMONY.

20  **Q.**   **(MR. CAHN)** WHO PUT THE MONEY IN YOUR CAR?

21  **A.**    I DID.

22  **Q.**    WHY DID YOU PUT THE MONEY IN YOUR CAR?

23  **A.**    TO TAKE IT BACK TO HEADQUARTERS.

24  **Q.**    WHAT WAS YOUR PURPOSE IN PUTTING THE MONEY IN YOUR CAR

25  AND TAKING IT BACK TO HEADQUARTERS, RATHER THAN LEAVING IT

APRIL 14, 2014

1   WITH MR. WRIGHT?

2   **A.**    SO I DIDN'T LEAVE IT IN THEIR CAR AND THEY DRIVE OFF

3   WITH IT.

4   **Q.**    SO, IN OTHER WORDS, IF YOU KEPT THE MONEY THEY WERE

5   GOING TO HAVE TO GO WITH YOU.

6   **A.**    THEY DIDN'T HAVE TO.  THEY WERE FREE TO LEAVE.

7   **Q.**    THEY WERE FREE TO LEAVE THEIR MONEY WITH YOU.

8   **A.**    CORRECT.

9   **Q.**    THANK YOU.

10  **A.**    YOU ARE WELCOME.

11          **MR. CHUN:**  NOTHING FURTHER, YOUR HONOR.

12          **THE COURT:**  THANK YOU VERY MUCH.  YOU WILL BE

13  EXCUSED.

14          GOVERNMENT'S NEXT.

15          **MR. CHUN:**  YOUR HONOR, COULD THIS WITNESS BE

16  EXCUSED?

17          **THE COURT:**  YES.

18          ANY OBJECTION?

19          **MR. CAHN:**  NO.  NO OBJECTION, YOUR HONOR.

20          **THE WITNESS:**  SHOULD I LEAVE THESE UP HERE?

21          **MR. CHUN:**  YES.

22          THE UNITED STATES CALLS OFFICER SNELL.

23          **THE CLERK:**  PLEASE STEP FORWARD.

24          PLEASE RAISE YOUR RIGHT HAND.

25          DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

APRIL 14, 2014

```
 1    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE
 2    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
 3              THE WITNESS:  I DO.
 4              THE CLERK:  PLEASE TAKE THE STAND.
 5              THE WITNESS:  GOOD MORNING.
 6              THE COURT:  GOOD MORNING.
 7              THE CLERK:  SIR, PLEASE STATE YOUR FULL NAME AND
 8    SPELL YOUR FIRST AND LAST NAMES.
 9              THE WITNESS:  BARRY SNELL.  B–A–R–R–Y.  S–N–E–L–L.
10              THE COURT:  THANK YOU.
11              COUNSEL.
12                        DIRECT EXAMINATION
13    Q.    (MR. CHUN) GOOD AFTERNOON, OFFICER SNELL.
14         JUST TO BE CLEAR, WERE YOU PREVIOUSLY A SAN DIEGO HARBOR
15    POLICE OFFICER?
16    A.    I WAS.
17    Q.    ARE YOU RETIRED NOW?
18    A.    I AM.
19    Q.    WHEN DID YOU RETIRE?
20    A.    JANUARY 1ST, 2014.
21    Q.    SO EARLIER THIS YEAR.
22    A.    CORRECT.
23    Q.    SO BEFORE RETIRING, HOW LONG WERE YOU A SAN DIEGO HARBOR
24    POLICE OFFICER?
25    A.    23 YEARS.
```

APRIL 14, 2014

SNELL - DIRECT EXAMINATION

1   **Q.**   AND DURING ANY OF THOSE YEARS WERE YOU A TASK FORCE

2   OFFICER AS WELL?

3   **A.**   I WAS.

4   **Q.**   WITH WHO?

5   **A.**   SAN DIEGO HARBOR POLICE.

6   **Q.**   AND WHICH YEARS WERE YOU A TASK FORCE OFFICER?

7   **A.**   APPROXIMATELY 2013 TO 2010 -- OR '9, I AM SORRY.

8   **Q.**   SO THE LAST THREE OR FOUR YEARS --

9   **A.**   FOUR YEARS, CORRECT.

10  **Q.**   -- OF YOUR SERVICE.

11       AND ON JULY 12TH, 2012 DID YOU MEET WITH FEDERAL AGENTS

12  TO DISCUSS A POSSIBLE NEED OF SAN DIEGO HARBOR'S ASSISTANCE

13  THAT NIGHT?

14  **A.**   CORRECT.

15  **Q.**   AND IN THE EARLY MORNING OF JULY 13TH, 2012 AT ABOUT

16  1:00 A.M., WERE YOU CALLED BACK TO ASSIST WITH A MONEY SEIZURE

17  ON I-5 NEAR NATIONAL CITY?

18  **A.**   I WAS.

19  **Q.**   DID YOU ARRIVE AT ABOUT 1:40 A.M.?

20  **A.**   CORRECT.

21  **Q.**   OKAY.  UPON ARRIVING, WHAT DID YOU FIND?

22  **A.**   THERE WAS A TRAFFIC STOP WITH A FORD RANGER PICKUP

23  TRUCK, AND THERE WAS THREE POLICE VEHICLES BEHIND THE FORD

24  PICKUP TRUCK.  AND I WAS THE LAST ONE TO PULL IN.

25  **Q.**   OKAY.  SO YOU SAY THREE VEHICLES.  HOW MANY POLICE

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

```
 1  OFFICERS WERE THERE ON THE SCENE?
 2  A.    THREE.
 3  Q.    AND THREE OFFICERS TOTAL, AND THEN YOU WOULD BE THE
 4  FOURTH?
 5  A.    CORRECT.
 6  Q.    AND DID YOU SEE THE FORD RANGER THAT YOU HAD PULLED
 7  OVER?
 8  A.    I DID.
 9  Q.    HOW MANY OCCUPANTS WERE THERE FOR THAT VEHICLE?
10  A.    TWO.
11  Q.    NOW, AFTER YOU ARRIVED WHAT DID YOU DO?
12  A.    I CONTACTED OFFICER TORRES.  AND HE EXPLAINED THAT HE
13  HAD MADE THE TRAFFIC STOP AND LOCATED A LARGE SUM OF MONEY IN
14  ONE OF THE SUITCASES.
15  Q.    OKAY.  THEN AFTER BEING TOLD THIS, WHAT DID YOU DO NEXT?
16  A.    I LOOKED -- I VERIFIED THE MONEY THAT WAS IN THE
17  SUITCASE.
18  Q.    SO YOU LOOKED AT THE SUITCASE YOURSELF?
19  A.    I DID.
20  Q.    AND DID YOU FIND MONEY WITHIN IT?
21  A.    I DID.
22  Q.    AND AFTER OBSERVING THE MONEY YOURSELF, WHAT DID YOU DO?
23  A.    I QUESTIONED MR. MCKENNIE, AS WELL AS A LITTLE BIT OF
24  MR. WRIGHT.
25  Q.    AND BASED ON YOUR CONVERSATION WITH MR. MCKENNIE, DID
```

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

1    YOU FIND HIM TO BE HONEST?

2    **A.**    DID I –– CAN YOU REPEAT THAT?

3    **Q.**    DID YOU BELIEVE HE WAS BEING HONEST WITH YOU?

4    **A.**    IN SOME REGARDS, YES.  NOT REGARDING HIS TRAVEL, BUT NOT

5    SO MUCH WHAT HIS PLANS WERE TO DO WITH THE MONEY OR WHERE HE

6    WAS GOING TO STAY.

7    **Q.**    OKAY.  SO IN REGARDS TO YOUR QUESTIONING ABOUT THE MONEY

8    DID YOU FEEL LIKE HE WAS NOT BEING HONEST WITH YOU?

9    **A.**    CORRECT.

10          **MR. CAHN:**  I AM GOING TO OBJECT TO THIS LINE OF

11   QUESTIONING, OBJECTION ON RELEVANCE AND WHETHER HE BELIEVED

12   THE INDIVIDUALS WERE BEING HONEST.

13          **THE COURT:**  GOES TO THE DURATION OF THE STOP?

14          **MR. CHUN:**  YES, YOUR HONOR.

15          **THE COURT:**  THE ANSWER WILL STAND.

16   **Q.**    **(MR. CHUN)** AND AFTER SPEAKING WITH MR. MCKENNIE, DID

17   YOU ALSO SPEAK WITH MR. WRIGHT BRIEFLY?

18   **A.**    I DID.

19   **Q.**    NOW, AS YOU ARE SPEAKING WITH MR. WRIGHT, WHERE ARE YOU?

20   KIND OF PROVIDE A PICTURE FOR US OF THE SCENE.

21   **A.**    THE FORD RANGER WAS THE FIRST VEHICLE IN LINE BEING THAT

22   IT WAS A TRAFFIC STOP, AND WE WERE ON THE PASSENGER SIDE OF

23   THE FORD RANGER, WHICH WAS ON THE RIGHT SIDE OF THE SHOULDER

24   OF I–5.

25   **Q.**    OKAY.  AND AS YOU WERE TALKING TO HIM, WHERE ARE THE

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

```
 1    OTHER OFFICERS IN RELATIONSHIP TO THE TWO OF YOU, YOU AND MR.
 2    WRIGHT?
 3    A.    THEY WERE IN CLOSE PROXIMITY, MAYBE A CAR LENGTH AWAY
 4    BUT THEY WERE IN THE GENERAL VICINITY.
 5    Q.    OKAY.  SO THEY ARE IN THE AREA, BUT YOU ARE SAYING ABOUT
 6    A CAR LENGTH AWAY.
 7    A.    YEAH.  I MEAN, THINGS WERE CONSISTENTLY CHANGING SO --
 8    BUT APPROXIMATELY IN THAT SAME AREA, BETWEEN THE FORD RANGER
 9    AND THE SECOND POLICE CAR.
10    Q.    AND AS YOU SPOKE TO MR. WRIGHT, WHAT WAS YOUR TONE OF
11    VOICE?
12    A.    PRETTY MUCH AS IT IS NOW.
13    Q.    ARE YOU SAYING THAT TO BE CONVERSATIONAL?
14    A.    YEAH.  THAT'S HOW I CONDUCT MY BUSINESS.
15    Q.    DID YOU EVER YELL?
16    A.    NEVER.
17    Q.    AND AFTER CONDUCTING YOUR INTERVIEW OF BOTH MR. WRIGHT
18    AND MR. MCKENNIE, WHAT DID YOU DO NEXT?
19    A.    AFTER QUESTIONING THEM?
20    Q.    YES.
21    A.    I THOUGHT IT WOULD BE BEST THAT WE CONDUCT A LITTLE BIT
22    FURTHER INVESTIGATION AWAY FROM THE FREEWAY.  I ASKED THEM IF
23    THEY WOULD GO BACK TO OUR STATION, VOLUNTARILY, TO TALK MORE
24    ABOUT THE MONEY.
25    Q.    LET ME ASK.  DID YOU ASK THEM OR DID YOU DIRECT THEM TO
```

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

```
1   FOLLOW YOU BACK TO THE STATION?
2   A.    ASKED THEM.
3   Q.    SO THEY WERE FREE TO LEAVE AFTER?
4   A.    ABSOLUTELY.
5   Q.    AND I THINK YOU JUST TESTIFIED -- AND CORRECT ME IF I AM
6   WRONG -- THAT YOU GAVE THEM THE OPTION TO VOLUNTARILY FOLLOW
7   YOU BACK; IS THAT RIGHT?
8   A.    CORRECT.
9   Q.    DID THEY AGREE TO FOLLOW YOU BACK TO THE STATION?
10  A.    THEY DID.
11  Q.    NOW, AS YOU WERE TALKING WITH THEM, DO YOU HAVE ANY
12  PROBLEM HEARING THEM?
13  A.    NO.
14  Q.    ANY PROBLEM SEEING THEM?
15  A.    NO.
16  Q.    IS THERE ANYTHING TO INDICATE THAT THEY WEREN'T CLEAR
17  ABOUT WHAT YOU WERE COMMUNICATING?
18  A.    NO.
19  Q.    AND DURING ANY PART OF YOUR INTERVIEW WITH THEM DID YOU
20  EVER TELL THEM THAT THEY WERE UNDER ARREST?
21  A.    NEVER.
22  Q.    DID YOU EVER PLACE THEM IN HANDCUFFS?
23  A.    NO.
24  Q.    DID YOU EVER BRANDISH YOUR FIREARM?
25  A.    NO.
```

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

1   **Q.**    DID YOU EVER SEE ANY OTHER OFFICERS BRANDISH A FIREARM?

2   **A.**    NO.

3   **Q.**    DID YOU EVER SEE ANY OTHER OFFICERS YELLING AT THEM?

4   **A.**    NO.

5   **Q.**    OR PLACING THEM UNDER ARREST?

6   **A.**    NO.

7   **Q.**    SO AFTER YOU GIVE THEM THE OPTION TO FOLLOW YOU BACK TO

8   THE STATION, WHAT OCCURS NEXT?

9   **A.**    DID YOU SAY WHAT HAPPENS NEXT AFTER THAT?

10  **Q.**    YES.

11  **A.**    WE, IN FRONT OF MR. MCKENNIE, SECURED HIS LUGGAGE WITH

12  THE MONEY IN THE BACK OF ONE OF THE POLICE CARS.  THEN WE

13  EXPLAINED TO MR. WRIGHT IF HE WOULD FOLLOW ONE OF THE POLICE

14  CARS FROM THE SCENE TO GO BACK TO OUR STATION, WHICH WAS

15  ACROSS FROM THE AIRPORT WHERE THEY JUST HAD COME FROM.

16  **Q.**    AND THIS IS AFTER THEY AGREED TO FOLLOW YOU BACK?

17  **A.**    CORRECT.

18  **Q.**    WHY DID YOU DECIDE TO SEIZE THIS MONEY?

19  **A.**    IN FOUR YEARS OF WORKING THE TASK FORCE AT THE AIRPORT,

20  WE CONTACT A LOT OF PEOPLE WITH LARGE SUMS OF MONEY.  AND THIS

21  WAS CONSISTENT BEHAVIOR THAT WE HAD SEEN IN THE PAST REGARDING

22  A LAST-MINUTE AIR TRAVEL AND LARGE SUMS OF MONEY, AND THE WAY

23  IT WAS PLACED IN THE LUGGAGE AND STATEMENTS THAT THEY HAD

24  MADE.

25  **Q.**    RELATED TO WHAT?

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

1    **A.**    WHAT DO YOU MEAN?

2    **Q.**    YOU FOUND ALL OF THIS TO BE RELATED TO CRIMINAL

3    ACTIVITY?

4    **A.**    CRIMINAL ACTIVITY.  SPECIFICALLY USED IN THE PURCHASE OR

5    SALES OF DRUGS.

6    **Q.**    THIS WAS CONSISTENT WITH YOUR TRAINING AND EXPERIENCE?

7    **A.**    CORRECT.

8    **Q.**    NOW, AFTER THE MONEY IS PLACED IN THE PATROL VEHICLE,

9    WHAT OCCURS AFTER THAT?

10    **A.**    THEY AGREE, THEN WE ALL WENT BACK TO OUR HARBOR POLICE

11    STATION.

12    **Q.**    OKAY.  NOW, WHO DROVE THE FORD RANGER BACK TO THE

13    STATION?

14    **A.**    MR. WRIGHT.

15    **Q.**    OKAY.  WAS THERE AN OFFICER IN THE CAR WITH THEM?

16    **A.**    NO.

17    **Q.**    SO HE WAS GIVEN HIS KEYS BACK AND HE COULD DRIVE THE

18    VEHICLE HIMSELF.

19    **A.**    CORRECT.

20    **Q.**    AND THERE WAS NOBODY INSIDE THAT WOULD STOP HIM FROM

21    GOING SOMEWHERE ELSE.

22    **A.**    CORRECT.

23    **Q.**    DID YOU HAVE ANY INTENTION OF ARRESTING THE OCCUPANTS

24    THAT NIGHT?

25    **A.**    NO.

APRIL 14, 2014

SNELL – DIRECT EXAMINATION

```
 1   Q.    AND JUST TIMING WISE, IT WAS ABOUT 1:55 A.M. THAT
 2   EVERYBODY DROVE BACK TO THE STATION?
 3   A.    CORRECT.
 4         MR. CHUN:  ONE MOMENT.
 5   Q.    (MR. CHUN) PRIOR TO BEING TOLD THAT THEY COULD FOLLOW
 6   YOU BACK TO THE STATION, DID YOU ADVISE THEM THAT THEY HAD
 7   CERTAIN ADMINISTRATIVE RIGHTS SO THAT THEY COULD COLLECT THIS
 8   MONEY BACK?
 9   A.    THAT IS SOMETHING THAT I GENERALLY TELL PEOPLE.  IF WE
10   SEIZE THE MONEY I ALWAYS SAY THAT THEY HAVE A RIGHT TO
11   PETITION TO GET THEIR MONEY BACK.
12         MR. CHUN:  OKAY.  NOTHING FURTHER, YOUR HONOR.
13         THE COURT:  CROSS-EXAMINATION.
14                    CROSS-EXAMINATION
15   Q.    (MR. CAHN) IT IS MR. SNELL NOW, RIGHT?  NO LONGER
16   OFFICER?
17   A.    MR. SNELL.
18   Q.    YOU WERE OFFICER SNELL ON THAT DATE.
19   A.    I WAS.
20   Q.    ON JULY 13TH, WHAT TIME DID YOU GET TO THE SCENE OF THIS
21   TRAFFIC STOP?
22   A.    APPROXIMATELY 1:40.
23   Q.    THE TRAFFIC STOP HAS BEEN GOING ON FOR 40 MINUTES,
24   ROUGHLY, AT THAT POINT?
25   A.    APPROXIMATELY.
```

APRIL 14, 2014

SNELL – CROSS–EXAMINATION

1   Q.   AND THE OTHER THREE OFFICERS ARE ALL THERE ALREADY.

2   A.   CORRECT.

3   Q.   OTHER OFFICERS MADE THE STOP.

4   A.   UM-HUM.

5   Q.   MR. WRIGHT AND MR. MCKENNIE ARE ALREADY OUT OF THE CAR.

6   A.   YES.

7   Q.   PRESUMABLY ANOTHER OFFICER HAS ALREADY GOTTEN THEM OUT

8   OF THE CAR.

9   A.   YES.

10  Q.   THE SEARCH HAS ALREADY BEEN COMPLETED.

11  A.   CORRECT.

12  Q.   AND THE OFFICER THAT DID THE SEARCH HAS ALREADY SECURED

13  THE SUITCASE THAT THE MONEY IS IN, RIGHT?

14  A.   IT WAS STILL IN THE BACK OF THE BED OF THE PICKUP TRUCK.

15  Q.   AND THIS OTHER OFFICER, OFFICER TORRES, TAKES IT OUT OF

16  THE PICKUP TRUCK WHILE YOU ARE THERE AND PUTS IT IN THE BACK

17  OF HIS CAR.

18  A.   NOT IN THE BEGINNING.  THAT WAS PRIOR TO US LEAVING TO

19  GO TO THE STATION.

20  Q.   BUT HE TAKES IT OUT AND PUTS IT IN HIS CAR, RIGHT?

21  A.   AT THE END, YES.

22  Q.   YOU DON'T TAKE IT OUT AND PUT IT IN YOUR CAR.

23  A.   I DON'T.

24  Q.   AND YOU DON'T KNOW WHAT THE OTHER OFFICER HAD TOLD MR.

25  WRIGHT AND MR. MCKENNIE ABOUT THE MONEY BEFORE THEN, RIGHT?

APRIL 14, 2014

SNELL – CROSS-EXAMINATION

```
1   A.    I DON'T KNOW.

2   Q.    BECAUSE YOU WEREN'T THE ONE WHO TOLD THEM ABOUT ANY

3   ADMINISTRATIVE RIGHTS THEY HAD.

4   A.    I WOULD HAVE BEEN THE ONE.

5   Q.    YOU WOULD HAVE?  SO DID YOU DO THAT THIS TIME?

6   A.    I BELIEVE I WOULD.  THAT IS NORMALLY WHAT I DO.

7   Q.    WHEN DID YOU DO THAT?

8   A.    I AM SORRY?

9   Q.    WHEN DID YOU DO THAT?

10  A.    WHEN I WOULD BE SPEAKING WITH THEM.

11  Q.    I AM A LITTLE CONFUSED NOW.

12        YOU GET THERE AT 1:40, RIGHT?

13  A.    CORRECT.

14  Q.    ROUGHLY.  YOU WALK OVER TO MR. WRIGHT AND MR. MCKENNIE.

15  A.    CORRECT.

16  Q.    YOU BEGIN TALKING TO MR. WRIGHT FIRST?

17  A.    MR. MCKENNIE.

18  Q.    YOU BEGIN TALKING TO MR. MCKENNIE FIRST.

19  A.    CORRECT.

20  Q.    AND WHERE IS MR. WRIGHT?

21  A.    I BELIEVE HE WAS OUTSIDE THE VEHICLE, STILL IN THE AREA

22  ON THE SIDE OF THE ROAD ON THE SHOULDER.

23  Q.    WHERE IS -- SO THE VEHICLE, YOU MEAN HIS CAR -- HIS

24  TRUCK?

25  A.    CORRECT.
```

APRIL 14, 2014

SNELL – CROSS-EXAMINATION

1  **Q.**    AND WHERE IS MR. MCKENNIE?

2  **A.**    ALL OF US WERE ON THE SIDE OF THE ROAD, ADJACENT TO THE

3  FORD RANGER PICKUP TRUCK.

4  **Q.**    SO YOU ARE ALL NEXT TO THE FORD RANGER.

5  **A.**    CORRECT.

6  **Q.**    SO YOU ARE ALL WITHIN EASY VIEWING DISTANCE OF EACH

7  OTHER?

8  **A.**    CORRECT.

9  **Q.**    AND WITHIN HEARING DISTANCE OF EACH OTHER.

10  **A.**    MOST LIKELY.

11  **Q.**    AND YOU TALK TO MR. MCKENNIE.

12  **A.**    YES.

13  **Q.**    AND YOU TELL HIM YOU ARE SEIZING HIS MONEY.

14  **A.**    NOT INITIALLY.

15  **Q.**    DID YOU TALK TO ANY OF THE OTHER OFFICERS BEFORE YOU

16  BEGAN ASKING MR. MCKENNIE QUESTIONS?

17  **A.**    I TALKED TO MR. TORRES, OFFICER TORRES.

18  **Q.**    WHAT DID OFFICER TORRES TELL YOU?

19  **A.**    HE TOLD ME THAT HE FOUND A LARGE SUM OF MONEY IN HIS

20  SUITCASE.

21  **Q.**    DID HE TELL YOU HE ALREADY QUESTIONED MR. WRIGHT AND MR.

22  MCKENNIE?

23  **A.**    NO, I DON'T BELIEVE HE DID.

24  **Q.**    AND YOU DIDN'T SEE ANYONE ELSE QUESTION MR. WRIGHT OR

25  MR. MCKENNIE WHILE YOU WERE THERE.

APRIL 14, 2014

SNELL - CROSS-EXAMINATION

1   **A.**    PEOPLE WERE TALKING, IT WAS PRETTY CASUAL ON THE SIDE OF

2   THE ROAD TALKING.  I DON'T KNOW WHAT WAS BEING SAID AWAY FROM

3   ME SPEAKING WITH AN INDIVIDUAL AT ONE TIME.

4   **Q.**    YOU SAID WHILE YOU WERE THERE MR. WRIGHT AND MR.

5   MCKENNIE WERE BOTH NEXT TO THE FORD RANGER.

6   **A.**    CORRECT.

7   **Q.**    AND YOU WERE TALKING TO THEM NEXT TO THE FORD RANGER.

8   **A.**    CORRECT.

9   **Q.**    AND THE RANGER IS ONLY THE DISTANCE I AM TO MR. WRIGHT

10  RIGHT NOW, CORRECT?

11  **A.**    CORRECT.

12  **Q.**    IT IS A COMPACT TRUCK.

13  **A.**    CORRECT.

14  **Q.**    IT IS NOT EVEN A FULL-SIZED TRUCK.

15  **A.**    CORRECT.

16  **Q.**    THAT IS NOT A LONG DISTANCE.

17  **A.**    WHEN I AM TALKING I AM TALKING AND FOCUSING ON WHO I AM

18  TALKING TO, I AM NOT PAYING ATTENTION TO WHAT IS HAPPENING

19  AROUND ME.

20  **Q.**    SO YOU ARE TALKING TO MR. MCKENNIE.

21  **A.**    AT FIRST, YES.

22  **Q.**    YOU DON'T KNOW IF ANYONE IS TALKING TO MR. WRIGHT.

23  **A.**    I DON'T KNOW.

24  **Q.**    THEN YOU GO TALK TO MR. WRIGHT.

25  **A.**    CORRECT.

APRIL 14, 2014

SNELL – CROSS-EXAMINATION

1   **Q.**     AND YOU DON'T KNOW IF ANYONE WAS TALKING TO MR.

2   MCKENNIE.   THAT IS YOUR TESTIMONY.

3   **A.**     YES.

4   **Q.**     AT SOME POINT YOU TELL MR. MCKENNIE YOU ARE SEIZING THE

5   MONEY.

6   **A.**     PRIOR TO US GOING BACK TO THE STATION I SAID I WASN'T

7   COMFORTABLE WITH THE WAY IT WAS BEING TRANSPORTED AND HIS

8   ONE-WAY TICKET AND SO ON.  AND I SAID I WOULD LIKE TO TALK TO

9   HIM MORE WITH AN INTERVIEW AT OUR STATION.

10  **Q.**     DOES THAT MEAN YOU TOLD HIM YOU WERE SEIZING THE MONEY,

11  OR YOU DIDN'T TELL HIM YOU WERE SEIZING THE MONEY?

12  **A.**     I DIDN'T TELL HIM AT THAT TIME.  I SAID WE WANT TO TALK

13  MORE ABOUT YOUR MONEY.

14  **Q.**     SO YOU HADN'T SEIZED THE MONEY AT THAT POINT.

15  **A.**     NOT AT THAT POINT.

16  **Q.**     SO WHY WAS THE MONEY TAKEN OUT OF THE TRUCK AND PUT INTO

17  A PATROL CAR?

18  **A.**     IT HAS BEEN MY EXPERIENCE, MY FOUR YEARS AS A TASK FORCE

19  OFFICER, THAT PEOPLE THAT DEAL IN DRUGS AND HAVE LARGE SUMS OF

20  MONEY MIGHT NOT BE THE MOST TRUSTWORTHY PERSON.  AND I DIDN'T

21  WANT THEM TO HAVE THAT MONEY AND DRIVE AWAY AND JUST KEEP

22  GOING.

23  **Q.**     SO THE MONEY WAS TAKEN SO THEY WOULDN'T JUST DRIVE OFF.

24  **A.**     OR TAKE ANY MONEY OUT OF IT WITHOUT US KNOWING.

25  **Q.**     AND YOU DIDN'T WANT THEM TO DRIVE OFF, THAT IS WHY YOU

APRIL 14, 2014

SNELL – CROSS-EXAMINATION

```
 1   PUT THE MONEY IN THE BACK OF THE PATROL CAR.
 2   A.    NOT NECESSARILY.  I TOLD THEM THEY WERE FREE TO LEAVE.
 3   I SAID YOU ARE FREE TO LEAVE.  WE MIGHT SEIZE YOUR MONEY, BUT
 4   I SAID I WANT TO TALK TO YOU MORE ABOUT IT.
 5   Q.    AH.
 6   A.    I DIDN'T MAKE THE DETERMINATION AT THAT MOMENT.
 7   Q.    MIGHT SEIZE YOUR MONEY, BUT YOU CAN COME BACK TO THE
 8   STATION AND TALK WITH US.
 9   A.    AND WE HAVE GIVEN MONEY BACK.  I SAID I WOULD LIKE TO
10   TALK TO YOU MORE ABOUT YOUR MONEY THAT YOU BROUGHT TO SAN
11   DIEGO.
12   Q.    BUT IF YOU DON'T COME BACK AND TALK TO US, WE ARE TAKING
13   YOUR MONEY; IS THAT RIGHT?
14   A.    I WOULD HAVE TO DO SOMETHING WITH IT.
15   Q.    WELL, YOU COULD GIVE IT BACK TO THEM, RIGHT?
16   A.    I COULD IF THEY CAME TO GET IT.
17   Q.    YOU COULD GIVE IT BACK TO THEM AT THE SIDE OF THE ROAD,
18   COULDN'T YOU?
19   A.    I COULD, BUT I WANTED TO TALK TO THEM MORE.
20   Q.    OKAY.  AND THAT IS WHY YOU KEPT THE MONEY.
21   A.    NO, NOT AT ALL.
22         MR. CAHN:  ONE MOMENT, YOUR HONOR.
23   Q.    (MR. CAHN) OFFICER, YOU DID WRITE A REPORT, DIDN'T
24   YOU --
25   A.    I DID.
```

APRIL 14, 2014

SNELL – CROSS-EXAMINATION

```
 1  Q.     -- IN THIS CASE?

 2         AND THAT REPORT IS 8 PAGES LONG --

 3  A.     CORRECT.

 4  Q.     -- ISN'T IT?

 5         AND DO YOU MENTION IN THAT REPORT WHERE YOU READ THE

 6  ADMINISTRATIVE RIGHTS TO MR. MCKENNIE OR ADVISED HIM OF HIS

 7  ADMINISTRATIVE RIGHTS?

 8  A.     IN MY REPORT, NO.

 9              MR. CAHN:  OKAY.  THANKS.

10              THE COURT:  REDIRECT.

11              MR. CHUN:  NO, YOUR HONOR.  NO FURTHER QUESTIONS.

12              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  YOU

13  WOULD BE EXCUSED AT THIS TIME.

14              GOVERNMENT'S NEXT WITNESS.

15              MR. CHUN:  YES, YOUR HONOR.  THE UNITED STATES CALLS

16  OFFICER AIKEN.

17              COULD THIS WITNESS BE EXCUSED, YOUR HONOR?

18              THE COURT:  YES.

19              MR. CAHN:  NO OBJECTION.

20              THE CLERK:  SIR, PLEASE STEP FORWARD.

21              PLEASE RAISE YOUR RIGHT HAND.

22              DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE

23  YOU SHALL GIVE IN THE CAUSE NOW BEFORE THIS COURT SHALL BE THE

24  TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

25              THE WITNESS:  YES, I DO.
```

APRIL 14, 2014

SNELL – CROSS-EXAMINATION

```
 1          THE CLERK:  PLEASE TAKE THE STAND.

 2          PLEASE STATE YOUR FULL NAME, AND SPELL YOUR FIRST

 3   AND LAST NAMES.

 4          THE WITNESS:  MICHAEL AIKEN.  A-I-K-E-N.

 5          THE COURT:  THANK YOU.  GOOD AFTERNOON.

 6          COUNSEL.

 7          MR. ROBINSON:  THANK YOU, YOUR HONOR.

 8                    DIRECT EXAMINATION

 9   Q.     (MR. ROBINSON) SIR, COULD YOU PLEASE TELL US HOW YOU

10   ARE CURRENTLY EMPLOYED.

11   A.     I AM A DETECTIVE WITH THE SAN DIEGO POLICE DEPARTMENT,

12   CURRENTLY ASSIGNED TO THE NARCOTIC TASK FORCE AT THE AIRPORT.

13   Q.     HOW LONG HAVE YOU BEEN WITH THE SDPD?

14   A.     A LITTLE OVER 24 YEARS.

15   Q.     HOW LONG HAVE YOU BEEN WITH THE NARCOTICS TASK FORCE AT

16   THE SAN DIEGO AIRPORT?

17   A.     I HAVE BEEN A FULL-TIME NARCOTIC INVESTIGATOR FOR 18

18   YEARS, AND I BELIEVE THE LAST 14 HAVE BEEN AT THE TASK FORCE.

19   14, YES.  SINCE RIGHT AFTER 9/11 I WAS TRANSFERRED TO THE TASK

20   FORCE.

21   Q.     CAN YOU GENERALLY DESCRIBE YOUR DUTIES AS A TASK FORCE

22   OFFICER ASSIGNED TO THE AIRPORT.

23   A.     MY PRIMARY DUTIES ARE TO INVESTIGATE DRUGS AND DRUG

24   PROCEEDS MOVING THROUGH TRANSPORTATION SOURCES SUCH AS

25   COMMERCIAL AIRLINES.  WE ALSO HAVE RESPONSIBILITIES AT THE BUS
```

APRIL 14, 2014

AIKEN – DIRECT EXAMINATION

1   AND TRAIN STATIONS AS WELL.

2   **Q.**   WOULD IT BE FAIR TO SAY THAT AT LEAST A PORTION OF YOUR

3   DUTIES ARE RESPONDING TO SEIZURES OF LARGE AMOUNTS OF CURRENCY

4   THAT YOU BELIEVE TO BE RELATED TO THE BUSINESS OF TRANSPORTING

5   OR SELLING NARCOTICS?

6   **A.**   THAT IS THE MAJORITY OF WHAT I DO, SIR.

7   **Q.**   DIRECTING YOUR ATTENTION TO JULY THE 13TH OF 2012, DID

8   YOU RESPOND TO A CALL DURING THE EARLY MORNING HOURS THAT DAY?

9   **A.**   YES, SIR, I DID.

10   **Q.**   WHO CALLED YOU?

11   **A.**   MY PARTNER, BARRY SNELL.  HE IS THE GENTLEMAN THAT JUST

12   LEFT THE COURTROOM.

13   **Q.**   WHAT WERE YOU ASKED TO DO IN THE EARLY MORNING HOURS OF

14   JULY 13TH, 2012?

15   **A.**   TO RESPOND TO THE HARBOR POLICE DEPARTMENT STATION TO

16   ASSIST HIM WITH A SEIZURE.

17   **Q.**   DID YOU RESPOND AS REQUESTED BY OFFICER SNELL?

18   **A.**   YES, I DID.  I BELIEVE I ARRIVED AT APPROXIMATELY

19   2:00 IN THE MORNING.

20   **Q.**   UPON ARRIVING AT THE POLICE STATION, WHAT DID YOU DO?

21   **A.**   I WENT INTO THE POLICE STATION AND FOUND DETECTIVE SNELL

22   AND ASKED HIM WHAT HE NEEDED ME TO HELP HIM WITH.

23   **Q.**   WHAT WERE YOU ASKED TO DO BY OFFICER SNELL?

24   **A.**   TO INTERVIEW A CRAIG WRIGHT.

25   **Q.**   DID YOU SPEAK BRIEFLY WITH OFFICER SNELL ABOUT WHAT HAD

APRIL 14, 2014

1   TRANSPIRED PRIOR TO YOUR ARRIVAL AT HARBOR PATROL THAT

2   MORNING?

3   **A.**   YES.

4   **Q.**   WERE YOU AWARE THAT A LARGE AMOUNT OF CURRENCY HAD BEEN

5   SEIZED?

6   **A.**   YES, SIR.

7   **Q.**   WAS THAT THE FOCAL POINT OF YOUR INTERVIEW OF MR.

8   WRIGHT?

9   **A.**   YES.

10   **Q.**   AT APPROXIMATELY WHAT TIME DID YOU BEGIN THE INTERVIEW

11   WITH MR. WRIGHT ON JULY THE 13TH?

12   **A.**   I WOULD SAY PROBABLY APPROXIMATELY 2:15 A.M.

13   **Q.**   WHERE DID THAT INTERVIEW OCCUR?

14   **A.**   AT A LARGE CONFERENCE TYPE TABLE IN A KIND OF A COMMON

15   AREA IN THE REAR OF THE STATION, WHERE THERE IS LIKE VENDING

16   MACHINES AND SOME BATHROOMS, AND THE OFFICERS' MAILBOXES ARE

17   THERE.  IT IS AN OLD, I THINK OAK, CONFERENCE TABLE IN THE

18   MIDDLE OF THE ROOM.

19   **Q.**   WOULD YOU CHARACTERIZE THE SETTING OF THE INTERVIEW AS A

20   FORMAL ONE OR AN INFORMAL ONE?

21   **A.**   I AM SORRY?

22   **Q.**   WOULD YOU CHARACTERIZE THE SETTING OF THE INTERVIEW AS

23   ONE WHERE IT WAS FORMAL OR RATHER INFORMAL?

24   **A.**   WELL, I IDENTIFIED MYSELF TO MR. WRIGHT AND EXPLAINED TO

25   HIM, YOU KNOW, WHO I WAS AND WHY I WAS THERE.  AND HE WAS

APRIL 14, 2014

1    SEATED AT THE TABLE WITH HARBOR OFFICER TORRES.  AND IT WASN'T

2    LIKE IN AN INTERVIEW ROOM, IT WASN'T –– IT WAS PRETTY LOW

3    STRESS, LOW-KEY.

4    **Q.**    WHEN YOU IDENTIFIED YOURSELF, WERE YOU WEARING ANYTHING

5    THAT WOULD HAVE IDENTIFIED YOURSELF AS A POLICE OFFICER?

6    **A.**    NO.  I DON'T WEAR A UNIFORM.  THIS IS ABOUT AS DRESSED

7    UP AS I GET.  USUALLY I AM IN JEANS AND A T-SHIRT OR A GOLF

8    SHIRT.

9    **Q.**    WERE YOU ARMED AT 2:00 A.M. ON JULY THE 13TH WHEN YOU

10   INTERVIEWED MR. WRIGHT?

11   **A.**    I AM SURE I HAD A GUN WITH ME.  IT WOULDN'T HAVE BEEN ––

12   IT WOULDN'T HAVE BEEN DISPLAYED IN ANY WAY.

13   **Q.**    DID YOU HAVE ANY CAUSE TO DISPLAY THAT FIREARM OPENLY OR

14   BRANDISH IT IN THE PRESENCE OF MR. WRIGHT DURING THE COURSE OF

15   THE INTERVIEW?

16   **A.**    NOT AT ALL.  WE WERE JUST –– IT WAS JUST REAL LOW-KEY

17   CONVERSATION TYPE TONE OF VOICE.  IT WAS NOT A –– IT WASN'T

18   ANY –– THERE WAS NO REASON TO HAVE A GUN OUT.

19   **Q.**    WHEN YOU FIRST APPROACHED MR. WRIGHT WERE YOU ABLE TO

20   SEE WHETHER OR NOT HIS HANDS WERE IN HANDCUFFS OR ANYTHING

21   OTHERWISE RESTRAINING HIS FREEDOM OF MOVEMENT?

22   **A.**    NO.  HE WAS UNHANDCUFFED AND SEATED AT THE TABLE.  AND

23   IT HAD BEEN EXPLAINED TO ME THAT HE HAD VOLUNTARILY COME BACK

24   TO THE POLICE STATION ON HIS OWN.  ACTUALLY FOLLOWED THE

25   OFFICERS, I THINK.

APRIL 14, 2014

AIKEN – DIRECT EXAMINATION

```
 1   Q.    AND WAS OFFICER TORRES ACTING IN AN AGGRESSIVE MANNER
 2   TOWARD MR. WRIGHT DURING THE COURSE OF YOUR INTERACTION WITH
 3   THOSE TWO INDIVIDUALS?
 4   A.    NO, SIR.
 5   Q.    ANY AT POINT DURING THE INTERVIEW WITH MR. WRIGHT DID
 6   YOU RAISE YOUR VOICE OR ACT IN AN OTHERWISE AGGRESSIVE MANNER
 7   TOWARDS HIM?
 8   A.    NO, SIR.
 9   Q.    HOW WOULD YOU DESCRIBE MR. WRIGHT'S DEMEANOR DURING THE
10   COURSE OF THE INTERVIEW?
11   A.    REAL CASUAL.
12   Q.    WAS HE RESPONSIVE TO THE QUESTIONS THAT YOU ASKED OF
13   HIM?
14   A.    YES.
15   Q.    AT ANY POINT DID HE ASK FOR CLARIFICATION OR SAY I DON'T
16   UNDERSTAND WHAT IS GOING ON HERE?
17   A.    NOT THAT I RECALL, NO.
18   Q.    WAS HE PAYING ATTENTION WHEN YOU WERE SPEAKING TO HIM?
19   A.    YES.  HE ANSWERED QUESTIONS.  I ASKED HIM GENERAL
20   QUESTIONS ABOUT WHAT HE WAS DOING, WHAT HE DID FOR A LIVING,
21   WHERE HE LIVED.  BASIC QUESTIONS LIKE THAT.
22   Q.    IN WHAT TONE OF VOICE DID YOU CONDUCT THE INTERVIEW?
23   A.    LIKE I AM NOW.
24   Q.    WAS YOUR DEMEANOR DURING THE COURSE OF THE INTERVIEW
25   WITH THE DEFENDANT THE SAME AS YOUR DEMEANOR HERE ON THE STAND
```

APRIL 14, 2014

AIKEN – DIRECT EXAMINATION

1    TODAY?

2    **A.**    I BELIEVE SO, YES.

3    **Q.**    WERE YOU THE ONE CONDUCTING THE INTERVIEW AS OPPOSED TO

4    OFFICER TORRES?

5    **A.**    CORRECT.

6    **Q.**    WHAT WAS HIS PRESENCE IN THE ROOM FOR?

7    **A.**    I THINK HE WAS INVOLVED WITH THE -- MADE THE TRAFFIC

8    STOP.  I DON'T KNOW.  I DIDN'T REQUEST HIM TO BE THERE, HE WAS

9    JUST SITTING THERE.  HE PROBABLY WAS JUST -- YOU KNOW, HE

10   WOULD PROBABLY JUST BE ESCORTING MR. WRIGHT IN THE POLICE

11   STATION.

12   **Q.**    GIVEN THE PHYSICAL LAYOUT OF THE ROOM IN WHICH YOU

13   CONDUCTED THE INTERVIEW, WAS MR. TORRES BLOCKING THE ENTRYWAY

14   OR THE EXIT WAY TO THAT INTERVIEW ROOM IN ANY MANNER

15   WHATSOEVER?

16   **A.**    IT IS NOT AN INTERVIEW ROOM, IT IS KIND OF A LARGE -- I

17   WOULD SAY THAT ROOM JUST -- WOULD BE ABOUT FROM THE FRONT OF

18   THIS PODIUM TO THE TABLE, AND THEN ALL THE WAY OVER TO THE

19   JURY BOX.  THAT KIND OF SQUARE AREA THERE.

20        AND THE CONFERENCE TABLE I WAS TALKING ABOUT WAS KIND OF

21   IN THE BACK PART OF IT.  AND THERE IS CHAIRS ALL THE WAY

22   AROUND IT.

23        THEN OFF TO THE -- OFF THAT ROOM IS A LARGER LINEUP ROOM

24   WHERE DETECTIVE SNELL WAS TALKING WITH THE OTHER GENTLEMAN.

25        THEN ALSO OFF OF THAT SAME ROOM ARE SEVERAL DOORS THAT

APRIL 14, 2014

AIKEN – DIRECT EXAMINATION

```
 1    LEAD TO DIFFERENT CORRIDORS.  AND THERE IS THE BATHROOMS.  AND
 2    THERE IS AN EXIT OUT TO THE BACK PARKING LOT.
 3    Q.    IS THAT EXIT DOOR MARKED WITH AN EXIT SIGN?
 4    A.    YOU GOT ME THERE.  I AM ASSUMING IT IS.  IT IS A --
 5    Q.    PUBLIC BUILDING?
 6    A.    -- PUBLIC BUILDING.  I IMAGINE IT IS.
 7    Q.    AT ANY POINT DURING THE INTERVIEW DID MR. WRIGHT EXPRESS
 8    A DESIRE TO TERMINATE THE INTERVIEW AND LEAVE?
 9    A.    NO.  HE COULD HAVE, HE WOULD BE FREE TO GO.  HE WASN'T
10    UNDER ARREST.
11    Q.    AT ANY POINT DURING THE INTERVIEW DID YOU TELL MR.
12    WRIGHT OF THE FACT THAT HE WAS FREE TO LEAVE AT ANY POINT?
13    A.    I DON'T BELIEVE I DID, I BELIEVE THAT PROBABLY WAS DONE
14    BEFORE I GOT THERE WITH DETECTIVE SNELL.  AS A MATTER OF
15    PRACTICE I DO THAT WITH ALL OF THE CONTACTS I DO AT THE
16    AIRPORT BECAUSE ALMOST ALL OF THEM ARE CONSENSUAL IN NATURE.
17    BUT THIS WAS A LITTLE DIFFERENT IN THAT I WAS CALLED TO THE
18    POLICE STATION.
19    Q.    WHEN YOU SAY CONSENSUAL IN NATURE, GIVEN YOUR HISTORY OF
20    WORKING AT THE AIRPORT, HOW MANY SEIZURES OF MONEY WOULD YOU
21    SAY YOU HAVE BEEN INVOLVED IN, ROUGHLY SPEAKING?
22    A.    SEVERAL HUNDRED.
23    Q.    AND OUT OF THOSE SEVERAL HUNDRED SEIZURES, HOW MANY OF
24    THOSE HAVE RESULTED IN THE ARREST OF SOMEONE INVOLVED IN THE
25    TRANSPORTATION OF THAT MONEY?
```

APRIL 14, 2014

1          **MR. ELLIS:**  OBJECTION.  RELEVANCE AT THIS POINT,

2     YOUR HONOR.

3          **THE COURT:**  WHAT IS THE RELEVANCE?

4          **MR. ROBINSON:**  IT GOES TO HIS STATE OF MIND IN

5     CONDUCTING THIS INTERVIEW.  I ANTICIPATE THE TESTIMONY IS

6     GOING TO BE HE ALMOST NEVER ARRESTS ANYONE IN CONNECTION WITH

7     MONEY, WHICH IS CONSISTENT WITH THE WAY IN WHICH HE IS

8     DESCRIBING THIS INTERVIEW.

9          **MR. ELLIS:**  THE SUBJECTIVE INTENT OF THE OFFICER IS

10    IRRELEVANT, YOUR HONOR.

11         **THE COURT:**  SUSTAINED.

12         **MR. ROBINSON:**  I HAVE NO FURTHER QUESTIONS.

13         **THE COURT:**  CROSS-EXAMINATION.

14         **MR. ELLIS:**  YES, YOUR HONOR.

15                    CROSS-EXAMINATION

16    **Q.**    **(MR. ELLIS)** OFFICER AIKEN, WHEN YOU ARRIVED IN THE

17    INTERVIEW ROOM, OR IN THE CONFERENCE ROOM, OFFICER TORRES WAS

18    SITTING IN THERE, CORRECT?

19    **A.**    YES, SIR.

20    **Q.**    HE WAS SITTING IN THERE WITH MR. WRIGHT, CORRECT?

21    **A.**    AT THE SAME TABLE IF I REMEMBER RIGHT, YES.

22    **Q.**    AND YOU DON'T KNOW HOW LONG HE HAD BEEN SITTING AT THAT

23    TABLE BEFORE YOU GOT THERE, CORRECT?

24    **A.**    NO.

25    **Q.**    YOU DON'T KNOW WHAT OFFICER TORRES SAID TO MR. WRIGHT

AIKEN - CROSS-EXAMINATION

```
 1   BEFORE YOU GOT THERE, CORRECT?
 2   A.    THAT'S CORRECT.
 3   Q.    YOU SAID ONE OF THE REASONS THAT OFFICER TORRES WAS
 4   LIKELY THERE IS BECAUSE HE WOULD HAVE HAD TO ESCORT MR. WRIGHT
 5   IN THE BUILDING, CORRECT?
 6   A.    I THINK THAT IS -- THAT IS MY SPECULATION.
 7   Q.    EXACTLY.  NOW, OFFICER AIKEN, TO BE CLEAR, YOU
 8   PERSONALLY NEVER TOLD MR. WRIGHT HE WAS FREE TO LEAVE,
 9   CORRECT?
10   A.    I DON'T REMEMBER DOING THAT.
11   Q.    SIR, YOU ALSO NEVER TOLD HIM THAT HE WAS FREE TO
12   TERMINATE THE INTERVIEW, DID YOU?
13   A.    THAT'S CORRECT.
14   Q.    NOW I WANT TO TALK TO YOU ABOUT THE SURROUNDINGS, WHAT
15   WAS GOING ON DURING THE INTERVIEW WITH MR. WRIGHT.
16   A.    OKAY.
17   Q.    NOW, YOU INDICATED THAT THIS WAS SOMEWHAT OF A PLEASANT
18   ENCOUNTER IN SOME SORT OF CONFERENCE ROOM, CORRECT?
19   A.    YES.
20   Q.    YOU WERE ALSO A K-9 OFFICER.
21   A.    CORRECT.
22   Q.    YOU HAD YOUR DOG WITH YOU.
23   A.    YES.
24   Q.    YOUR DOG WAS BARKING DURING THE INTERVIEW, CORRECT?
25   A.    I HAVE A LABRADOR RETRIEVER, AND HE DOESN'T BARK.  AND
```

APRIL 14, 2014

1    HE WAS OUTSIDE IN THE VEHICLE, HE WASN'T -- I DON'T EVEN KNOW

2    IF MR. WRIGHT EVER SAW MY DOG.

3    **Q.**    WERE THERE OTHER DOGS AT THE STATION THAT DAY?

4    **A.**    NO.

5    **Q.**    NOW, YOU ARE A TASK FORCE OFFICER; IS THAT CORRECT?

6    **A.**    YES, SIR.

7    **Q.**    AND SO YOU ARE ASSIGNED TO BOTH -- IS IT SAN DIEGO

8    POLICE DEPARTMENT?

9    **A.**    YES, SIR.

10   **Q.**    AND WITH THE FBI?

11   **A.**    NO, WITH DEA.

12   **Q.**    WITH DEA.

13         SIR, IN YOUR EXPERIENCE AS AN OFFICER WITH THE SAN DIEGO

14   POLICE DEPARTMENT, HAVE YOU EVER RECORDED AN INTERROGATION

15   WITH A SUSPECT?

16   **A.**    HAVE I EVER RECORDED?  YES, I HAVE.

17   **Q.**    WITH VIDEO?

18   **A.**    I HAVE BEEN -- I WOULD SAY PROBABLY SO.

19   **Q.**    AND YOU HAVE DEFINITELY DONE AUDIO.

20   **A.**    YES, SIR.

21   **Q.**    IN FACT, YOU CARRY AN AUDIO DEVICE FOR PURPOSES -- IN

22   CASE YOU DO INTERROGATE SOMEONE SO YOU CAN HAVE A RECORD OF

23   IT; IS THAT CORRECT?

24   **A.**    I DON'T ANY MORE, NO.  I DID WHEN I WAS ASSIGNED TO THE

25   POLICE STATION.  I HAVEN'T IN YEARS.

APRIL 14, 2014

AIKEN – CROSS–EXAMINATION

1    **Q.**    BECAUSE IT IS DEA POLICY TO SPECIFICALLY NOT RECORD AN

2    INTERVIEW WITH A SUSPECT; IS THAT CORRECT?

3    **A.**    THAT IS MY UNDERSTANDING, YES.

4    **Q.**    SO YOU WERE FOLLOWING PROTOCOL WHEN YOU DID NOT RECORD

5    THIS INTERVIEW; IS THAT CORRECT?

6    **A.**    YES, SIR.

7    **Q.**    YOU DID HAVE PAPER WITH YOU?

8    **A.**    YES.

9    **Q.**    AND A PEN?

10   **A.**    I AM SURE I DID.

11   **Q.**    AND AT NO TIME DID YOU ASK MR. WRIGHT TO WRITE OUT ANY

12   TYPE OF STATEMENT.

13   **A.**    NO, I DIDN'T DO THAT.

14   **Q.**    ALSO TO BE CLEAR, OFFICER AIKEN, AT NO POINT, SIR, DID

15   YOU TELL MR. WRIGHT WHAT HIS MIRANDA RIGHTS ARE.

16   **A.**    NO, I DID NOT.

17   **Q.**    AND TO BE CLEAR, THAT WOULD INCLUDE HIS RIGHT TO REMAIN

18   SILENT?

19   **A.**    I AM FAMILIAR WITH MIRANDA RIGHTS.  I DID NOT MIRANDIZE

20   HIM, HE WAS NOT IN CUSTODY.

21   **Q.**    I BET YOU ARE, BUT JUST FOR THE RECORD.  YOU TOLD HIM HE

22   HAD THE RIGHT TO REMAIN SILENT -- YOU NEVER TOLD HIM HE HAD

23   THE RIGHT TO REMAIN SILENT.

24   **A.**    I NEVER TOLD HIM.

25   **Q.**    YOU NEVER TOLD HIM THAT HE HAD THE RIGHT TO SPEAK WITH A

APRIL 14, 2014

AIKEN – CROSS-EXAMINATION

```
 1   LAWYER.
 2   A.    THAT IS CORRECT.
 3   Q.    OR TO TERMINATE THE INTERVIEW.
 4   A.    CORRECT.
 5   Q.    NOW, AS FAR AS WHAT YOU WERE TOLD, YOUR TESTIMONY IS
 6   THAT AGENT -- OR EXCUSE ME -- OFFICER SNELL -- OR THEN OFFICER
 7   SNELL --
 8   A.    CORRECT.
 9   Q.    -- GAVE YOU A RUNDOWN OF WHAT HAD HAPPENED PRIOR TO YOU
10   GETTING THERE.
11   A.    REAL SHORT AND BRIEF, YEAH.  I JUST ASKED HIM, WHAT DO
12   YOU NEED ME TO DO?  JUST WANT TO HELP OUT.
13   Q.    JUST ONE QUESTION ON THAT, SIR.  THIS IS 2:00 A.M.
14   WHAT SHIFT WERE YOU WORKING?
15   A.    WELL, I WAS OFF.  I GOT CALLED FROM HOME.
16   Q.    SO YOU WERE SLEEPING.
17   A.    MORE THAN LIKELY.  I DON'T REMEMBER, BUT I AM SURE I
18   WAS.  NORMALLY I WOULD BE SLEEPING AT THAT TIME.
19   Q.    SO PROBABLY A LITTLE TIRED, AS WELL, WHEN YOU GOT DOWN
20   TO THE STATION?
21   A.    PROBABLY.
22   Q.    NOW, SIR, DO YOU BRING WITH YOU -- I KNOW YOU SAID THAT
23   YOU DON'T BRING AUDIO RECORDING DEVICES FOR INTERROGATIONS OR
24   INTERVIEWS, BUT DO YOU CARRY A PERSONAL AUDIO RECORDING DEVICE
25   ON YOU?
```

APRIL 14, 2014

AIKEN - CROSS-EXAMINATION

1    **A.**    NO.

2    **Q.**    NOW FINALLY, SIR, YOU ARE UNAWARE OF THEN THE

3    CIRCUMSTANCES THAT LED MR. WRIGHT TO BEING IN THAT CONFERENCE

4    ROOM ON JULY 13TH?

5    **A.**    CAN YOU REPEAT THE QUESTION?

6    **Q.**    YOU WERE -- PERSONALLY, YOU HAVE NO PERSONAL KNOWLEDGE

7    OF THE FACTS THAT LED MR. WRIGHT TO BE SITTING IN THAT

8    CONFERENCE ROOM ON JULY 13TH.

9    **A.**    NO PERSONAL KNOWLEDGE, JUST WHAT I WAS TOLD BY THE OTHER

10   OFFICER.

11            **MR. ELLIS:**  JUST A MOMENT, YOUR HONOR.

12            THANK YOU FOR YOUR TIME.

13            **MR. CHUN:**  NOTHING FURTHER.  THANK YOU, YOUR HONOR.

14            **THE COURT:**  THANK YOU VERY MUCH.  YOU WOULD BE

15   EXCUSED.

16            ANY ADDITIONAL WITNESSES?

17            **MR. CHUN:**  NO, YOUR HONOR.

18            **THE COURT:**  ANY AFFIRMATIVE EVIDENCE?

19            **MR. ELLIS:**  NO, YOUR HONOR.

20            **THE COURT:**  ALL RIGHT.

21            LET'S ADDRESS, FIRST, THE GOVERNMENT MISCONDUCT

22   MOTION.

23            MR. ELLIS, DO YOU WISH TO ARGUE THAT?

24            **MR. ELLIS:**  YES, YOUR HONOR.  I WILL BE VERY BRIEF.

25            I THINK WHAT WAS BORE OUT TODAY BY THE

APRIL 14, 2014

1   CROSS-EXAMINATION OF THE AGENT IS THIS.

2          ONE IS, PRIOR TO MAY 2012 AGENT CHEVIRON AND THE

3   U.S. ATTORNEY'S OFFICE WERE AWARE THAT MR. ATAYEE HAD USED --

4   BEEN VIOLENT AND USED RACIALLY OFFENSIVE COMMENTS TOWARDS A

5   WOMAN OF COLOR.  THEY WERE ALSO AWARE THAT HE HAD A HISTORY OF

6   USING OFFENSIVE LANGUAGE TOWARDS MINORITIES.  THEY WERE AWARE

7   THAT HE WAS VIOLENT.  THEY WERE AWARE THAT HE WAS CONTINUING

8   TO ENGAGE IN DRUG TRAFFICKING -- OR AT LEAST CONTINUING TO

9   ENGAGE IN CRIMINAL CONDUCT.  AND DESPITE THAT INFORMATION THEY

10  STILL SENT HIM OUT INTO THE COMMUNITY TO TRY TO ENSNARE

11  OTHERS.

12         I THINK IT IS ALSO IMPORTANT TO NOTE THAT, AS WE

13  INDICATED, THE GOVERNMENT NEVER ALERTED PROBATION THAT MR.

14  ATAYEE WAS CHARGED.  THAT IS FOR THE DECEMBER 4TH, 2010

15  INCIDENT.

16         THAT IS CLEAR WHEN YOU LOOK AT OFFICER PELOT'S

17  REPORT TO THE COURT, WHICH IS THE SECOND AMENDED PETITION.

18  SHE INDICATES SHE WAS NEVER TOLD THAT CHARGES WERE FILED

19  AGAINST ATAYEE.

20         WE ALSO HAVE EVIDENCE THAT AGENT CHEVIRON WAS AWARE

21  THAT CHARGES HAD BEEN FILED, THE GOVERNMENT WAS OBVIOUSLY

22  AWARE OF THAT, AND THEY DID NOTHING TO ALERT THE COURT.

23         THAT IS SIGNIFICANT BECAUSE THAT MEANS FOR ALMOST A

24  YEAR ATAYEE CONTINUED TO REMAIN ON SUPERVISED RELEASE, DESPITE

25  THE FACT HE WAS CONTINUING TO COMMIT CRIMINAL ACTIVITY AND

APRIL 14, 2014

1    WITHOUT JUDGE GONZALEZ'S KNOWLEDGE.

2             UNDER THESE CIRCUMSTANCES, YOUR HONOR, THE ONES

3    ARGUED AT THE PREVIOUS HEARING AND THOSE IN OUR MOTION, WE

4    WOULD ASK YOU TO DISMISS THE INDICTMENT.

5             **THE COURT:**  ALL RIGHT.

6             MR. ROBINSON.

7             **MR. ROBINSON:**  I THINK THE FACTUAL DISPUTE IS CLEAR

8    AS TO WHAT THE GOVERNMENT DID AND DID NOT DO.  THE WHOLE

9    PREMISE OF THE MOTION TO DISMISS THE INDICTMENT IS THAT THE

10   GOVERNMENT SOMEHOW ENGAGED IN OUTRAGEOUS CONDUCT THAT IS SO

11   SHOCKING TO THE UNIVERSAL SENSE OF JUSTICE THAT THE CHARGES

12   WOULD NOT BE ALLOWED TO GO FORWARD.

13            I AM NOT -- STILL NOT SURE WHAT THE SHOCKING CONDUCT

14   ON THE PART OF THE GOVERNMENT IS.  DID WE USE AN INDIVIDUAL

15   WHO WAS AN UNSAVORY CHARACTER?  YES, WE DID, TO FURTHER THE

16   INVESTIGATION.  BUT THAT, IN AND OF ITSELF, DOES NOT

17   CONSTITUTE OUTRAGEOUS CONDUCT BY ANY STRETCH OF THE

18   IMAGINATION.

19            I THINK THAT, AS THE NINTH CIRCUIT HAS REPEATEDLY

20   RECOGNIZED, THE FERRETING OUT OF CRIMINAL ACTIVITY SOMETIMES

21   INVOLVES THE USE OF OTHER INDIVIDUALS WHO ARE SIMILARLY

22   SITUATED WITH THE DEFENDANT, AND THAT IS WHAT HAPPENED IN THIS

23   PARTICULAR CASE.

24            AGENT CHEVIRON EXERCISED EXTRAORDINARY DUE DILIGENCE

25   WITH RESPECT TO THIS COOPERATING WITNESS.  THE COOPERATING

APRIL 14, 2014

```
 1    WITNESS WAS DOUBLE DEALING BEHIND HIS BACK.  BUT THAT IN AND

 2    OF ITSELF, WHILE TRULY UNFORTUNATE, DOES NOT MEAN THAT THE

 3    GOVERNMENT DID ANYTHING WRONG IN THE CONDUCT OF THIS

 4    PARTICULAR INVESTIGATION.

 5          THE DEFENSE ALLEGATION THAT THIS IS SOMEWHAT AKIN TO

 6    A CASE IN TEXAS WHERE A POLICE OFFICER WHO WAS RACIALLY

 7    MOTIVATED MADE UP FACTS TO PROSECUTE INDIVIDUALS FROM A

 8    MINORITY GROUP AGAINST WHOM HE WAS PREJUDICED COULDN'T BE

 9    STARKLY MORE CONTRASTED WITH THE GOVERNMENT'S CONDUCT IN THIS

10    PARTICULAR CASE.

11          AND UNLESS THE COURT HAS ANY PARTICULAR CONCERNS, WE

12    WOULD ASK THE COURT TO DENY THE MOTION.

13          THE COURT:  WHAT ABOUT THE KNOWLEDGE ON THE PART OF

14    AGENT CHEVIRON ABOUT THE DECEMBER 10 INCIDENT AND THEN SOME OF

15    THE OTHER UNLAWFUL ACTIVITY.  AND THEN THE ASSERTION THAT HE

16    DID NOT INFORM THE PROBATION OFFICER THAT CHARGES WERE

17    BROUGHT, OR OTHERWISE TERMINATE.

18          MR. ROBINSON:  I THINK THE TESTIMONY WAS THAT WHEN

19    THOSE INCIDENTS CAME TO HIS ATTENTION HE DILIGENTLY CALLED

20    OFFICER PELOT.  IT IS THE GOVERNMENT'S POSITION HE HAD NO DUTY

21    TO DO SO.  I THINK IT WAS COMMENDABLE DILIGENCE ON HIS PART

22    THAT HE LET THE SUPERVISING OFFICER KNOW.

23          IT IS INCUMBENT UPON, AS THE COURT KNOWS, THE

24    SUPERVISEE TO REPORT ANY LAW ENFORCEMENT CONTACT TO THEIR

25    SUPERVISING OFFICER.  IN THIS CASE THE CONFIDENTIAL INFORMANT
```

APRIL 14, 2014

1    DID REPORT THAT CONTACT WITH LAW ENFORCEMENT, AND SPECIAL

2    AGENT CHEVIRON SIMILARLY REPORTED THAT CONTACT.

3              AS THE COURT IS WELL AWARE, IT WAS MONTHS BEFORE ANY

4    CHARGES WERE FILED AND THOSE CHARGES WERE ULTIMATELY DISPOSED

5    OF VIA $100 FINE.

6              BUT FOR THE DEFENSE TO ASSERT THAT IT WAS INCUMBENT

7    UPON AGENT CHEVIRON TO DO REPEATED RECORDS CHECK FOR THE

8    CONFIDENTIAL INFORMANT AND THEN AT SOME POINT, UPON LEARNING

9    THAT CHARGES HAD IN FACT BEEN FILED BY THE D.A.'S OFFICE, TO

10   HAVE THEN AN OBLIGATION TO RE-INFORM MS. PELOT OF THE

11   UNDERLYING CONDUCT AND THE RESULTING CHARGES, I THINK GOES FAR

12   ABOVE AND BEYOND WHAT HIS RESPONSIBILITIES WERE IN THIS

13   CIRCUMSTANCE.

14             BUT AS TO BOTH INCIDENTS, THE TESTIMONY IS

15   CLEAR THAT SPECIAL AGENT CHEVIRON NOTIFIED PROBATION OFFICER

16   PELOT.

17             AND, MORE SIGNIFICANTLY, AT NO POINT DID THE

18   GOVERNMENT ASK THAT THE CONFIDENTIAL INFORMANT RECEIVE ANY

19   SPECIAL TREATMENT IN REGARDS TO THOSE VIOLATIONS.

20             I WOULD RESPECTFULLY ARGUE TO THE COURT THAT WE

21   COULD HAVE, AND IT WOULD BE JUSTIFIED UNDER THE CIRCUMSTANCES,

22   GIVEN SOME OF THE ONGOING INVESTIGATION.  BUT WHAT THE RECORD

23   MAKES CLEAR IS THAT, ONE, WE ASKED THAT HE BE HELD ACCOUNTABLE

24   FOR THAT CONDUCT.  AND IT WAS JUDGE GONZALEZ'S DECISION TO

25   CONTINUE THE HEARING PAST THE APRIL DATE AND NOT TO PUT THE

APRIL 14, 2014

```
 1   DEFENDANT -- OR THE CONFIDENTIAL INFORMANT IN CUSTODY FOR THE

 2   30-MONTH PERIOD REQUESTED BY MR. CHUN AT THAT HEARING.

 3              THE COURT:  ALL RIGHT.  OKAY.

 4          MR. ELLIS:  ONE VERY BRIEF RESPONSE, YOUR HONOR?

 5              THE COURT:  YES.

 6          MR. ELLIS:  I THINK THE PROBLEM IS THAT CHEVIRON

 7   CALLS MS. PELOT AND SAYS HEY, THERE WAS AN ARREST.  OR HE SAYS

 8   THERE IS SOME SORT OF CONVERSATION ABOUT IT.

 9              BUT WHAT IS IMPORTANT ABOUT THAT IS BY JUST TELLING

10   HER IT IS JUST AN ARREST IT IS THE OMISSION, BECAUSE HE

11   LEARNS, SHORTLY AFTER MARCH 18TH, 2011, THAT FORMAL CHARGES

12   ARE FILED.  THAT IS WHAT MS. PELOT SHOULD HAVE KNOWN ABOUT,

13   THAT IS WHAT SHE DIDN'T KNOW ABOUT.  AFTER CALLING HER AND

14   TELLING HER THERE IS JUST AN ARREST, HIS FAILING TO CALL AND

15   FOLLOW UP WITH BY THE WAY CHARGES WERE ALSO FILED IS REALLY

16   WHAT THIS STEMS FROM.

17              AGAIN, THAT IS CLEAR FROM PAGE 2 OF THE SECOND

18   AMENDED PETITION, SHE WAS NOT AWARE OF THIS UNTIL MONTHS

19   LATER, IN MAY.

20              THE COURT:  ALL RIGHT.  THANK YOU.

21              ON THIS MOTION, I WOULD DENY THE MOTION FINDING THAT

22   THERE IS NOT ANY EVIDENCE OF GOVERNMENTAL MISCONDUCT,

23   PARTICULARLY OUTRAGEOUS CONDUCT.

24              SPECIAL AGENT CHEVIRON DID APPRISE THE PROBATION

25   OFFICER OF THE EVENTS, WHICH I THINK IS SOMETHING THAT,
```

APRIL 14, 2014

```
 1   CERTAINLY, HE DID.  I DON'T KNOW WHETHER THERE IS AN
 2   OBLIGATION TO DO THAT OR NOT, BUT THE FACT IS HE WENT AHEAD
 3   AND DID THAT AND INFORMED HER OF THE UNDERLYING EVENTS, WHICH
 4   I THINK IS THE MOST SALIENT FACT THERE.
 5            THERE IS NO EVIDENCE TO INDICATE THAT THE
 6   GOVERNMENT, THROUGH SPECIAL AGENT CHEVIRON OR OTHER AGENTS OF
 7   THE GOVERNMENT, THROUGH ANY AGENCY, REQUESTED SPECIAL
 8   CONCESSIONS ON THE PART OF THE C.H.S.  THE FACT THAT THE
 9   C.H.S. WAS INVOLVED IN OTHER UNLAWFUL ACTIVITY, SOME OF IT
10   APPEARS TO HAVE OCCURRED UNBEKNOWNST TO SPECIAL AGENT
11   CHEVIRON, SOME OF IT WAS KNOWN AND WAS DISCUSSED, AND
12   ULTIMATELY THE DEPARTMENT CONTINUED TO USE THE C.H.S.  BUT ALL
13   OF THE EVIDENCE BEFORE ME INDICATES THAT THAT USE WAS
14   CAREFULLY SUPERVISED.
15            THE LANGUAGE THAT THE C.H.S. USED IS CERTAINLY
16   DISTURBING, BUT THERE IS ALSO EVIDENCE IN THE RECORD THAT
17   AGENT CHEVIRON ADMONISHED THE C.H.S.
18            SO THERE IS NOT ANY INDICATION BEFORE THE COURT, ON
19   THIS RECORD, OF ANY GOVERNMENTAL MISCONDUCT.  AND THEREFORE I
20   WOULD DENY THAT MOTION.
21            WITH RESPECT TO THE STOP AND THEN THE SUBSEQUENT
22   QUESTIONING OF MR. WRIGHT, MR. CAHN ARE YOU ARGUING THAT, OR
23   MR. ELLIS?
24            **MR. CAHN:**  JUDGE, JUST BRIEFLY.  I KNOW THE COURT IS
25   WELL AWARE OF THE LAW ON THIS.  THE CRITICAL -- WELL, THERE IS
```

APRIL 14, 2014

```
 1    A COUPLE OF CRITICAL INQUIRIES.
 2              ONE, WHAT WAS THE RESTRICTION OF MOVEMENT OF MR.
 3    WRIGHT, YOU KNOW, WAS HE REALLY FREE TO LEAVE AND WHEN WAS HE
 4    FREE TO LEAVE.
 5              I THINK THE EVIDENCE, AS IT CAME OUT IN THIS
 6    HEARING, IS HE WAS NEVER REALLY FREE TO LEAVE.  I MEAN, FROM
 7    THE MOMENT HE WAS STOPPED, HIS DRIVER'S LICENSE AND
 8    REGISTRATION WERE SEIZED.  AND FROM OFFICER TORRES, WHO IS THE
 9    ONE WHO IS ACTUALLY IN CONTROL OF THESE, WE LEARNED THAT THEY
10    WERE NOT GIVEN BACK UNTIL THE VERY END OF THE STOP.  AT
11    WHICH POINT, AS OFFICER SNELL MADE CLEAR, THE MONEY WAS
12    SEIZED.  AND THE PURPOSE OF SEIZING THE MONEY, AS RELATIVELY
13    CANDIDLY ADMITTED BY THE TWO OF THEM, WAS TO MAKE SURE THAT
14    MR. WRIGHT AND MR. MCKENNIE WOULD FOLLOW THEM BACK TO THE
15    POLICE HOUSE.
16              THEY WERE BROUGHT INTO THE POLICE HOUSE INTO AN
17    INTERIOR PORTION OF THE POLICE HOUSE.  ONE OF THE THINGS
18    THAT IS CLEAR FROM THE DESCRIPTION IS THAT THE NEED FOR AN
19    ESCORT ONLY EXISTS BECAUSE MR. WRIGHT AND MR. MCKENNIE -- MR.
20    WRIGHT, WE WILL FOCUS ON HERE, WAS BEING BROUGHT BACK TO A
21    NONPUBLIC AREA OF THE POLICE STATION WHERE HE COULDN'T SIMPLY
22    WALK OUT.
23              HIS FRIEND'S MONEY HAS BEEN SEIZED, IF NOT FORMALLY
24    AT LEAST INFORMALLY, AND HE IS TAKEN BACK TO THIS POLICE
25    HOUSE.  AND NO ONE IN THAT SITUATION, NO NORMAL NONLAWYER
```

APRIL 14, 2014

```
 1    WOULD UNDERSTAND THAT HE HAD A RIGHT TO SAY, I WANT TO LEAVE

 2    AND WANT TO GO.

 3           BUT EVEN ASIDE FROM THAT, EVEN IF HE HAD BEEN FREE

 4    TO LEAVE EARLIER, SAY WHEN HE GOT HIS LICENSE BACK, THAT IS

 5    ALREADY TOO LATE.  AND IT IS TOO LATE BECAUSE REGARDLESS OF

 6    WHAT CAUSE THEY HAD TO STOP MR. WRIGHT AND MR. MCKENNIE AT

 7    THAT POINT, THE CAUSE -- THE TEST FOR WHEN A DETENTION GETS

 8    CONVERTED INTO ARREST IS WHEN THE POLICE ARE NO LONGER

 9    DILIGENTLY PURSUING A MEANS OF EITHER CONFIRMING OR ALLAYING

10    SUSPICION, DILIGENTLY PURSUING.

11           AND WHAT IS CLEAR IS THAT THEY WEREN'T DOING THAT

12    FROM ABOUT THE TIME THE SEARCH CONCLUDED AND THIS BRIEF

13    QUESTIONING, WHICH YOU HEARD OFFICER TORRES SAY WAS ONLY 10

14    MINUTES.  SO FOR MORE THAN HALF AN HOUR, WHICH IS

15    PRESUMPTIVELY INVALID, THEY FINISHED THEIR QUESTIONING, THEY

16    FINISHED THEIR SEARCH, THEY FINISHED WHATEVER THEY NEED TO DO

17    TO ACTUALLY WRITE A TICKET; BUT INSTEAD THEY HOLD ON TO THE

18    LICENSE, THEY HOLD ON TO THE REGISTRATION.  THEY WAIT FOR

19    OFFICER SNELL TO ARRIVE TO DO FURTHER QUESTIONING, EVEN THOUGH

20    THEY HAD AN ADEQUATE OPPORTUNITY.  AND THEY MAKE MR. WRIGHT

21    SIT ON THE SIDE OF THE ROAD WITH NO GOOD REASON AND NO ABILITY

22    TO LEAVE.

23           AND WHEN THEY FINALLY GIVE HIM BACK HIS LICENSE AND

24    REGISTRATION, WHICH FREES HIM TO LEAVE, THEY SEIZE THE MONEY

25    AS AN INCENTIVE TO GET THEM TO FOLLOW HIM.
```

APRIL 14, 2014

```
 1              AT THAT POINT THE LAW IS THAT THE DETENTION IS
 2   CONVERTED TO AN ARREST.  AND THE SIGNIFICANCE OF THAT IS THAT
 3   ONCE THAT HAS OCCURRED ANY FURTHER QUESTIONING, ANY ACTION BY
 4   THE OFFICERS THAT IS DESIGNED TO ELIMINATE -- TO ELICIT,
 5   RATHER, INCRIMINATING INFORMATION HAS TO BE PRECEDED BY
 6   MIRANDA RIGHTS.  AND IT IS ABSOLUTELY CLEAR THAT THAT WASN'T
 7   DONE HERE.
 8              SO UNDER THOSE CIRCUMSTANCES WE BELIEVE THAT THE
 9   STATEMENTS MADE AT THE POLICE STATION NEED TO BE SUPPRESSED AS
10   VIOLATIVE OF MIRANDA.
11         THE COURT:  IS THE FOCUS OF THE MOTION A FIFTH
12   AMENDMENT ISSUE, THAT IS STATEMENTS ATTRIBUTED TO MR. WRIGHT
13   AT THE STATION?
14         MR. CAHN:  YES, YOUR HONOR.  OUR -- THE CHAIN OF
15   LOGIC IS THE DETENTION, WHICH WOULDN'T REQUIRE MIRANDA
16   WARNINGS FOR INTERROGATION, GETS CONVERTED TO A CUSTODIAL
17   ARREST WHEN THERE IS A FAILURE TO DILIGENTLY PURSUE THE
18   INVESTIGATION.  THAT REQUIRES MIRANDA BEFORE ANY FURTHER
19   QUESTIONING.  THAT MIRANDA WARNING DIDN'T OCCUR, AND THEREFORE
20   WHAT IS ESSENTIALLY A FOURTH AMENDMENT VIOLATION CREATES A
21   FIFTH AMENDMENT PROBLEM.
22         THE COURT:  SO THERE IS NOT A MOTION TO SUPPRESS
23   EVIDENCE.  THERE IS NO FOURTH AMENDMENT MOTION.
24         MR. CAHN:  NO.
25         THE COURT:  THIS IS A FIFTH AMENDMENT ISSUE RELATING
```

APRIL 14, 2014

```
 1   TO STATEMENTS ONLY ATTRIBUTED TO MR. WRIGHT?
 2        MR. CAHN:  YEAH, IT IS A FUNNY THING.  YOU COULD
 3   ARGUE THAT THERE IS A FOURTH AMENDMENT ISSUE WHEN YOU ARE
 4   SAYING THE DETENTION WAS CONVERTED INTO AN ARREST.  BUT I
 5   THINK IT IS REALLY PROPERLY ANALYZED AS A FIFTH AMENDMENT
 6   ISSUE BECAUSE WHAT IS RELEVANT IS THAT THE QUESTIONING THEN
 7   BECOMES CUSTODIAL UNDER THE LAW.  SO I THINK IT IS MORE
 8   PROPERLY ANALYZED AS A FIFTH AMENDMENT ISSUE.
 9        THE COURT:  THE MOTION FOCUSES NOT ON ANY
10   STATEMENTS ATTRIBUTED TO MR. WRIGHT AT THE SCENE VERSUS AT THE
11   STATION?
12        MR. CAHN:  IN LIGHT OF THE EVIDENCE THAT HAS COME
13   OUT, I DON'T THINK THERE IS SUFFICIENT EVIDENCE TO ESTABLISH A
14   VIOLATION OF THE FIFTH AMENDMENT FOR THE QUESTIONING AT THE
15   SCENE.  BUT I THINK THERE IS CLEARLY SUFFICIENT EVIDENCE TO
16   ESTABLISH A VIOLATION OF A FIFTH AMENDMENT IN THE
17   NONMIRANDIZED QUESTIONING AT THE STATION.
18        THE COURT:  WHAT ABOUT THE FACT THAT THE MONEY IS
19   NOT MR. WRIGHT'S?
20        MR. CAHN:  WELL, IT IS NEVERTHELESS HIS FRIEND'S WHO
21   HE IS TRAVELING WITH.  AND THE POINT ISN'T THAT IT WAS MR.
22   WRIGHT'S ALONE OR THAT THAT -- IT IS THAT AT EVERY POINT THEY
23   ARE DOING EVERYTHING POSSIBLE TO ENSURE THAT NEITHER OF THESE
24   INDIVIDUALS FEEL FREE TO LEAVE.
25        AND THE COURT'S JOB IS TO LOOK AT THIS FROM THE
```

APRIL 14, 2014

1  POINT OF VIEW OF THE NORMAL AVERAGE PERSON, THE REASONABLE

2  PERSON, AND HOW WOULD THEY REACT.

3           AND I WOULD ASK THE COURT TO SIMPLY THINK, IF YOU

4  HAD A FRIEND WHO HAD A VALUABLE PROPERTY WHO WAS A PASSENGER

5  IN YOUR CAR, AND THE POLICE TOOK CUSTODY OF THAT AND SAID COME

6  BACK TO THE STATION AND TALK TO US ABOUT IT; YOU WOULDN'T FEEL

7  YOU COULD SIMPLY DRIVE OFF AND LEAVE YOUR FRIEND OR TO SIMPLY

8  DRIVE OFF WITH YOUR FRIEND AND LEAVE THAT VALUABLE PROPERTY

9  WITH THE POLICE.

10           **THE COURT:**  WHAT ABOUT THE DRIVING --

11           **MR. CAHN:**  AND I THINK THE CIRCUMSTANCES THE WAY

12  THE POLICE WENT ABOUT IT MADE IT CLEAR THAT THEY UNDERSTOOD

13  THAT THEY WERE COMPELLING MR. WRIGHT AND MR. MCKENNIE TO GO

14  BACK TO THE STATION.  THAT IS WHY THEY DID THIS THE WAY THEY

15  DID.

16           **THE COURT:**  WHAT ABOUT DRIVING TO THE STATION AND

17  WAITING IN THE CAR WHILE YOUR FRIEND GETS THE MONEY?

18           **MR. CAHN:**  WELL, BUT THEY HAD MADE CLEAR THAT THEY

19  INTENDED TO QUESTION MR. WRIGHT AS WELL AS MR. MCKENNIE.  THAT

20  WAS PART OF THEIR -- I THINK THAT BOTH OFFICER TORRES AND

21  OFFICER SNELL MADE THAT CLEAR.

22           **THE COURT:**  BUT THE ARGUMENT, AS A UNDERSTAND IT, IS

23  MR. WRIGHT REALLY IS COMPELLED TO GO TO THE STATION BECAUSE HE

24  WANTS TO BE A GOOD FRIEND, AND HIS FRIEND'S MONEY IS AT THE

25  STATION SO HE REALLY HAS TO GO.  BUT WHAT COMPELS HIM TO GO

APRIL 14, 2014

```
 1    INTO THE STATION AND TO BE INTERVIEWED?
 2            MR. CAHN:  I THINK THERE HAS BEEN A SUFFICIENT SHOW
 3    OF AUTHORITY.  I THINK THERE HAS BEEN SUFFICIENT DETENTION UP
 4    TO THAT TIME THAT PREVENTS HIM FROM HAVING A FREE AND
 5    VOLUNTARY CHOICE TO SIMPLY LEAVE.
 6            THE COURT:  ALL RIGHT.
 7            MR. CAHN:  HE WAS, AS OFFICER AIKEN, I BELIEVE IT
 8    WAS, POINTED OUT, WAS ESCORTED INTO THE POLICE OFFICE.  HE
 9    WASN'T SIMPLY FREE TO GO WHERE HE WANTED TO GO AND DO WHAT HE
10    WANTED TO DO.
11            THE COURT:  OKAY.
12            MR. CHUN.
13            MR. CHUN:  YOUR HONOR, THE ISSUE IS A FIFTH
14    AMENDMENT ISSUE WHETHER OR NOT MIRANDA RIGHTS SHOULD HAVE BEEN
15    ADVISED.  WE WOULD DISAGREE.  AND IT REALLY STARTS AT THE
16    BEGINNING, THEN, OF AT THE VERY END OF THE STOP OFFICER SNELL
17    TESTIFIES THAT HE ADVISED THEM THEY COULD LEAVE.  THAT WAS
18    ALSO OFFICER TORRES'S TESTIMONY.  THAT ONCE HE GIVES BACK THE
19    LICENSE AND REGISTRATION, ISSUES THE CITATION, THEY ARE FREE
20    TO GO.
21            YES, IT IS TRUE THAT THE MONEY WAS SEIZED; HOWEVER,
22    THAT, WE WOULD SAY, IS INDEPENDENT OF THEM ACTUALLY DECIDING
23    TO SAY OH, WAIT, WE WILL GO ASK -- ANSWER MORE QUESTIONS
24    ABOUT THIS MONEY WITH THE HOPES OF GETTING IT BACK THAT
25    EVENING.
```

APRIL 14, 2014

1          SO THEIR DECISION, AT THAT POINT, ONCE THE OPTION IS

2    GIVEN TO THEM, I BELIEVE BREAKS ANY ISSUE OF THEM BEING IN

3    CUSTODY.

4          **THE COURT:**  WOULD YOU MAKE THAT SAME ARGUMENT AS TO

5    MR. MCKENNIE?  BECAUSE I THINK IT IS FAIR TO SAY, BASED ON THE

6    TESTIMONY PRESENTED, THAT THE MONEY WAS SEIZED.  I THINK THAT

7    IS THE ACTUAL WORD USED BY THE OFFICER.

8          **MR. CHUN:**  YES, YOUR HONOR.

9          **THE COURT:**  AND IT WOULD BE FAIR TO INFER THAT IT

10   WAS SEIZED BECAUSE THEY WANTED MORE DISCUSSION TO OCCUR.  AND

11   THAT WOULD CERTAINLY BRING MR. MCKENNIE TO THE TABLE.  IF HE

12   WANTS HIS MONEY BACK HE NEEDS TO TALK.

13         **MR. CHUN:**  YOUR HONOR, I ACTUALLY DON'T KNOW IF THAT

14   IS TRUE.  I THINK THE MONEY WAS SEIZED OUT OF FEAR THAT IT WAS

15   RELATED TO CRIMINAL ACTIVITY.  HOWEVER, THE CONVERSATIONS

16   FOLLOWING AFTERWARDS, HE WAS FREE TO COME AND TALK ABOUT IT OR

17   HE WAS FREE TO LEAVE IT ALONE AND WALK AWAY FROM IT.  I MEAN,

18   THAT WAS AN OPTION.

19         AS THE COURT FRAMES IT HERE, IN REGARDS TO MR.

20   MCKENNIE, YES, IN THIS SITUATION MR. MCKENNIE MIGHT HAVE FELT

21   MORE COMPELLED BECAUSE IT WAS HIS MONEY.

22         AS FOR MR. WRIGHT, HE IS THE DRIVER, HE IS THE

23   FRIEND.  I UNDERSTAND THAT HE CHOOSES TO GO ALONG.  AND I

24   THINK THAT IS THE ISSUE IS HE CHOOSES TO GO ALONG BECAUSE HIS

25   FRIEND'S MONEY HAS BEEN SEIZED.

APRIL 14, 2014

1        I DON'T THINK THERE IS ANY EVIDENCE HERE TO SUGGEST

2    THAT THE OFFICERS FORCED, YOU KNOW, AN INTERVIEW WITH HIM.

3    THAT HE WAS PLACED UNDER ARREST.  THAT ANY ACTIVITIES OCCURRED

4    CAUSING HIS STATEMENTS NOT TO BE VOLUNTARY, HE WAS COERCED

5    INTO ANYTHING OF THAT SORT.

6        I BELIEVE THE WAY THIS SHOULD BE LOOKED AT IS HE

7    WENT ALONG, HE AGREED TO ANSWER QUESTIONS.  AND THERE IS

8    NOTHING ABOUT THAT SITUATION THAT WOULD HAVE MADE ANYONE FEEL

9    THEY WERE UNDER ARREST SEEING THAT THEY WERE JUST TAGGING

10   ALONG, SPECIFICALLY BEING TOLD BY AN OFFICER THAT IT WAS THEIR

11   CHOICE TO GO ALONG.  AND IF IT IS JUST A FIFTH AMENDMENT

12   ISSUE --

13        **THE COURT:**  DO YOU DRAW A DISTINCTION BETWEEN MR.

14   WRIGHT AND MR. MCKENNIE, OR DO YOU ARGUE THAT THERE WOULD NOT

15   BE A FIFTH AMENDMENT VIOLATION AS TO EITHER OF THEM?

16        **MR. CHUN:**  I WOULD ARGUE THAT THERE WOULD BE NO

17   VIOLATION AS TO EITHER OF THEM, YOUR HONOR.  HOWEVER, I DON'T

18   BELIEVE THE ISSUE OF MR. MCKENNIE IS BEFORE THIS COURT.

19        **THE COURT:**  ALL RIGHT.

20        MR. CAHN.

21        **MR. CAHN:**  NOTHING FURTHER, YOUR HONOR.

22        **THE COURT:**  I THINK THERE IS AN IMPORTANT

23   DISTINCTION BETWEEN THE TWO DEFENDANTS.  IF MR. MCKENNIE WERE

24   BRINGING THIS MOTION, I THINK HE HAS A FORMIDABLE ARGUMENT

25   THAT IT IS A CUSTODIAL INTERROGATION.  THAT THEY HAVE TAKEN

APRIL 14, 2014

```
 1    HIS MONEY AND THEY ARE BASICALLY SAYING, IF YOU WANT YOUR
 2    MONEY, YOU MAY BE ENTITLED TO IT ANYWAY SOME TIME DOWN THE
 3    ROAD, BUT IF YOU WANT IT BACK TONIGHT, $120,000, THEN YOU
 4    SHOULD PROBABLY TALK TO US.
 5              I THINK THAT CAN BE FAIRLY CHARACTERIZED AS A
 6    CUSTODIAL SETTING, PARTICULARLY WHEN THE OFFICERS BELIEVE
 7    THERE IS STRONG SUSPICION, IF NOT PROBABLE CAUSE, THAT IT IS
 8    DRUG RELATED MONEY AND SO THEY WANT TO TALK MORE.
 9              BUT WHAT ABOUT MR. WRIGHT?  IT IS NOT HIS MONEY.
10    THAT HAS BEEN THE DEFENSE POSITION ALL ALONG.  I CAN
11    UNDERSTAND THE ARGUMENT THAT MR. WRIGHT WOULD FEEL COMPELLED,
12    AS A GOOD FRIEND, TO DRIVE HIS FRIEND, MR. MCKENNIE, TO THE
13    STATION SO THAT MR. MCKENNIE CAN GET HIS MONEY BACK.  BUT
14    THERE IS A COMPLETE SEPARATION THERE.  THERE IS NOTHING IN --
15    THERE IS NO EVIDENCE TO INDICATE THAT MR. WRIGHT IS IN ANY
16    FORM OF CUSTODIAL SETTING WITH RESPECT TO COMING INTO THE
17    STATION.  IT SEEMS TO ME THAT HE REALLY IS VOLUNTARILY GOING
18    INTO THE STATION.  HE IS NOT IN AN INTERROGATION ROOM, HE IS
19    IN A MUCH LARGER ROOM.  HE IS NOT HANDCUFFED.  APPEARS, BY ALL
20    OF THE EVIDENCE, TO BE A VERY CONGENIAL BACK AND FORTH
21    DISCUSSION.  AND THEN CONSISTENT WITH WHAT THE OFFICERS HAVE
22    TESTIFIED TO, HE WAS FREE TO GO.  AND HE DID GO.
23              SO FOR THOSE REASONS, I WOULD DENY THE MOTION AS TO
24    MR. WRIGHT.
25              I THINK THAT IT IS ANALOGOUS TO A STANDING ISSUE.
```

APRIL 14, 2014

```
 1   THE DEFENSE HAS BEEN CLEAR THAT IT IS NOT HIS MONEY, SO THE
 2   FACTS THAT WOULD TRIGGER A CUSTODIAL SETTING ARE MUCH MORE
 3   ATTENUATED WHEN IT COMES TO MR. WRIGHT AS OPPOSED TO MR.
 4   MCKENNIE.
 5           SO FOR THOSE REASONS I WOULD RESPECTFULLY DENY THE
 6   FIFTH AMENDMENT MOTION AS TO MR. WRIGHT.  I WOULD FIND THAT IT
 7   WAS NONCUSTODIAL IN THAT SETTING, AT THAT TIME, UNDER THESE
 8   FACTS.
 9           WITH THAT, WE HAVE MOTIONS IN LIMINE SET AND A TRIAL
10   DATE SET.  ARE THERE ANY OTHER ISSUES?
11           MR. CHUN:  YOUR HONOR, JUST FOR CLARITY OF THE
12   RECORD.  I BELIEVE THE MOTION I FILED ALSO INCLUDED THE FOURTH
13   AMENDMENT, WHICH MR. CAHN CONCEDED BASED ON THE EVIDENTIARY
14   HEARING.  WOULD THE COURT RULE ON THAT AS WELL?
15           MR. CAHN:  WE WILL WITHDRAW THAT.  THE FOURTH
16   AMENDMENT PORTION OF THE MOTION, I DON'T THINK IT IS
17   ESTABLISHED BY EVIDENCE.
18           THE COURT:  ALL RIGHT.
19           ON THIS PARTICULAR MOTION, IF YOU ARE AWARE OF ANY
20   CASE THAT HAS SOMETHING FACTUALLY SIMILAR I WOULD LIKE TO
21   LEARN ABOUT IT.  IT IS AN ISSUE THAT I HAVE NOT ENCOUNTERED
22   BEFORE.  BUT ABSENT RENEWING THE MOTION, THIS WOULD BE THE
23   RULING.
24           MR. CAHN:  I UNDERSTAND, YOUR HONOR.
25           YOUR HONOR, THERE IS ANOTHER MATTER I WOULD LIKE
```

APRIL 14, 2014

1    TO -- AND THE COURT JUST MENTIONED OUR UPCOMING DATES.  AND I

2    HAVE TO SAY AT THIS POINT I AM CONCERNED ABOUT OUR DATES.

3          I AM CONCERNED BECAUSE WE -- WE WERE BEFORE YOU LAST

4    WEEK ON A DISCOVERY ISSUE.  I UNDERSTAND THE GOVERNMENT IS

5    WORKING EXPEDITIOUSLY TO GET IT TO US, BUT IT IS VOLUMINOUS

6    AND THEY HAVEN'T YET DONE SO.

7          WE HAVE TO MAKE SENSE OF IT AND INVESTIGATE IT ONCE

8    WE GET IT, AND WE ARE NOW, YOU KNOW, NIGH ON THE HEELS OF IN

9    LIMINE DATES AND TRIAL DATES.  EVEN GOING INTO THIS HEARING,

10   MR. ELLIS MANAGED TO MAKE BETTER SENSE OF THE REDACTED

11   DISCOVERY THAN I DID, BUT I FELT WOEFULLY UNPREPARED IN SOME

12   WAYS FOR THIS CROSS-EXAMINATION.  AND I AM CONCERNED THAT WE

13   REALLY WON'T BE IN A POSITION TO GIVE MR. WRIGHT THE

14   REPRESENTATION HE IS DUE ON A MATTER THIS SERIOUS IF WE DON'T

15   PUSH BACK THESE DATES A LITTLE BIT.

16         SO I WOULD ASK THE COURT TO CONSIDER A 30 TO 60-DAY

17   CONTINUANCE IN LIGHT OF THE DISCOVERY ISSUES.

18         I WOULD ALSO ASK THE COURT TO CONSIDER A FIRM

19   CUTOFF DATE FOR THE PRODUCTION OF ALL GIGLIO AND BRADY

20   MATERIALS.

21         **MR. CHUN:**  YOUR HONOR, THE STATUS IS, WE BELIEVE THE

22   UNREDACTED DISCOVERY THAT WE HAD GONE OVER THE LAST TIME WILL

23   LIKELY COME OUT TODAY.  AND THAT THE FEW DOCUMENTS REGARDING

24   THE C.H.S.'S NEW CHARGE, WHICH HE HAS NOT YET BEEN SENTENCED

25   FOR, WOULD BE COMING SHORTLY AFTER THAT, PROBABLY BY THE END

APRIL 14, 2014

```
 1    OF THIS WEEK.
 2              THE COURT:  IN LIGHT OF THAT, DO YOU OPPOSE?
 3              MR. CHUN:  NO, YOUR HONOR.
 4              THE COURT:  HOW MUCH DISCOVERY ARE WE TALKING ABOUT,
 5    TOTAL?
 6              MR. CHUN:  THE INITIAL BATCH, I BELIEVE THAT --
 7              MR. CAHN:  IT WAS 700 PAGES BUT ABOUT 500 OF IT IS
 8    REALLY NEW MATERIAL.
 9              MR. CHUN:  YES, YOUR HONOR.
10              MR. CAHN:  MAYBE 550.
11              MR. CHUN:  AND IN REGARDS TO THE NEW CASE, I WOULD
12    IMAGINE A ROUGH ESTIMATE OF LESS THAN 100 PAGES.
13              THE COURT:  MR. CAHN, HOW MUCH TIME ARE YOU ASKING?
14              MR. CAHN:  CAN I HAVE A MOMENT JUST TO TALK TO MR.
15    ELLIS REALLY QUICKLY?
16              THE COURT:  YES.
17              MR. CAHN:  YOUR HONOR, OUT OF AN ABUNDANCE OF
18    CAUTION AND SO THAT I AM NOT IN A POSITION OF COMING BACK AND
19    ASKING THIS COURT FOR MORE TIME -- WHICH I HATE TO DO, I DON'T
20    EVEN LIKE TO DO IT NOW -- I AM GOING TO ASK FOR 60 DAYS SO WE
21    CAN BE ABSOLUTELY CERTAIN WE WILL BE IN TRIAL AT THAT TIME.
22    THAT GETS US PAST THE HOLIDAYS SO WE DON'T HAVE THAT WHOLE
23    MEMORIAL DAY AND JULY 4TH AND EVERYTHING.
24              THE COURT:  HOW ABOUT JULY 21?
25              MR. CAHN:  JULY 21 WORKS FOR ME, YOUR HONOR.  THE
```

APRIL 14, 2014

```
 1   NINTH CIRCUIT CONFERENCE IS BEFORE THAT, RIGHT?  OR AFTER
 2   THAT?
 3             THE COURT:  I AM NOT CERTAIN.
 4             MR. CAHN:  WE BETTER MAKE SURE WE ARE NOT SETTING IT
 5   FOR THAT.  LET ME JUST CHECK MY -- I KNOW I HAVE GOT IT IN MY
 6   I-PAD.  I WILL BE HUNG IF I DON'T SHOW UP, SO -- MY WIFE WILL
 7   HANG ME IF I SKIP A FREE TRIP TO MONTEREY.
 8             IT IS JULY 14TH TO 17TH IS THE CONFERENCE, SO THE
 9   21ST WORKS.
10             THE COURT:  GOOD FOR THE GOVERNMENT?
11             MR. CHUN:  YES, YOUR HONOR.
12             THE COURT:  LET'S SET JULY 21, 9:00, FOR JURY TRIAL.
13             HOW ABOUT JULY 11 AT 11:00 FOR MOTIONS IN LIMINE?
14             MR. ELLIS:  THAT WOULD BE GREAT, YOUR HONOR.
15             THE COURT:  AND THEN ALL DISCOVERY WILL BE PRODUCED
16   BY THE END OF THIS WEEK?
17             MR. CHUN:  I BELIEVE THAT IS POSSIBLE, YOUR HONOR.
18             THE COURT:  DO YOU HAVE ANY HESITATION?
19             MR. CHUN:  COULD WE SET IT ONE WEEK FURTHER, YOUR
20   HONOR?  I ONLY SAY THAT BECAUSE I PLAN ON BEING OUT OF THE
21   DISTRICT.
22             MR. CAHN:  WE HAVE NO OBJECTION TO THAT EXTRA WEEK
23   IN LIGHT OF THE TIME THE COURT HAS GIVEN US.
24             THE COURT:  THAT WOULD BE APRIL 25.
25             MR. CHUN:  YES, YOUR HONOR.
```

APRIL 14, 2014

```
1              THE COURT:  ALL DISCOVERY PRODUCED BY THAT TIME.
2         ANY OTHER ISSUES?
3              MR. CHUN:  YOUR HONOR, THE TIME FOR THE IN LIMINE
4    DATE?  11:00 O'CLOCK?
5              THE COURT:  11:00 O'CLOCK, YES.
6              MR. CAHN:  JUDGE, CAN WE HAVE A DATE -- AND THE
7    COURT HASN'T ASKED FOR A DATE, BUT TWO WEEKS AFTER THE
8    GOVERNMENT'S CLOSE OF PRODUCTION FOR ALL RECIPROCAL DISCOVERY
9    TO BE PRODUCED?  I DON'T KNOW THAT WE HAVE A LOT, BUT JUST IN
10   CASE.  I WANTED TO GO THROUGH EVERYTHING WE HAVE GOT.
11             THE COURT:  YES.
12        ON THE DECEMBER 6TH INTERVIEW WITH MR. WRIGHT, I HAD
13   REVIEWED THE DVD AND I AM TRYING TO RECALL WHERE WE LEFT THAT.
14   WAS THERE A RULING ON IT OR WAS THERE SOME AREAS THAT WERE
15   RESERVED SUBJECT TO ADDITIONAL ARGUMENT?
16             MR. ELLIS:  YOUR HONOR, WE SUBMITTED ON THE MOTION
17   AND THE GOVERNMENT SUBMITTED THE DVD.
18             MR. CHUN:  YES, YOUR HONOR.  I THINK WE ARE STILL
19   WAITING FOR A RULING ON THAT.
20             THE COURT:  BECAUSE THERE WAS ONE AREA THAT I WAS
21   CONCERNED ABOUT THAT MIGHT WARRANT FURTHER DISCUSSION.
22        SOMEWHERE -- AND I AM LOOKING THROUGH MY NOTES AND I
23   COULD NOT IDENTIFY IT, BUT SOMEWHERE IN THE INTERVIEW -- THIS
24   WAS A VERY FREE-WHEELING, CONVERSATIONAL, RELAXED APPEARING
25   DISCUSSION BETWEEN THE AGENTS AND MR. WRIGHT.  SOMEWHERE IN
```

```
1    THIS DISCUSSION AGENT VITOVSKY SAYS WORDS TO THE EFFECT IF YOU

2    DON'T COOPERATE IT COULD BE MORE THAN 10 YEARS.

3            SO I JUST -- I WANT TO MAKE SURE THAT THE PARTIES

4    ARE FOCUSED ON THAT SO THAT THERE ISN'T AN INVOLUNTARY,

5    COERCIVE ASPECT TO THAT.  AND I DON'T RECALL WHETHER WE

6    ACTUALLY HAD THAT DISCUSSION.

7            MR. ELLIS:  WOULD THE COURT ALLOW US TO DISCUSS THAT

8    AT THE MOTION IN LIMINE HEARING?

9            THE COURT:  YES.

10           MR. ELLIS:  SUFFICIENTLY IN ADVANCE OF TRIAL TO WORK

11   THAT OUT?

12           THE COURT:  THAT WAS THE ONLY AREA OF CONCERN I

13   HAVE, AND SO I JUST WANT TO MAKE SURE THE RECORD IS CLEAR ON

14   THAT AND I CAN RULE ONE WAY OR ANOTHER ON IT.

15           MR. CHUN:  THAT WOULD BE THAT PARTICULAR PHRASE,

16   YOUR HONOR, THE DISCUSSION OF PENALTIES?

17           THE COURT:  YES.  IN CONTEXT, OF COURSE.  I NEED

18   TO -- I WOULD LIKE THE PARTIES' THOUGHTS ON WHETHER ENOUGH WAS

19   SAID, FROM THE DEFENDANT'S STANDPOINT, THAT IT RENDERS

20   STATEMENTS INVOLUNTARY; IN OTHER WORDS, WHETHER IT WAS

21   SUFFICIENTLY COERCIVE, ALONG THE LINES OF IF YOU ARE NOT GOING

22   TO COOPERATE THEN YOU ARE LOOKING AT MORE THAN 10 YEARS.

23           WHICH WOULD, OF COURSE, IMPLY THAT IF YOU COOPERATE

24   YOU ARE GOING TO GET LESS TIME.  SO THAT'S THE ISSUE I WANTED

25   TO LOOK AT.
```

APRIL 14, 2014

```
1          MR. ELLIS:  YES, YOUR HONOR.  I DIDN'T MEAN TO
2    INTERRUPT THE COURT.  I WOULD ASK THE COURT TO RESERVE RULING
3    UNTIL THE MOTION IN LIMINE DATE.
4          THE COURT:  YES.
5          MR. ELLIS:  THANK YOU, YOUR HONOR.
6          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.
7          MR. ELLIS:  THANK YOU, YOUR HONOR.
8
9                         *   *   *
10         I CERTIFY THAT THE FOREGOING IS A CORRECT
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
11         IN THE ABOVE-ENTITLED MATTER.
12    S/LEEANN PENCE                           5/15/2014
13    LEEANN PENCE, OFFICIAL COURT REPORTER    DATE
14
15
16
17
18
19
20
21
22
23
24
25
```

APRIL 14, 2014

```
                     INDEX OF WITNESSES

                  DIRECT    CROSS    REDIRECT    RECROSS
CHEVIRON, NICHOLAS
   BY MR. ROBINSON   9                 79,88,99
   BY MR. ELLIS               20                    85,96


TORRES, JOSE
   BY MR. CHUN      102                  138
   BY MR. CAHN               118                     141


SNELL, BARRY
   BY MR. CHUN      144
   BY MR. CAHN               152


AIKEN, MICHAEL
   BY MR. ROBINSON  160
   BY MR. ELLIS              167
```

APRIL 14, 2014

```
 1

 2

 3                       INDEX OF EXHIBITS

 4

 5    EXHIBIT    IDENTIFIED RECEIVED

 6

 7      2          19        20

 8      A          22        95

 9      B          22        95

10      C          31

11      J          75        96

12      F          96        96

13      G          96        96

14      H          96        96

15      3          116       117

16      N          120

17

18

19

20

21

22

23

24

25
```

APRIL 14, 2014